Niall P. McCarthy (SBN 160175)
nmccarthy@cpmlegal.com
Elizabeth T. Castillo (SBN 280502)
ecastillo@cpmlegal.com
Melissa Montenegro (SBN 329099)
mmontenegro@cpmlegal.com
Kevin J. Boutin (SBN 334965)
kboutin@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel: (650) 697-6000

Matthew D. Schultz (*pro hac vice*)
mschultz@levinlaw.com
William F. Cash (*pro hac vice*)
bcash@levinlaw.com
Scott Warrick (*pro hac vice*)
swarrick@levinlaw.com
**LEVIN, PAPANTONIO, RAFFERTY,
PROCTOR, BUCHANAN, O'BRIEN,
BARR & MOUGEY, P.A.**
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Tel: (850) 435-7140

R. Frank Melton, II (*pro hac vice*)
melton@newsomelaw.com
C. Richard Newsome (*pro hac vice*)
newsome@newosmelaw.com
William C. Ourand, Jr. (*pro hac vice*)
ourand@newsomelaw.com
**NEWSOME MELTON, PA**
201 S. Orange St., #1500
Orlando, FL 32801
Tel: (407) 280-1433
*Counsel for Plaintiffs & the Proposed Classes*

Courtney L. Davenport (*pro hac vice*)
courtney@thedavenportlawfirm.com
**THE DAVENPORT LAW FIRM, LLC**
18805 Porterfield Way
Germantown, MD 20874
Tel: (703) 901-1660

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

JOHN BRITTON, EVA JACINTO, CELESTE
FELICE, GLENDA DILLON, STEPHEN
GEARHART, PATRICIA JONES, MELISSA
WARREN, NICOLE SENKPEIL, ENIKO GEDO,
JEREMY YOUNG, RHONDA HUNT MUHAMMED,
KRISTEN LUIZ, ANTHONY RASPANTINI,
FRANCINE LEWIS, and MATTHEW KAKOL, on
behalf of themselves and all others similarly situated,

             Plaintiffs,

v.

ARC AUTOMOTIVE, INC.,
AUDI AKTIENGESELLSCHAFT,
AUDI OF AMERICA, LLC,
BAYERISCHE MOTOREN WERKE
AKTIENGESELLSCHAFT,
BMW OF NORTH AMERICA, LLC,
FORD MOTOR COMPANY,
GENERAL MOTORS, LLC,
JOYSON SAFETY SYSTEMS,
DR. ING. H.C. F. PORSCHE AG,
PORSCHE CARS NORTH AMERICA, INC.,
TOYODA GOSEI NORTH AMERICA, INC.,
VOLKSWAGEN AKTIENGESELLSCHAFT, and
VOLKSWAGEN GROUP OF AMERICA, INC.,

             Defendants.

Case No. 3:22-CV-03053-JD

**FIRST AMENDED CLASS
ACTION COMPLAINT**

Jury Trial Demanded

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................1

II. PARTIES, JURISDICTION, AND VENUE ......................................................3

    A.  The Defendants ..........................................................................................3

        1.  The ARC Defendant ......................................................................3
        2.  The Audi Defendants .....................................................................3
        3.  The BMW Defendants ...................................................................3
        4.  The Ford Defendant .......................................................................4
        5.  The GM Defendant .........................................................................4
        6.  The Porsche Defendants .................................................................4
        7.  The Volkswagen Defendants ..........................................................4
        8.  The Joyson Safety Systems Defendant ...........................................4
        9.  The Toyoda Gosei North America Defendant .................................5

    B.  The Plaintiffs .............................................................................................5

    C.  Jurisdiction and Venue ............................................................................10

        1.  Personal Jurisdiction—The ARC Defendant ...............................10
        2.  Personal Jurisdiction—Audi and the Volkswagen Defendants .....12
        3.  Personal Jurisdiction—BMW Defendants ...................................16
        4.  Personal Jurisdiction—Ford Defendant .......................................18
        5.  Personal Jurisdiction—GM Defendant .........................................19
        6.  Personal Jurisdiction—Porsche Defendants .................................20
        7.  Personal Jurisdiction—The Joyson Safety System Defendant ......21
        8.  Personal Jurisdiction—The Toyoda Gosei North America Defendant ....22

III. DEFENDANTS' AGENTS .................................................................................23

IV. AIDING AND ABETTING ...............................................................................24

V.  ADDITIONAL FACTUAL ALLEGATIONS ...................................................24

    A.  The General Design, Assembly, And Placement Of Airbag Inflators. ...........24

    B.  The ARC Inflator Supply Chain. ...........................................................28

    C.  ARC's Stored Gas Hybrid Inflators Contain Dangerous Ammonium Nitrate-Based Propellant. ......................................................................29

    D.  The OEM Defendants Have Long Been Aware of the Dangers of Ammonium Nitrate-Based Propellants. ...................................................36

    E.  ARC's Stored Gas Hybrid Inflators Containing Ammonium Nitrate-Based Propellant Have Ruptured, Causing Injuries And Deaths. ..................41

    F.  NHTSA Has Been Investigating ARC's Toroidal Stored Gas Hybrid Inflators Since 2015. ...............................................................................46

    G.  Defendants' Misconduct And Economic Injury To Plaintiffs And The Class. ........................................................................................................50

VI.   **TOLLING OF THE STATUTE OF LIMITATIONS**..................................................**52**

    A.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims.................................................52

    B.    Fraudulent Concealment Tolled the Statute of Limitations...................................53

VII.  **CLASS ACTION ALLEGATIONS**...............................................................**54**

VIII. **CAUSES OF ACTION: NATIONAL CLASS**..............................................**63**

    National Class Count I:

    Common Law Fraudulent Concealment

    Against All Defendants.......................................................................63

    National Class Count II:

    Violation of the Magnusson-Moss Warranty Act

    Against the OEM Defendants.............................................................68

IX.   **CAUSES OF ACTION: CALIFORNIA SUBCLASS**..................................**70**

    California Subclass Count I:

    Violations of California's Consumer Legal Remedies Act

    Against the ARC, Audi, Ford, and Joyson Safety System Defendants ...........................70

    California Subclass Count II:

    Violation of California's Unfair Competition Law

    Against the ARC, Audi, Ford, and Joyson Safety Systems Defendants..........................78

    California Subclass Count III:

    Breach of Implied Warranty

    Against the Audi and Ford Defendants...............................................83

    California Count IV:

    Violations of the Song-Beverly Act via Breach of Implied Warranty

    Against the Audi and Ford Defendants...............................................84

    California Subclass Count V:

    Breach of Express Warranty

    Against the Audi and Ford Defendants...............................................85

    California Subclass Count VI:

    Violations of the Song-Beverly Act via Breach of Express Warranty

    Against the Audi and Ford Defendants...............................................86

X.    **CAUSES OF ACTION: FLORIDA SUBCLASS**.........................................**88**

    Florida Subclass Count I:

    Violations of Florida's Unfair and Deceptive Trade Practices Act

Against the ARC, Joyson, Toyoda Gosei North America, BMW, GM, Porsche, and Volkswagen Defendants........................................................................88

**XI.     CAUSES OF ACTION: ILLINOIS SUBCLASS ...............................................95**

Illinois Subclass Count I:

Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act Against the ARC, Joyson, Toyoda Gosei North America, BMW, GM, and Volkswagen Defendants........................................................................95

Illinois Subclass Count II:

Violations of the Illinois Uniform Deceptive Trade Practices Act Against the ARC, Joyson, Toyoda Gosei North America, BMW, GM, and Volkswagen Defendants......................................................................101

Illinois Subclass Count III:

Breach of Express Warranty

Against the BMW, GM and Volkswagen Defendants....................................104

Illinois Subclass Count IV:

Breach of Implied Warranty

Against the BMW, GM and Volkswagen Defendants....................................105

**XII.    CAUSES OF ACTION: MASSACHUSETTS SUBCLASS ...........................106**

Massachusetts Subclass Count I:

Violations of Mass. Ch. 93A (Regulation of Business Practices for Consumers' Protection)

Against the ARC, Joyson, and BMW Defendants........................................106

Massachusetts Subclass Count II:

Breach of Express Warranty

Against the BMW Defendants .......................................................................112

Massachusetts Subclass Count III:

Breach of Implied Warranty

Against the BMW Defendants .......................................................................113

**XIII.   CAUSES OF ACTION: NEW JERSEY SUBCLASS..................................115**

New Jersey Subclass Count I:

Violations of the New Jersey Consumer Fraud Act

Against the ARC, Joyson, and Ford Defendants .........................................115

New Jersey Subclass Count II:

Breach of Express Warranty

Against Ford..........................................................................................................121

New Jersey Subclass Count III:

Breach of Implied Warranty

Against Ford..........................................................................................................122

**XIV.  CAUSES OF ACTION: NEW YORK SUBCLASS ...................................................123**

New York Subclass Count I:

Violations of the New York General Business Law

Against the ARC, Joyson, Ford, and Volkswagen Defendants ......................................123

New York Subclass Count II:

Breach of Express Warranty

Against the Ford and Volkswagen Defendants..............................................................130

New York Subclass Count III:

Breach of Implied Warranty

Against the Ford and Volkswagen Defendants..............................................................131

**XV.  PRAYER FOR RELIEF** ...............................................................................................**132**

**XVI.  DEMAND FOR JURY TRIAL** .................................................................................**1333**

I.    **INTRODUCTION**

1.      This action concerns defective toroidal stored gas hybrid airbag inflators manufactured by Defendant ARC Automotive, Inc. ("ARC"), which are installed in tens of millions of airbag assembly modules utilized in vehicles manufactured by certain vehicle manufacturers, including Audi, BMW, Ford, General Motors ("GM"), Porsche, and Volkswagen.

2.      At this early stage, Plaintiffs cannot determine with certainty every vehicle manufacturer by make, model, and model year equipped with defective ARC toroidal stored gas hybrid inflators. The vehicles that are the subject of this complaint contain either a driver or passenger toroidal stored gas hybrid inflator manufactured by ARC from 2001 to present that uses ammonium nitrate in its propellant ("Class Vehicles").

3.      All ARC inflators at issue in this action are substantially similar and share a common, uniform defect: the use of ammonium nitrate, a volatile and unstable chemical, as the propellant, combined with other faulty design decisions that compounded the dangers posed by the volatility of the phase-stabilized ammonium nitrate ("PSAN"), including the failure to incorporate pressure relief valves and using friction welding to secure the inflator halves without ensuring all metal flash would be removed (the "Inflator Defect"). It is well known in the airbag industry—and ARC itself has acknowledged—that ammonium nitrate is a dangerous propellant chemical that can over-pressurize during airbag deployment, sometimes resulting in violent explosions of the metal inflator canister, which expels shrapnel into the occupant compartment. The Inflator Defect is present in ARC's toroidal stored gas hybrid inflators (the "Defective Inflators").

4.      There have been at least seven ruptures of ARC's stored gas hybrid inflators in vehicles, including six driver inflators and one passenger inflator. Two of those ruptures resulted in driver fatalities. Additionally, at least two passenger inflators have ruptured during ARC's internal testing.

5.      To date, GM has issued three recalls related to ruptures of ARC stored gas hybrid driver inflators, including one rupture that caused a driver fatality and two ruptures that caused driver injuries. GM was aware, or should have been aware, that the Inflator Defect caused the ruptures, and that millions of its vehicles contain the Defective Inflators. However, rather than

FIRST AMENDED CLASS ACTION COMPLAINT; Case No. 3:22-CV-03053-JD          1

recalling all Defective Inflators, GM recalled only a small subset of its vehicles containing inflators manufactured in the same lot as the ruptured inflators.

6.      Similarly, Volkswagen has issued a limited recall following a rupture. BMW and Ford have each issued one recall related to a rupture of an ARC driver inflator during testing. BMW and Ford were aware, or should have been aware, that the Inflator Defect caused the ruptures, and that tens of thousands of their vehicles contain the Defective Inflators. However, rather than recalling all Defective Inflators, Volkswagen, BMW, and Ford recalled only a small subset of its vehicles containing inflators manufactured in the same lot as the ruptured inflator.

7.      The National Highway Traffic Safety Administration ("NHTSA") is currently investigating ARC's toroidal stored gas hybrid inflators. ARC is aware that its Defective Inflators are installed in millions of vehicles. However, ARC has concealed the defect from the public; namely, that its inflators contain a propellant made from volatile and unstable ammonium nitrate. ARC has not recalled any of the Defective Inflators. The airbag module manufacturers are also aware that ARC's inflators contain a propellant made from volatile and unstable ammonium nitrate but have concealed the defect from the public.

8.      Plaintiffs and the Class were unaware when they purchased or leased their vehicles that the vehicles contain the Defective Inflators, which not only may fail in their purpose to protect the occupants during a crash but may actually cause significant injury or death in crashes that otherwise would have resulted in minor injuries.[1]

9.      As a result of Defendants' misconduct and fraudulent concealment, Plaintiffs and the Class either purchased or leased vehicles they otherwise would not have, or paid more to own or lease their vehicles than they would have paid, had the Inflator Defect been disclosed at the time of purchase or lease. Plaintiffs and the Class also have suffered economic loss because the Defective Inflators significantly diminish the value of the vehicles in which they were installed. Plaintiffs and the Class did not receive the benefit of their bargain, as they purchased and leased vehicles believing they were safe and suitable for use on the roadway and met ordinary and reasonable

---

[1] Throughout this Complaint, Plaintiffs use "the Class" to refer to members of the proposed national class and all subclasses.

1  consumer expectations regarding safe and reliable operation. Through this action, Plaintiffs seek to

2  ensure that Defendants do not continue to reap economic gain at the expense and safety of

3  unsuspecting consumers.

4  **II.    PARTIES, JURISDICTION, AND VENUE**

5       **A.    The Defendants**

6       10.    When Plaintiffs refer to a corporate family or companies by a single name in the

7  Complaint (*e.g.*, VOLKSWAGEN), they are alleging that one or more employees or agents of

8  entities within that corporate family engaged in misconduct on behalf of every company in that

9  family. The individual participants in the misconduct did not always distinguish between the entities

10  within a corporate family (*e.g.*, VOLKSWAGEN AKTIENGESELLSCHAFT versus

11  VOLKSWAGEN GROUP OF AMERICA, INC.). As a result, those agents represented the entire

12  corporate family with respect to such conduct.

13       **1.    The ARC Defendant**

14       11.    Defendant ARC AUTOMOTIVE, INC. ("ARC") is incorporated under the laws of

15  Delaware and maintains its principal place of business in Tennessee.

16       **2.    The Audi Defendants**

17       12.    Defendant AUDI AKTIENGESELLSCHAFT ("Audi AG" or "Audi") is

18  incorporated under the laws of Germany and maintains its principal place of business in Germany.

19       13.    Defendant AUDI OF AMERICA, LLC, was formed under the laws of Delaware and

20  maintains its principal place of business in Virginia.

21       14.    Defendants AUDI AG and AUDI OF AMERICA, LLC, will be collectively known

22  as the "Audi Defendants."

23       **3.    The BMW Defendants**

24       15.    Defendant BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT

25  ("BMW AG" or "BMW") is incorporated under the laws of Germany and maintains its principal

26  place of business in Germany.

27       16.    Defendant BMW OF NORTH AMERICA, LLC, was formed under the laws of

28  Delaware and maintains its principal place of business in New Jersey.

1    17.    Defendants BMW AG and BMW OF NORTH AMERICA, LLC, will be collectively

2  referred to collectively as the "BMW Defendants."

3          **4.    The Ford Defendant**

4    18.    Defendant FORD MOTOR CO. ("Ford") is incorporated under the laws of Delaware

5  and maintains its principal place of business in Michigan.

6          **5.    The GM Defendant**

7    19.    Defendant GENERAL MOTORS, LLC is incorporated under the laws of Delaware

8  and maintains its principal place of business in Michigan.

9          **6.    The Porsche Defendants**

10   20.    Defendant DR. ING. H.C. F. PORSCHE AG ("Porsche AG") is incorporated under

11 the laws of Germany and maintains its principal place of business in Germany.

12   21.    Defendant PORSCHE CARS NORTH AMERICA, INC. is incorporated under the

13 laws of Delaware and maintains its principal place of business in Georgia.

14   22.    Defendants PORSCHE AG and PORSCHE CARS NORTH AMERICA, INC. will

15 be referred to collectively as the "Porsche Defendants."

16         **7.    The Volkswagen Defendants**

17   23.    Defendant VOLKSWAGEN AKTIENGESELLSCHAFT ("Volkswagen AG") is

18 incorporated under the laws of Germany and maintains its principal place of business in Germany.

19   24.    Defendant VOLKSWAGEN GROUP OF AMERICA, INC. is incorporated under the

20 laws of New Jersey and maintains its principal place of business in Virginia.

21   25.    Defendants VOLKSWAGEN AG and VOLKSWAGEN GROUP OF AMERICA,

22 INC. will be collectively referred to as the "Volkswagen Defendants."

23   26.    Collectively, the Audi Defendants, the BMW Defendants, Ford, GM, the Porsche

24 Defendants, and the Volkswagen Defendants will be referred to as the Original Equipment

25 Manufacturer Defendants ("OEM Defendants").

26         **8.    The Joyson Safety Systems Defendant**

27   27.    Defendant JOYSON SAFETY SYSTEMS ("Joyson") in incorporated under the laws

28 of Delaware and maintains its principal place of business in Michigan.

9.      **The Toyoda Gosei North America Defendant**

28.      Defendant TOYODA GOSEI NORTH AMERICA CORPORATION ("Toyoda Gosei") is incorporated under the laws of Michigan and has its principal place of business in Michigan.

29.      Collectively, the Joyson Safety Systems Defendant and the Toyoda Gosei North America Defendant will be referred to as the "Airbag Module Defendants."

B.      **The Plaintiffs**

30.      Plaintiff John Britton resides in Burlingame, California. He purchased a 2016 Ford F-150 from The Ford Store Morgan Hill in Morgan Hill, California, on July 22, 2016, and a 2017 Ford F-150 from Bill Brandt Ford in Brentwood, California, on August 26, 2017. He had a reasonable expectation that the vehicles had properly designed airbags that did not have a dangerous defect that could cause them to rupture and eject metal shrapnel into his face at the time he purchased the vehicles. The defect would have been material to his decision to purchase the vehicles. Had the defect been disclosed, he either would not have purchased the vehicles or would have paid less for the vehicles given that the defect constitutes a major safety hazard. As a result, he did not receive the benefit of the bargain.

31.      Plaintiff Eva Jacinto resides in Los Angeles, California. She purchased a 2016 Audi A3 from Desert European Motorcars in Rancho Mirage, California on June 26, 2018. She had a reasonable expectation that the vehicle had a properly designed airbag that did not have a dangerous defect that could cause it to rupture and eject metal shrapnel into her face at the time she purchased the vehicle. The defect would have been material to her decision to purchase the vehicle. Had the defect been disclosed, she either would not have purchased the vehicle or would have paid less for the vehicle given that the defect constitutes a major safety hazard. As a result, she did not receive the benefit of her bargain.

32.      Plaintiff Celeste Felice resides in Gibsonton, Florida. She purchased a 2016 GMC Acadia from Brandon Mitsubishi in Tampa, Florida, on or around December 21, 2021. She had a reasonable expectation that the vehicle had a properly designed airbag that did not have a dangerous defect that could cause it to rupture and eject metal shrapnel into her face at the time she purchased

the vehicle. The defect would have been material to her decision to purchase the vehicle. Had the defect been disclosed, she either would not have purchased the vehicle or would have paid less for the vehicle given that the defect constitutes a major safety hazard. As a result, she did not receive the benefit of her bargain.

33.     Plaintiff Glenda Dillon resides in Jacksonville Beach, Florida. She purchased a 2017 BMW X5 from Tom Bush BMW Jacksonville in Jacksonville, Florida, on April 14, 2017. She had a reasonable expectation that the vehicle had properly designed airbags that did not have a dangerous defect that could cause them to rupture and eject metal shrapnel into her face at the time she purchased the vehicles. The defect would have been material to her decision to purchase the vehicles. Had the defect been disclosed, she either would not have purchased the vehicles or would have paid less for the vehicles given that the defect constitutes a major safety hazard. As a result, she did not receive the benefit of her bargain.

34.     Plaintiff Stephen Gearhart resides in Fort Myers Beach, Florida. He purchased a 2017 Porsche Macan GTS from Porsche of Fort Myers in Fort Myers, Florida, on December 11, 2019. He had a reasonable expectation that the vehicle had a properly designed airbag that did not have a dangerous defect that could cause it to rupture and eject metal shrapnel into his face at the time he purchased the vehicle. The defect would have been material to his decision to purchase the vehicle. Had the defect been disclosed, he either would not have purchased the vehicle or would have paid less for the vehicle given that the defect constitutes a major safety hazard. As a result, he did not receive the benefit of his bargain.

35.     Plaintiff Patricia Jones resides in Brandon, Florida. She purchased a 2019 Volkswagen GTI from Volkswagen Brandon in Tampa, Florida, on February 16, 2019. She had a reasonable expectation that the vehicle had a properly designed airbag that did not have a dangerous defect that could cause it to rupture and eject metal shrapnel into her face at the time she purchased the vehicle. The defect would have been material to her decision to purchase the vehicle. Had the defect been disclosed, she either would not have purchased the vehicle or would have paid less for the vehicle given that the defect constitutes a major safety hazard. As a result, she did not receive the benefit of her bargain.

1    36.    Plaintiff Melissa Warren resides in Palos Hills, Illinois. She purchased a 2017

2   Chevrolet Traverse from Advantage Chevrolet in Hodgkins, Illinois, on November 16, 2016. She

3   had a reasonable expectation that the vehicle had a properly designed airbag that did not have a

4   dangerous defect that could cause it to rupture and eject metal shrapnel into her face at the time she

5   purchased the vehicle. The defect would have been material to her decision to purchase the vehicle.

6   Had the defect been disclosed, she either would not have purchased the vehicle or would have paid

7   less for the vehicle given that the defect constitutes a major safety hazard. As a result, she did not

8   receive the benefit of her bargain.

9    37.    Plaintiff Nicole Senkpeil resides in Orland Park, Illinois. She purchased a 2014

10  Chevrolet Traverse from Apple Chevrolet in Tinley Park, Illinois, on June 19, 2017. She had a

11  reasonable expectation that the vehicle had a properly designed airbag that did not have a dangerous

12  defect that could cause it to rupture and eject metal shrapnel into her face at the time she purchased

13  the vehicle. The defect would have been material to her decision to purchase the vehicle. Had the

14  defect been disclosed, she either would not have purchased the vehicle or would have paid less for

15  the vehicle given that the defect constitutes a major safety hazard. As a result, she did not receive

16  the benefit of her bargain.

17   38.    Plaintiff Eniko Gedo resides in Bensenville, Illinois. She purchased a 2017

18  Volkswagen Golf from Larry Roesch Volkswagen of Bensenville in Bensenville, Illinois, on

19  October 28, 2017. She had a reasonable expectation that the vehicle had a properly designed airbag

20  that did not have a dangerous defect that could cause it to rupture and eject metal shrapnel into her

21  face at the time she purchased the vehicle. The defect would have been material to her decision to

22  purchase the vehicle. Had the defect been disclosed, she either would not have purchased the

23  vehicle or would have paid less for the vehicle given that the defect constitutes a major safety

24  hazard. As a result, she did not receive the benefit of her bargain.

25   39.    Plaintiff Jeremy Young resides in Buffalo Grove, Illinois. He purchased a 2019

26  Volkswagen Jetta from Castle Volkswagen of Schaumburg in Schaumburg, Illinois, on April 19,

27  2021. He had a reasonable expectation that the vehicle had a properly designed airbag that did not

28  have a dangerous defect that could cause it to rupture and eject metal shrapnel into his face at the

1   time he purchased the vehicle. The defect would have been material to his decision to purchase the

2   vehicle. Had the defect been disclosed, he either would not have purchased the vehicle or would

3   have paid less for the vehicle given that the defect constitutes a major safety hazard. As a result, he

4   did not receive the benefit of his bargain.

5         40.     Plaintiff Rhonda Hunt Muhammed resides in Evanston, Illinois. She purchased a

6   2019 BMW X5 from Fields BMW Northfield in Northfield, Illinois, on July 19, 2021. She had a

7   reasonable expectation that the vehicle had a properly designed airbag that did not have a dangerous

8   defect that could cause it to rupture and eject metal shrapnel into her face at the time she purchased

9   the vehicle. The defect would have been material to her decision to purchase the vehicle. Had the

10  defect been disclosed, she either would not have purchased the vehicle or would have paid less for

11  the vehicle given that the defect constitutes a major safety hazard. As a result, she did not receive

12  the benefit of her bargain.

13        41.     Plaintiff Kristen Luiz resides in Rutland, Massachusetts. She purchased a 2015

14  BMW X5 from Wagner BMW of Shrewsbury in Shrewsbury, Massachusetts, on August 29, 2017.

15  She had a reasonable expectation that the vehicle had a properly designed airbag that did not have a

16  dangerous defect that could cause it to rupture and eject metal shrapnel into her face at the time she

17  purchased the vehicle. The defect would have been material to her decision to purchase the vehicle.

18  Had the defect been disclosed, she either would not have purchased the vehicle or would have paid

19  less for the vehicle given that the defect constitutes a major safety hazard. As a result, she did not

20  receive the benefit of her bargain.

21        42.     Plaintiff Anthony Raspantini resides in Brick, New Jersey. He purchased a 2015

22  Ford F-150 from All American Ford in Point Pleasant, New Jersey, on May 5, 2018. He had a

23  reasonable expectation that the vehicle had a properly designed airbag that did not have a dangerous

24  defect that could cause it to rupture and eject metal shrapnel into his face at the time he purchased

25  the vehicle. The defect would have been material to his decision to purchase the vehicle. Had the

26  defect been disclosed, he either would not have purchased the vehicle or would have paid less for

27  the vehicle given that the defect constitutes a major safety hazard. As a result, he did not receive the

28  benefit of his bargain.

43.     Plaintiff Francine Lewis resides in Deer Park, New York. She leased a 2019 Volkswagen Jetta from Smithtown Volkswagen in Saint James, New York on November 9, 2019. She had a reasonable expectation that the vehicle had a properly designed airbag that did not have a dangerous defect that could cause it to rupture and eject metal shrapnel into her face at the time she leased the vehicle. The defect would have been material to her decision to lease the vehicle. Had the defect been disclosed, she either would not have leased the vehicle or would have paid less for the vehicle given that the defect constitutes a major safety hazard. As a result, she did not receive the benefit of her bargain.

44.     Plaintiff Matthew Kakol resides in Massapequa Park, New York. He purchased a 2017 Ford Mustang from Levittown Ford in Levittown, New York, on August 7, 2017. He had a reasonable expectation that the vehicle had a properly designed airbag that did not have a dangerous defect that could cause it to rupture and eject metal shrapnel into his face at the time he purchased the vehicle. The defect would have been material to his decision to purchase the vehicle. Had the defect been disclosed, he either would not have purchased the vehicle or would have paid less for the vehicle given that the defect constitutes a major safety hazard. As a result, he did not receive the benefit of his bargain.

45.     The following chart summarizes the Plaintiffs by the state in which they are domiciled, which also is the state in which they purchased or leased their Class Vehicle:

| State | Plaintiff Name | Model Year | Make/Model |
|---|---|---|---|
| California | John Britton | 2016<br>2017 | Ford F-150<br>Ford F-150 |
| California | Eva Jacinto | 2016 | Audi A3 |
| Florida | Celeste Felice | 2016 | GMC Acadia |
| Florida | Glenda Dillon | 2017 | BMW X5 |
| Florida | Stephen Gearhart | 2017 | Porsche Macan GTS |
| Florida | Patricia Jones | 2019 | Volkswagen GTI |
| Illinois | Melissa Warren | 2017 | Chevrolet Traverse |
| Illinois | Nicole Senkpeil | 2014 | Chevrolet Traverse |
| Illinois | Eniko Gedo | 2017 | Volkswagen Golf |
| Illinois | Jeremy Young | 2019 | Volkswagen Jetta |
| Illinois | Rhonda Hunt Muhammed | 2019 | BMW X5 |
| Massachusetts | Kristen Luiz | 2015 | BMW X5 |
| New Jersey | Anthony Raspantini | 2015 | Ford F-150 |
| New York | Francine Lewis | 2019 | Volkswagen Jetta |
| New York | Matthew Kakol | 2017 | Ford Mustang |

C. **Jurisdiction and Venue.**

46.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act because there is minimal diversity and the matter in controversy exceed the sum or value of $5,000,000.00, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2)(A). No cause of action stated here has been assigned or otherwise given to any other court or tribunal.

47.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). Each Defendant does substantial business in California and within this District, many are registered to do business and is doing business within California, and each maintains requisite minimum contacts with California.

48.     Furthermore, venue is proper in this District because, like many other class members, significant and material aspects of the transactions relating to Plaintiffs' purchase of their Class Vehicles occurred within and were otherwise connected to this District.

49.     ARC, the Airbag Module Defendants, and the OEM Defendants distribute the vehicles equipped with the Defective Inflators in this District and receive substantial compensation and profits from the sale, service, and use of vehicles equipped with the Defective Inflators in this District, and each Defendant's misconduct occurred within this District so as to subject each to this Court's personal jurisdiction.

1.     **Personal Jurisdiction—The ARC Defendant**

50.     This Court has specific personal jurisdiction over ARC, which receives substantial compensation and profits from the sale of the Defective Inflators intended for vehicles sold in this District and has and continues to conceal and make material omissions in this District so as to subject it to personal jurisdiction in this District.

51.     ARC, under its predecessor name Atlantic Research Corporation, registered as an active corporation in California in May 1968 and remained active until December 2010. During that time, ARC designed and developed the Defective Inflators included in the Class Vehicles. The inflators manufactured and sold after that time to be used in vehicles sold in California utilized the same technology and propellant compound.

52.     ARC's factories in Knoxville, Tennessee; Morgantown, Kentucky; and McAllen, Texas, have consigned more than 2,500 shipments that arrived through California ports. These shipments contained airbag inflator components, including initiators (which ignite the propellant), metal parts, and propellant. As the consignee, ARC takes possession of the goods at the port of entry and arranges for their transport to the ARC facilities.

53.     ARC, through its overseas facilities, particularly ARC Qinghua Xian in China, have imported more than 100 shipments containing "safety devices," *i.e.*, airbag inflators, through California ports. Those shipments were consigned predominately by Key Safety Systems, which manufactured many of the airbag assembly modules in the Class Vehicles.

54.     ARC maintains lucrative and profitable relationships with the Airbag Module Defendants and all of the OEM Defendants, knowing that each of those OEMs maintains a vast dealership and distribution network within California and each Plaintiff's jurisdiction. ARC supplies Defective Inflators and other automotive component parts with the intent and purpose that they be installed and sold in Class Vehicles throughout the nation, including in California, knowing that California is the most heavily populated state in the country and that ARC's business could not survive if OEMs did not purchase and install ARC automotive components in their vehicles.

55.     ARC's intent and expectation that its automotive components, including the Defective Inflators, would be sold, serviced, and used in California is evidenced by its inclusion of "California Proposition 65" warnings with its product information, including on its "Product Safety Sheet" for hybrid inflators.[2] Given that California Proposition 65 applies only within California, and that the disclaimers required by the statute are intended to be conveyed for the benefit and protection of California residents and consumers, the addition of that disclaimer reveals that ARC knew and expected its products would be sold, serviced, and used within California—and that, consequently, California residents and consumers are a necessary part of ARC's business model and will be subject to the risk of injury and death should ARC's products, including its Defective

---

[2] *See, e.g.,* http://www.arcautomotive.com/@ssets/doc/Safety%20Data%20Sheet%20Inflator%20 Generic%20Nov%202017.pdf (last accessed May 17, 2022).

Inflators, fail to perform their intended purpose or rupture and eject metal shrapnel, as already has occurred within California.

56.     Moreover, as a result of its business relationships with other companies doing extensive business throughout California, ARC is routinely and regularly required to inspect, investigate, and otherwise assist in the analysis and repair of ARC automotive components and parts, such as the Defective Inflators, which were used and allegedly failed within California. ARC's involvement in this regard occurs as part of the warranty claims process, root cause investigations conducted with airbag module manufacturers and OEMs, actions taken to ensure compliance with safety regulations, and participation in investigations involving ruptures in automobiles equipped with ARC Defective Inflators within California.

57.     When the OEM Defendants have issued a recall of the ARC inflators containing the Inflator Defect, they have instructed the technicians to return the original ARC airbag to ARC's Knoxville headquarters, rather than to the OEMs. This means that ARC has likely received, or will in the future, Defective Inflators removed from vehicles in California and returned to ARC by technicians in California.

58.     Plaintiffs are aware of at least one rupture of a defective ARC passenger-side inflator that occurred in a 2016 Audi A3 vehicle in Westminster, California. ARC is also aware of this rupture.

## 2.     Personal Jurisdiction—Audi and the Volkswagen Defendants

59.     The Volkswagen Defendants submitted themselves to jurisdiction in this Court through their pervasive marketing and purposeful cultivation of profitable relationships with customers, dealerships, service facilities, and other individuals and entities throughout California and the rest of the United States.

60.     The Volkswagen Defendants receive substantial compensation and profits from the sale of vehicles containing the defective ammonium nitrate airbag inflators in this District, and have concealed and continue to conceal and make material omissions in this District so as to subject them to personal jurisdiction in this Court.

61.     In September 2020, Volkswagen AG voted to purchase the remaining 0.36 shares of Audi AG stock that it did not yet own, making Audi AG a wholly owned subsidiary of Volkswagen AG. In the United States, Audi of America, Inc., is registered as a fictitious name for Volkswagen Group of America, Inc. In litigation, Audi of America, Inc., has recognized that it is not an organized company but rather, "is a d/b/a of Volkswagen Group of America, Inc." Audi of America, LLC, is a subsidiary of Volkswagen AG and was formed in Delaware and is located near Volkswagen Group of America's headquarters in Herndon, Virginia.

62.     Volkswagen AG and Audi AG design and develop Volkswagen and Audi brand vehicles with input from Volkswagen Group of America. When vehicles are manufactured overseas but are intended for sale in the United States, Volkswagen AG and Audi AG ensure, through design and compliance testing, that the vehicles comply with U.S. regulations and safety standards, including emissions standards set by the California Air Resources Board.

63.     Collectively, Volkswagen Group operates 120 production plants in almost 30 countries.[3] Eight of these facilities are located in California, including an Electronics Research Lab & Design Center in Belmont, California; a Technical Center in Oxnard, California; and a Volkswagen/Audi/Porsche Training Center in Eastvale, California.[4] The Volkswagen/Audi/VCI Western Region is headquartered in Woodland Hills, California.[5]

64.     Volkswagen AG maintains the U.S. trademarks for multiple Volkswagen-related words or statements, including the name Volkswagen and the name VW.[6] [7] Audi AG maintains the trademark over the name Audi and the four interconnected rings that form its symbol.[8]

65.     Volkswagen AG ships all vehicles made overseas, including Plaintiff Eva Jacinto's 2016 Audi A3, which was manufactured in Germany, to the United States, including through California and each Plaintiff's jurisdiction, for distribution by the United States entities.

---

[3] Volkswagen AG, Group Portrait & Production Plants.
[4] Volkswagen Group of America, Locations, U.S. Facilities.
[5] Id.
[6] U.S. Trademark No. 75598249, Volkswagen, filed Dec. 2, 1998, registered Apr. 27, 2004.
[7] U.S. Trademark No. 79001133, VW, filed Dec. 23, 2003, registered Sept. 6, 2005.
[8] U.S. Trademark No. 75090951, Audi, filed Apr. 4, 1996, registered July 29, 1997.

66.     Volkswagen Group of America, Inc., has been registered as an active business in California since June 1956, when it registered under its previous name, Volkswagen of America, Inc. According to Volkswagen Group of America, Inc., the entity is a wholly owned subsidiary of Volkswagen AG and "houses the U.S. operations of a worldwide family of distinguished and exciting brands including Audi, Bentley, Bugatti, Lamborghini and Volkswagen, as well as VW Credit, Inc. . . . Founded in 1955, VWGoA's headquarters are in Herndon, Va.; the company has approximately 6,000 employees in the United States and sells its vehicles through a network of approximately 1,000 independent dealers."[9]

67.     Volkswagen Group of America's website contains a "Find a Dealer" function, which identifies at least 62 Volkswagen-authorized dealerships in California, as depicted below:[10]



68.     Several of these authorized dealerships are located in the proximity of San Francisco, California, as depicted below:[11]

_____

[9] Volkswagen Group of America, Inc., About Us.
[10] Volkswagen Group of America, Inc., Find a Dealer – California, USA.
[11] Volkswagen Group of America, Inc., Find a Dealer – San Francisco, California, USA.



69.     Audi of America is the importer and distributor of Audi brand vehicles sold in the

United States. Volkswagen Group of America, through Audi of America, has also authorized several

Audi-brand dealerships within 50 miles of San Francisco:[12]



70.     Plaintiff Eva Jacinto bought her 2016 Audi A3 from authorized dealer Desert Europa

Motorcars in Rancho Mirage, California.

---

[12] Audi of America. Find a Dealer – San Francisco, California.

1

### 3.    Personal Jurisdiction—BMW Defendants

2       71.    The BMW Defendants submitted themselves to jurisdiction in this Court through

3    their pervasive marketing and purposeful cultivation of profitable relationships with customers,

4    dealerships, service facilities, and other individuals and entities throughout California and the rest

5    of the United States. BMW also maintains offices and operations in California.

6       72.    The BMW Defendants receive substantial compensation and profits from the sale of

7    vehicles containing the defective ammonium nitrate airbag inflators in this District, and have

8    concealed and continue to conceal and make material omissions in this District so as to subject

9    them to personal jurisdiction in this Court.

10      73.    BMW of North America, LLC, is a wholly owned subsidiary of BMW AG. BMW

11   AG designs and develops BMW brand vehicles with input from BMW of North America, LLC.

12   When vehicles are manufactured overseas but are intended for sale in the United States, BMW AG

13   and BMW of North America, LLC, ensure, through design and compliance testing, that the vehicles

14   comply with U.S. regulations and safety standards, including emissions standards set by the

15   California Air Resources Board.

16      74.    BMW AG maintains the U.S. trademarks for multiple BMW-related logos, words or

17   marketing phrases, including the name BMW and the phrase My BMW.[13] [14]

18      75.    BMW AG ships all vehicles made overseas, including Plaintiffs Glenda Dillon's,

19   Rhonda Hunt Muhammed's, and Kristen Luiz's vehicles, to the United States, including through

20   California ports, and each Plaintiff's jurisdiction for distribution by BMW of North America, LLC.

21      76.    BMW of North America, LLC, has been registered as an active business in

22   California since January 2001. BMW of North America, LLC, is responsible for importing,

23   distributing, marketing, sales, and financial services for vehicles sold in North America. The BMW

24   Group, which collectively includes BMW AG and BMW of North America, LLC, maintains several

25   facilities in California, including the BMW Group Engineering and Emission Test Center in

26   Oxnard, California, which opened in 2000 and is focused on "functional and endurance testing of

27

28   [13] U.S. Trademark No. 87383973, BMW, filed Mar. 25, 2017, registered Nov. 14, 2017.
     [14] U.S. Trademark No. 88142424, My BMW, filed Oct. 4, 2018, registered Jan. 14, 2020.

whole vehicles and vehicle systems under typical U.S. and extreme environmental conditions (heat and cold);" the BMW Technology Office USA in Mountain View, California, which "ensure[s] that BMW remains at the forefront of global trends and technology;" the Designworks studio in Newbury Park, California, one of three global "design innovation" centers BMW operates; and the Regional Parts Distribution center in Redlands, California, which serves "the Southwestern Region of the BMW Group dealer network supplying everything dealers need to service their customers."[15] [16] [17] [18] Additionally, BMW of North America, LLC, operates a BMW Performance Center in Thermal, California, with a track available for drivers to hone their driving skills, including through a BMW driving school.[19]

77.     BMW of North America, LLC's website contains a "Choose Your Local BMW Center" authorized-dealer locator, which identifies multiple authorized dealers in the Northern California region, as depicted below:[20]



---

[15] BMW Careers, BMW Group Engineering and Emission Test Center at Oxnard.
[16] BMW Careers, BMW Technology Office USA – Silicon Valley.
[17] BMW Group Designworks – Los Angeles.
[18] "BMW Group Opens New Regional Parts Distribution Center in Redlands, California," Press Release, Jan. 23, 2015.
[19] BMW Driving Schools, The BMW Performance Center.
[20] BMW of North America, Choose Your Local BMW Center – San Francisco.

### 4.      Personal Jurisdiction—Ford Defendant

78.      Ford submitted itself to jurisdiction in this Court through its pervasive marketing and purposeful cultivation of profitable relationships with customers, dealerships, service facilities, and other individuals and entities throughout California and the rest of the United States. Ford also maintains offices and operations in California.

79.      Ford receives substantial compensation and profits from the sale of vehicles containing the defective ammonium nitrate airbag inflators in this District, and has and continues to conceal and make material omissions in this District so as to subject it to personal jurisdiction in this Court.

80.      Ford has been registered as an active company in California since 1920. In its forms submitted to the California Secretary of State, Ford represents that its California office is located in Palo Alto. Ford opened its first office in Silicon Valley in 2012 and in 2015, built the Ford's Research and Innovation Center Palo Alto to "accelerate its development of technologies and experiments in connectivity, mobility, autonomous vehicles, customer experience and big data."[21]

81.      Since 1998, Ford has had an office in Irvine that served as the headquarters for its Lincoln-Mercury brand and its premier brands and is now helping to develop Ford's growing line of electric vehicles. Ford has also maintained an office in San Diego since at least 2000, when it became the headquarters for Ford's environmental brand of vehicles. Ford's website advertises job openings at the Palo Alto, Irvine, and San Diego offices.

82.      Thus, Ford not only has authorized dealerships in California, but has also maintained at least three executive offices that contribute to design and development of Ford's vehicles during the time the Class Vehicles were designed, developed, tested, and manufactured.

83.      According to Ford's Dealer Directory, there are 149 authorized Ford dealerships in California.[22] Several authorized dealers are located in the San Francisco area.[23]

---

[21] Ford Motor Co., Press Release, "Ford Opens New Silicon Valley Research Center to Drive Innovation in Connectivity, Mobility, Autonomous Vehicles," Jan. 22, 2015.
[22] Ford, Dealer Directory – California.
[23] Ford, Locate a Ford Dealer – San Francisco.

1

### 5.   Personal Jurisdiction—GM Defendant

2       84.     GM has submitted itself to jurisdiction in this Court through its pervasive marketing

3  and purposeful cultivation of profitable relationships with customers, dealerships, service facilities,

4  and other individuals and entities throughout California and the rest of the United States.

5       85.     GM receives substantial compensation and profits from the sale of vehicles

6  containing the Defective Inflators in this District, and has and continues to conceal and make

7  material omissions in this District so as to subject itself to personal jurisdiction in this Court.

8       86.     GM designs, develops, manufactures, and distributes Chevrolet, Buick, GMC, and

9  Cadillac brand vehicles in the United States, including throughout California and each Plaintiff's

10  jurisdiction. GM has been registered as active to conduct business in California since October 2009,

11  but it has had facilities in California for decades.

12      87.     Currently, GM has 14 facilities, 203 authorized dealers, almost 500 employees, and

13  more than 300 suppliers located in California alone.[24] Among the GM facilities in California are the

14  North Hollywood Design Center and the new Advanced Design Center in Pasadena, which will

15  replace the North Hollywood Center later this year.[25] In its announcement about the new Pasadena

16  Advanced Design Center, GM stated, "The investment also signals GM's long-term commitment to

17  maintain a physical presence in one of North America's largest hubs for multidisciplinary design

18  and cutting-edge innovation."[26] Furthermore, the Rancho Cucamonga Parts Distribution Center is

19  located in California.[27] From 1954 through 1999, the company operated a GM Training Center "as a

20  state-of-the-art training facility for GM mechanics and salesmen" in Burbank.[28] In 2011, GM

21  opened a new training center in Glendale.[29]

22

23

24

---

25  [24] General Motors, LLC, General Motors in California.

26  [25] "General Motors Invests in New Advanced Design and Technology Campus in Southern California," Press Release, July 13, 2021.

27  [26] *Id.*
[27] General Motors, LLC, GM in the U.S.

28  [28] Los Angeles Conservancy, General Motors Training Center.
[29] Manage360 Constructors, General Motors Training Center, Glendale, CA.

FIRST AMENDED CLASS ACTION COMPLAINT; Case No. 3:22-CV-03053-JD                    19

1

###### 6.     Personal Jurisdiction—Porsche Defendants

2        88.     Porsche submitted itself to jurisdiction in this Court through its pervasive marketing

3   and purposeful cultivation of profitable relationships with customers, dealerships, service facilities,

4   and other individuals and entities throughout California and the rest of the United States. Porsche

5   also maintains offices and operations in California.

6        89.     Porsche receives substantial compensation and profits from the sale of vehicles

7   containing the defective ammonium nitrate airbag inflators in this District, and has and continues to

8   conceal and make material omissions in this District so as to subject it to personal jurisdiction in

9   this Court.

10        90.     Volkswagen AG wholly owns Porsche Holding Stuttgart GmbH, which wholly owns

11   Porsche AG's capital, making Volkswagen AG "the ultimate parent company of the Porsche AG

12   Group."[30] Porsche AG, based in Stuttgart, Germany, designs, develops, tests, and manufactures

13   Porsche brand vehicles sold in the United States. Porsche AG owns the trademarks to Porsche,

14   Porsche Design, and many other Porsche-related logos and marks for Porsche products sold in the

15   United States.

16        91.     Porsche AG wholly owns Porsche Cars North America, Inc., which is based in

17   Atlanta, Georgia. Porsche Cars North America is the exclusive importer and distributor of Porsche

18   vehicles sold in the United States. Porsche Cars North America employees provide vehicles, parts,

19   service, marketing, and training for 189 authorized dealers.[31] When vehicles are manufactured

20   overseas but intended for sale in the United States, Porsche AG ensures, through design and

21   compliance testing, that the vehicles comply with U.S. regulations and safety standards, including

22   emissions standards set by the California Air Resource Board ("CARB"). In December 2020, both

23   Porsche AG and Porsche Cars North America settled emissions-related issues with CARB for

24   vehicles manufactured between 2011 and 2019.[32]

25

26

27   ───────────────
[30] Porsche AG, 2021 Annual Report, at 2.

28   [31] About Porsche Cars North America.
[32] Cal. Air Resources Bd., Porsche AG & Porsche Cars NA Inc. Settlement, Dec. 2020.

92.     In 2021, the California Highway Patrol informed Porsche Cars North America that its upcoming Porsche 911 GT3 with the manual transmission could not be sold in California because it violated their test procedures. Demonstrating the importance of the California market to Porsche vehicles sales, Porsche Cars North America negotiated with the state for months before the state found a method for testing the vehicles and allowed their sale.[33]

93.     Porsche Cars North America has been registered as active to conduct business in California since November 1987. Porsche Cars North America maintains a logistic complex for parts distribution in Ontario, California. Porsche also has a Porsche Experience Center Los Angeles, a driving track that is the headquarters of Porsche Motorsport North America. Porsche Design Costa Mesa and Porsche Design Store Beverly Hills sell Porsche accessories and fashion products. Porsche often debuts new models at the annual Los Angeles Auto Show.

94.     According to Porsche Cars North America's Find a Dealer function, Porsche has several authorized dealers in the Northern California area:[34]



### 7.     Personal Jurisdiction—The Joyson Safety System Defendant

95.     This Court has specific personal jurisdiction over Joyson Safety Systems which receives substantial compensation and profits from the from the sale of the Defective Inflators

---

[33] "Porsche, California Reach Deal Over 911 GT3 Manual Trans Fiasco," Motor1.com, June 22, 2021.
[34] Porsche Cars N. Am., Find a Dealer – San Francisco, Cal.

intended for vehicles sold in this District and has and continues to conceal and make material omissions in this District so as to subject it to personal jurisdiction in this Court.

96.     Joyson Safety Systems registered as an active corporation in California in October 2014 under its predecessor's name, Key Safety Systems, Inc., which stated that in addition to its headquarters in Michigan, it had an office in Sunnyvale, California. Key Safety Systems continues to list the Sunnyvale office on its statements filed annually with the California Secretary of State.

97.     In 2016, Key Safety Systems was acquired by China-based company Ningbo Joyson Electronic Corporation. In April 2018, Ningbo Joyson provided the funding to Key Safety Systems to acquire Takata Corporation, and the U.S. company became known as Joyson Safety Systems. Prior to its acquisition by Ningbo Joyson and its acquisition of Takata Corp., Key Safety Systems had manufactured airbag systems and its own types of inflators since 1992, when it was known as Breed Technologies, Inc.

98.     Joyson Safety Systems and its predecessor companies have sold its airbag assembly modules containing ARC inflators to OEMs with offices in California, including the BMW Defendants, Ford, Porsche, and the Volkswagen Defendants.

99.     Joyson Safety Systems maintains lucrative and profitable relationships with all of the OEM Defendants, knowing that each of those OEMs maintains a vast dealership and distribution network within California and each Plaintiff's jurisdiction. Joyson Safety Systems supplies airbags containing Defective Inflators and other automotive component parts with the intent and purpose that they be installed and sold in Class Vehicles throughout the nation, including in California, knowing that California is the most heavily populated state in the country and that Joyson Safety Systems' business could not survive if OEMs did not purchase and install Joyson Safety Systems' automotive components in their vehicles.

### 8.     Personal Jurisdiction—The Toyoda Gosei North America Defendant

100.     This Court has specific personal jurisdiction over Toyoda Gosei North America Corporation, which receives substantial compensation and profits from the from the sale of the Defective Inflators intended for vehicles sold in this District and has and continues to conceal and make material omissions in this District so as to subject it to personal jurisdiction in this Court.

101.     Toyoda Gosei North America Corporation first registered as an active corporation in California in 2002 under the name TG North America Corporation. Although the company was at the time, and remains, headquartered in Michigan, it stated that it maintained an office in Lathrop, California. In 2004, TG North America Corporation informed California that it had changed its name to Toyoda Gosei North America Corporation.

102.     Toyoda Gosei North America first established a regional headquarters in San Jose, California, in 2008.[35] On its latest Statement of Information filed with the California Secretary of State, Toyoda Gosei North America stated that its California address is in Cupertino, California.

103.     Toyoda Gosei North America, which also manufactures its own airbag inflator types, has sold its airbag assembly modules containing ARC inflators to OEMs with offices in California, including GM.

104.     Toyoda Gosei North America maintains lucrative and profitable relationships with all of the OEM Defendants, knowing that each of those OEMs maintains a vast dealership and distribution network within California and each Plaintiff's jurisdiction. Toyoda Gosei North America supplies airbags containing Defective Inflators and other automotive component parts with the intent and purpose that they be installed and sold in Class Vehicles throughout the nation, including in California, knowing that California is the most heavily populated state in the country and that Toyoda Gosei North America's business could not survive if OEMs did not purchase and install Toyoda Gosei North America automotive components in their vehicles.

III.     **DEFENDANTS' AGENTS**

105.     ARC, each OEM Defendant, and each Airbag Module Defendant acted as an agent for each other with respect to the acts and violations alleged herein.

106.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as agents with the Defendants in the offenses alleged in this Complaint,

---

[35] Toyoda Gosei N. Am. Corp., 2017 Profile of the Americas, at 3.

and have performed acts and made statements in furtherance of misconduct and concealment alleged herein.

107.    Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

**IV.    AIDING AND ABETTING**

108.    Plaintiffs and the Class were harmed by Defendants' misconduct and concealment. Defendants are responsible for the harm because the Airbag Module Defendants and OEM Defendants aided and abetted ARC in committing the misconduct and concealment.

109.    Although ARC is responsible for manufacturing the Defective Inflators, the Airbag Module Defendants are responsible for procuring, testing, and approving the Defective Inflators, and the OEM Defendants are responsible for installing them in Class Vehicles and selling the Class Vehicles to consumers. The Airbag Module Defendants and OEM Defendants are responsible as aiders and abettors because they were aware that ARC manufactured driver and passenger toroidal stored gas hybrid inflator using ammonium nitrate and the potential dangers associated with such inflators. Nevertheless, the Airbag Module Defendants and OEM Defendants approved the design, ordered the production, and installed the Defective Inflators, thereby showing that they had the specific intent to facilitate the misconduct that ARC undertook. At a minimum, the Airbag Module Defendants and OEM Defendants were liable as aiders and abettors of ARC's tortious conduct, breaches of warranty, and statutory violations alleged herein The OEM Defendants' conduct was a substantial factor in causing harm to consumers who ultimately and unknowingly purchased or leased Class Vehicles containing Defective Inflators.

**V.    ADDITIONAL FACTUAL ALLEGATIONS**

   **A.    The General Design, Assembly, and Placement Of Airbag Inflators.**

110.    ARC has a long history of developing pyrotechnic propellants for use in rocket motors and airbag inflators, among other products. The company was formed in 1949 under the

name Atlantic Research Corporation, with its specific aim to develop propellants for the U.S. Department of Defense.[36] ARC first supplied propellant for passenger-side airbag inflators in 1970 and developed its first hybrid passenger inflators as part of a joint venture with Allied Signal in 1993.[37]

111.    The airbag inflator is a metal canister that produces the gas that fills an attached airbag cushion. The diagram below illustrates the basic components of the driver airbag system, both stationary and upon deployment (sodium azide is a type of inflator propellant that is no longer used):[38]



112.    The Defective Inflators—which are equipped in both driver- and passenger-side airbags—are toroidal stored gas hybrid inflators, which means they are shaped like a small, circular can (toroidal) and comprised mostly of highly compressed gas, with a secondary chemical compound propellant used to heat the stored gas so that it expands enough to sufficiently fill the airbag cushion. When the vehicle signals that airbag deployment is necessary, the inflator is designed to first release the stored gas and then ignite the propellant to heat the released gas in a controlled manner.

_____

[36] ARC Automotive, Who We Are, accessed Apr. 21, 2022.
[37] *Id.*
[38] Clemson Univ. Vehicular Electronics Lab., Airbag Inflators.

113.     Airbag inflators are contained within a housing or canister. The shape of the inflator canisters used in the driver airbag module assembly and passenger airbag assembly typically differ in design, most notably by the shape of the inflator canister. Frontal driver airbag inflators are tailored for fitment for a steering-wheel mounted module, whereas the passenger side inflator is located in the dash area, creating different packaging constraints. Thus, passenger inflators are often tubular in shape, and driver inflators are typically disc shaped. However, ARC's toroidal stored gas hybrid inflators for driver and passenger applications are similarly shaped and structured for both positions. For instance, a commonly used ARC driver hybrid inflator is the CADH (or ADH-C on the inflator labels), which is depicted in the image from ARC, shown below:[39]



114.     This design is similar to a common ARC hybrid passenger side airbag inflator, the PH7 shown in the image below:[40]



---

[39] ARC Automotive, Products, Dual Level CADH Hybrid Inflator, accessed Apr. 21, 2022.
[40] ARC Automotive, Products, Dual Level PH7 (120) Hybrid Inflator, accessed Apr. 21, 2022.

115.    The following photos show the back side of the driver inflator (the side facing away from the driver) for the 2013-2017 Chevrolet Traverse. The photo on the right shows that same inflator photo zoomed-in on the label that identifies it as an ARC ADH-C inflator:[41]

 

116.    Below are photos of an ARC hybrid front passenger inflator identified as an ARC PH7 used in the 2015-2017 Audi A3.[42] The photo shows the similarity to the driver side inflator used in the GM vehicle models cited above.



---

[41] eBay, 2013-2014-2015-2016-2017 Chevrolet Traverse Driver Airbag, accessed Apr. 21, 2022.
[42] Audi A3 Right Passenger Dash Bag, eBay.

117.    The substantially similar inflators are attached to different airbag cushions, which are tailored to the size and shape needed for a driver or passenger module. For example, the image below of the passenger-side airbag in a 2015-2017 Audi A3, which is the airbag and inflator type installed in Plaintiff Jacinto's vehicle, shows the ARC toroidal inflator attached to an oblong airbag module that houses the passenger side airbag, manufactured by Key Safety Systems:[43]



### B.    The ARC Inflator Supply Chain.

118.    ARC, referred to as a Tier 2 supplier because it supplies automotive components to a Tier 1 supplier which then supplies automotive parts to an OEM, manufactures the inflators, which it supplies to airbag system manufacturers who assemble the airbag module that includes the ARC inflator. These airbag module manufacturers, referred to as a Tier 1 supplier to the vehicle manufacturer, included Key Safety Systems, which is now Joyson Safety Systems; Delphi Automotive Systems Corp., which was acquired by Autoliv, Inc., in 2009; and Toyoda Gosei Co. Ltd. The airbag module assembly is then delivered to the OEM.

119.    The airbag assembly manufacturer produces the assembled airbag system modules with its name and assembly identification numbers stamped on the module and cushion. ARC inflators that are incorporated into the assembly contain markings identifying its inflators on a small label on the component. Ordinary consumers typically are unaware of these assembly and supply arrangements, often are unaware that inflators even exist, and would in any event be unable to determine Tier 2 manufacturers like ARC on automotive components, particularly when an assembly contains the Tier 1 and/or OEM manufacturer identification.

---

[43] *Id.*

120.     Typically, Tier 1 suppliers receive specifications from the OEM. The Tier 1 supplier will provide the OEM with engineering design information that conforms to the OEM's supplier Production Part Approval Process ("PPAP"), which includes specifications detailing the properties, characteristics, testing, and validation of the components that make up the assembly. As part of this process, the Tier 1 suppliers receive similar documentation from a Tier 2 supplier like ARC. This information is then examined by the OEM and must meet with their approval and sign-off before production can begin.

121.     When an issue arises with an automotive part like the airbag module assembly or one of its components like the inflator, the OEM typically requests to examine design and validation testing for all relevant components. Thus, at least by the time the ARC Defective Inflators began rupturing and NHTSA began investigating, the BMW Defendants, Ford, GM, the Porsche Defendants, and the Volkswagen Defendants, had examined, or should have examined, all documentation related to ARC's inflators, including the type of chemicals used in the propellant. The OEM Defendants would have worked with both ARC and the Tier 1 airbag module assembly supplier during these evaluations.

122.     Joyson Safety Systems, including its acquisitions Takata and Key Safety Systems, and Toyoda Gosei North America Corp. also manufacture their own brands of inflators. They have been aware for decades that propellants that use ammonium nitrate are volatile and unstable, and the inflators they manufacture have not used ammonium nitrate-based propellants.

**C.     ARC's Stored Gas Hybrid Inflators Contain Dangerous Ammonium Nitrate-Based Propellant.**

123.     Airbag propellants are created through a compounded mixture of chemicals, which typically includes a fuel and an oxidizer. Most inflator manufacturers use a variant of guanidine nitrate as the fuel in their propellant in frontal impact airbag designs. Guanidine nitrate has been proven over the last two decades to be a safe and durable propellant chemical.[44]

---

[44] "Takata's Switch to Cheaper Airbag Propellant Is at Center of Crisis," N.Y. Times, Nov. 19, 2014.

124.    A small number of airbag propellant manufacturers have used ammonium nitrate in the past as a fuel alternative due to cost savings. Ammonium nitrate, commonly used as a fertilizer, is well known for its use in making cheap explosives. Upon Plaintiffs' investigation and belief, the majority of airbag manufacturers use alternate airbag designs which, while costing slightly more than ammonium nitrate-based designs, are also fiscally remunerative. Importantly, these alternate designs offer a marked safety increase over ammonium nitrate-based designs and do not explode in a shrapnel-like manner which can maim or kill vehicle passengers.

125.    Despite the availability of these alternative propellants, ARC has used ammonium nitrate in its secondary propellant since at least 2001. Secondary propellant ignites after the initial ignition, which in the ARC inflators is the release of the stored gas.

126.    Ammonium nitrate is volatile and must be precisely phase-stabilized to mitigate its explosive characteristics, which are exacerbated when exposed to fluctuating temperature cycles— which motor vehicle airbags are routinely exposed to. Even when ammonium nitrate is phase-stabilized, or PSAN, its use in an airbag propellant is considered overly risky and inappropriate by most in the scientific, research, safety, OEM, and supplier manufacturing communities.

127.    PSAN's faster dynamic burning rate also means that, even in the absence of routine high temperature exposure and moisture exposure, which can result in degraded propellant, an airbag inflator can rupture if the vents are inadequate or obstructed. In its recall of one lot of ARC passenger-side inflators, Ford noted that, "[p]reliminary analysis indicates that weld flash from the inflator canister welding process at the Tier 2 inflator supplier may obstruct the gas exhaust port."[45] If the ARC welding process incorporated into the design of the inflators allows weld flash, or pieces of weld debris, to block exhaust ports, the PSAN can exacerbate the over-pressurization and lead to an explosive rupture.

128.    The design of the Defective Inflators requires that they be welded using a friction welding process, in which friction is created between the two shells of the inflator through rotation, generating heat that causes the steel material to soften and fuse the pieces together. As the high-

---

[45] Ford, Recall No. 17V529, Part 573 Safety Recall Report, Aug. 31, 2017.

speed rotation and force used in friction welding softens the metal, some of the material splashes out of the weld, creating weld flash when it hardens. In the ARC inflators, both the outside shells and the internal column in the center of the inflator are bonded through friction welding and can result in flash. The pieces of flash weld inside the inflator are not visible.

129.   When a manufacturer selects the type of welding process it wants to incorporate into its design, the process must be designed to either have a machine remove the weld flash after the weld is completed or incorporate the weld flash into the component's design. There are various welding parameters by which the flash can be minimized and removed, and the component manufacturer is responsible for selecting a welding machine and process that incorporates the appropriate parameters.

130.   Although welding is itself a manufacturing process, the type of welding used for a component is incorporated into the design and, as one welding machine manufacturer has pointed out in a guide to friction welding, "no operator skill is involved in friction welding."[46] Thus, ARC's selection of a friction welding process that did not minimize flash and ensure all flash was removed was a design defect. This defective design can allow pieces of weld flash to obstruct the exhaust port, and the resulting over-pressurization is exacerbated by the use of PSAN, leading to explosive ruptures.

131.   According to a *New York Times* article written in 2016, ammonium nitrate is about 30 percent cheaper than other chemicals that can be used in propellants. In the late 1990s, another inflator manufacturer, Autoliv Inc., began testing PSAN-based inflators and determined that PSAN can generate gas so fast that it, "blows the inflator to bits."[47] The article noted that another inflator manufacturer, TRW, used PSAN until 2006 but only after implementing several cost-prohibitive measures to mitigate "well-known issues" with PSAN that can "stimulate an explosive response."[48] The article also explained that decades of research into ammonium nitrate propellant had proven its volatility even after phase stabilization and that the U.S. Council on Automotive Research

---

[46] Thompson Friction Welding, "A Practical Guide to Friction Welding," Sept. 26, 2004, at 30.
[47] "A Cheaper Airbag, and Takata's Road to a Deadly Crisis," N.Y. Times, Aug. 26, 2016.
[48] *Id.*

("USCAR"), a consortium formed by Ford, GM, and Chrysler in the early 2000s, specified that inflators that contained ammonium nitrate were subject to additional testing and evaluation to ensure their "resistance to temperature aging in an environment of high humidity."[49]

132.    In 2012, researchers at Pennsylvania State University's High Pressure Combustion Laboratory analyzed PSAN-based propellant and concluded that PSAN is susceptible to dynamic burning, which means that when the propellant is exposed to sudden pressure increases, it may burn at a much faster rate and at higher temperatures than expected, leading to over-pressurization.[50] In their findings, the researchers warned that, "the effect of dynamic burning behavior of the propellant needs to be accounted for when designing or analyzing systems that subject the PSAN propellant to high pressurization rates," because with or without countermeasures for moisture and temperature cycling, PSAN itself is too volatile. Upon information and belief, the OEM Defendants and Airbag Module Defendants were aware of the study at least as far back as mid-2014, when NHTSA opened an investigation into Takata's inflators. The *New York Times* published an article about this study, and Takata's attempts to bury it, in October 2015, only a few months after NHTSA opened its investigation into ARC's inflators.[51]

133.    ARC itself has acknowledged the dangers of using ammonium nitrate in propellants.

134.    In a patent filed in July 1995 and granted in March 1998, titled "Eutectic Mixtures of Ammonium nitrate and Amino Guanidine Nitrate," ARC noted that ammonium nitrate was commonly used as an oxidizer bound together with other chemicals like guanidine nitrate, but that "it undergoes certain phase changes during temperature variations causing cracks and voids if any associated binder is not sufficiently strong and flexible to hold the composition together."[52] Additionally, "[a]mmonium nitrate compositions are hygroscopic and difficult to ignite, particularly

---

[49] *Id.*

[50] Jonathan T. Essel, et al., Transient Burning Behavior of Phase-Stabilized Ammonium Nitrate Based Airbag Propellant, 11 Int'l J. of Energetic Material & Chemical Propulsion 473 (2012).

[51] "Takata and Honda Kept Quiet on Study That Questioned Airbag Propellant," N.Y. Times, Oct. 22, 2015.

[52] Patent US 5,726,382 A, Eutectic Mixtures of Ammonium nitrate and Amino Guanidine Nitrate, filed July 28, 1995, published Mar. 10, 1998, at 8.

1    if small amounts of moisture have been absorbed."[53] ARC proposed to use a eutectic, or melted-

2    together, mixture of ammonium nitrate, guanidine nitrate, and potassium nitrate in hopes of

3    reducing phase change during temperature cycling.

4           135.    In another patent filed in December 1998 and granted in January 2000, titled

5    "Nonazide Ammonium Nitrate Based Gas Generant Compositions that Burn at Ambient Pressure,"

6    ARC described previous patents stating that PSAN "is a problem since many gas generant

7    compositions containing this oxidizer have unacceptably low melting points and are thermally

8    unstable."[54] ARC proposed a new chemical compound using PSAN, high bulk density

9    nitroguanidine, high nitrogen fuels, and copper phthalocyanine. ARC posited this combination

10   would increase the thermal stability more than other compounds containing PSAN and allow for

11   "self-sustained burning at ambient pressure and temperature."[55]

12          136.    In its investigation into ARC toroidal stored gas hybrid inflators, addressed further

13   below, NHTSA confirmed that ARC hybrid inflators dating back to at least 2001 utilized an

14   ammonium-nitrate-based propellant.

15          137.    A December 2015 version of ARC's Material Safety Data Sheet ("MSDS") for its

16   stored gas hybrid inflators, attached to a set of MSDSs compiled by AmSafe for its NexGen

17   Seatbelt & Structure-Mounted Airbag Systems, confirms the newer driver and passenger inflators

18   also contain ammonium nitrate:[56]

19
20
21
22
23
24

**ARC Automotive, Inc**
Material Safety Data Sheet

| 1.0 | Product and Contact Information |
| --- | --- |

| Product Name: Hybrid Airbag Inflator Assembly | |
| Chemical Name / Synonym / Trade Name: | Inflator Assembly |
| Pseudonyms/Programs: | APH, AHS, SH5, CADH, PH7-120, PH7-90, PH5, PH5.1, CH3, CH5, Piston, HC38, HD38, ADH89, MHS, DH7, DH8, MPD, SP2, PH8, etc. |
| Manufacturer's Name: | ARC Automotive, Inc. |
| Address: | 1601 Midpark Road Suite 100 |
| | Knoxville, TN 37921 |
| ARC Information Phone Number: | (865) 583-7851 |
| Emergency Phone (Chemtree) Inside USA | (800) 424-9300 |

25

26   [53] *Id.*

26   [54] Patent US 6,017,404 A, Nonazide Ammonium nitrate Based Gas Generant Compositions that Burn
     at Ambient Pressure, filed Dec. 23, 1998, published Jan. 25, 2000, at 5.
27   [55] *Id.*, at 8.
28   [56] AmSafe NexGen Seatbelt & Structure-Mounted Airbag Systems Handling, Shipping, Storage, and
     Disposal Instructions, ARC Automotive, Inc. Material Safety Data Sheet, Dec. 21, 2015, at PDF 26.

The inflator assembly is a steel pressure vessel containing igniter assemblies, compressed gas composed of between 0 and 170 grams of 75-98% argon / 2-50% helium mixture. It also contains the following potentially hazardous chemicals formulted into gas generant components.

| HAZARDOUS INGREDIENTS | | CAS NO. | Carcinogen |
|---|---|---|---|
| ARCAIR 102A/ 102H/ 102K/ 102J | up to 40g: | Not Listed | No |
| • Ammonium Nitrate | | 6484-52-2 | No |
| • Guanidine Nitrate | | 506-93-4 | No |
| • Potassium Nitrate | | 7757-79-1 | No |
| • Potassium Perchlorate | | 7778-74-7 | No |
| • Polyvinyl Alcohol | | 9002-89-5 | No |
| • Copper Phthalocyanine | | 147-14-8 | No |
| • Graphite | | 7782-42-5 | No |

138.   In 2014, another inflator manufacturer—Takata Corporation—generated enormous attention on the use of PSAN-based propellant when it was revealed that the global automotive parts and components supplier and vehicle manufacturers were aware of multiple ruptures in both driver and passenger inflators over several years, prompting recalls of tens of millions of driver and passenger inflators covering several model years. Thus far, hundreds of people have been injured by Takata inflator ruptures, and at least 27 people have died worldwide.

139.   Despite industry knowledge that PSAN is thermally unstable, excessively hygroscopic, and unable to withstand temperature cycling, ARC continued to use PSAN in its secondary propellant in its inflators for the entire time Takata used PSAN in its main propellant.

140.   In 2019, following several ruptures of its inflators that contained PSAN-based propellant, ARC acknowledged that the use of ammonium nitrate was unacceptable. In a patent published July 2019, entitled "Non-Ammonium Nitrate Based Generants," ARC stated: "With ammonium nitrate based generants becoming unacceptable for usage in automotive airbag inflator applications regardless whether they are used in pyrotechnic or hybrid type inflators, alternate or non-ammonium nitrate containing generants are highly desirable. Even in a hybrid inflator where the generant is stored in a high-pressure inert gas atmosphere making moisture intrusion nearly impossible, ammonium nitrate based generants are still considered unacceptable."[57]

141.   ARC was also aware that utilizing a pressure relief mechanism would mitigate the dangers of PSAN-related over-pressurization. According to the *New York Times* article mentioned above, as part of its efforts to mitigate the known dangers associated with PSAN, in the early 2000s,

---

[57] Patent US 2019/0218155 A1, Non-Ammonium Nitrate Based Generants, filed Jan. 17, 2019, published July 18, 2019, at 2.

1  TRW incorporated a pressure relief valve in its PSAN-based inflators that allowed gas to escape

2  should the inflator begin to over-pressurize.

3          142.    In fact, ARC has designed inflators that contain such mechanisms. In February 2013,

4  ARC filed a patent entitled, "Variable Orifice Construction," that would allow the inflator to

5  increase the size of the exit orifice when the internal gas pressure was rising.[58] Although the patent

6  mentions that the flexible orifice size is needed because some propellants result in higher pressure

7  than others, it does not mention the fact that the invention would also reduce the chance of a flash

8  nugget blocking the orifice enough to cause a rupture.

9          143.    In December 2020, ARC implicitly acknowledged both that its current design

10 allowed for weld flash to partially block the exit orifice and that its current design did not

11 adequately vent excess gas when it filed a patent application entitled, "Airbag Inflator With

12 Pressure Relief Valve and Increased Combustion Efficiency."[59] In the patent, ARC noted that,

13 "Some existing inflator assemblies utilize a center support structure that requires two simultaneous

14 welds, which is problematic in respect of manufacturing and also increases the potential for weld

15 particles to exit the inflator upon deployment. Existing designs have also been configured to

16 fragment during deployment as a consequence, in the event of excessive pressure increase within

17 the inflator due to some failure or external condition or the like, these existing inflator designs can

18 be potentially hazardous for vehicle occupants."[60]

19         144.    ARC continued, "[i]t would be desirable to provide an airbag inflator that reduces

20 gaseous effluents with efficient combustion while incorporating additional safety features in respect

21 of venting and unintended increased in internal pressure and weld particles."[61] ARC proposed a

22 hybrid inflator that contains a series of vent holes and sub-chambers that vent into each other

23 through control vents, so that the propellant is not igniting the stored gas in one chamber with

24 enough force to rupture that chamber. The inflator would also have flow diverters to "further direct

25

---

26 [58] U.S. Patent 8,770,621 B1, Variable Orifice Construction, filed Feb. 26, 2013, pub. July 8, 2014.
   [59] U.S. Patent 2022/0185224 A1, Airbag Inflator With Pressure Relief and Increased Combustion
27 Efficiency, filed Dec. 11, 2020, pub. June 16, 2022, at 10.
   [60] *Id.*
28 [61] *Id.*

and control pressure and flow before exiting the top vessel."[62] Finally, the inflator would have a pressure relief mechanism in the bottom portion of the inflator "in the event of excess internal pressure without any rupture of the inflator during a deployment event."[63] During manufacturing, ARC would conduct hydroburst tests to confirm that the pressure relief mechanism works to vent any excess gas.

**D.** **The OEM Defendants Have Long Been Aware of the Dangers of Ammonium Nitrate-Based Propellants.**

145.     A BMW vehicle experienced one of the first known ruptures of a Takata inflator in 2003, when a driver-side airbag ruptured in a BMW vehicle in Switzerland. At the time, BMW and Takata concluded it was an anomaly caused by operator error in including too many propellant wafers.[64] Upon information and belief, BMW learned of Honda's initial Takata-related recalls by at least 2010, which demonstrated the rupture was not an anomaly, but BMW did not recall its own PSAN-based inflators until several years later.

146.     Along with Volkswagen AG, BMW was a member of the Group of Five German automakers that allegedly met with Takata in February 2007 to discuss the issues associated with ammonium nitrate-based propellant.

147.     BMW issued its first Takata-related recall in 2013 after multiple passenger-side inflators containing PSAN ruptured in vehicles, and issued its first recall of driver-side inflators in 2014. Craig Westbrook, vice president of after sales at BMW of North America, testified at a December 2014 Congressional hearing about the investigation of Takata inflators, in which he stated that BMW was conducting its own investigation into the PSAN with a third-party.[65] He also stated that he was unaware of any ruptures ever in a BMW driver-or passenger-side inflator, which later had to be corrected when the 2003 rupture in Switzerland came to light.

---

[62] *Id.*
[63] *Id.*
[64] "Exclusive: Takata Investigated Defective Air Bag Inflator as Early as 2003," Reuters, Dec. 3, 2014.
[65] U.S. House Comm. on Energy and Commerce, Subcomm. on Commerce, Manuf., and Trade, Hearing on Takata Airbag Ruptures and Recalls, Dec. 3, 2014.

148.    In November 2020, NHTSA and BMW confirmed that a driver died in Arizona in September 2020 when the driver airbag in his 2004 BMW 3 series vehicle ruptured.[66]

149.    Thus, BMW AG and its wholly owned subsidiary BMW of North America, LLC, have been aware since at least 2003 that using ammonium nitrate in an inflator propellant poses dangers to occupants and has resulted in injuries and deaths.

150.    BMW also is aware that the passenger-side inflators it purchased from ARC are the same or substantially similar to the driver-side toroidal stored gas hybrid inflators that have ruptured with fatal results. Finally, BMW is aware that in January 2017, an ARC passenger-side inflator intended for BMW vehicles rupture during lot acceptance testing at ARC's facility in the same manner as the other ruptures that resulted in injuries and deaths.

151.    Despite BMW's knowledge that the use of PSAN-based propellant in an airbag inflator was dangerous and could result in ruptures, it continued to purchase and install ARC inflators containing PSAN for years, even as it was recalling Takata's inflators that contained the propellant. BMW has not informed consumers that the airbag inflators in their vehicles contain PSAN-based propellant, nor have they recalled vehicles beyond the 36 vehicles determined to contain an inflator from the same lot as the inflator that ruptured during testing.

152.    As mentioned above, Ford is a member of USCAR, which has long acknowledged the dangers of ammonium nitrate-based propellants and has required additional testing and evaluation for any inflators that contain that chemical. In the early 2000s, Ford selected Takata's inflators that contained PSAN even though the inflators could not meet USCAR specifications and its own inflator engineer was opposed to the use of ammonium nitrate-based propellant. Ford was aware that Takata's PSAN-based inflators were rupturing in testing as early as 2004 and added a desiccant, or drying agent, to one inflator in 2005 but not to any of its other PSAN-based inflators.[67]

153.    In November 2014, Ford learned that a pregnant woman in Malaysia had died when the single-stage inflator in her vehicle ruptured. Although other OEMs whose vehicles contained the

---

[66] "Exploding Takata Air Bag Inflator Kills Man in Arizona Crash," AP News, Nov. 12, 2020.
[67] In re: Takata Airbag Prod. Liab. Litig., S.D. Fla., MDL No. 2599, Plaintiffs' Status Report Preceding February 28, 2017 Hearing, Feb. 27, 2017, at 4-5.

1    same inflator type recalled their vehicles, which were sold only in foreign markets, Ford refused to

2    issue a comprehensive recall of its U.S. vehicles with that inflator type. In December 2015, the

3    same type of inflator ruptured in a vehicle in South Carolina, killing the driver, Joel Knight. Only

4    then did Ford agree to recall all vehicles containing that inflator.

5         154.    Despite Ford's knowledge that the use of PSAN-based propellant in an inflator was

6    dangerous and could result in ruptures, Ford continued to purchase and install ARC inflators

7    containing ammonium nitrate for years, even as it was recalling Takata inflators with PSAN-based

8    propellant. When an ARC inflator intended for Ford vehicles ruptured during testing, just like

9    Takata inflators had done, Ford recalled only a small number of vehicles that contained a particular

10   lot of inflators, despite its knowledge that NHTSA had been investigating ARC inflators for two

11   years at that point after several ruptures, including a fatal rupture in a 2009 Hyundai Elantra.

12        155.    As with Ford, GM is one of three members of USCAR, which has acknowledged the

13   dangers of ammonium nitrate in its specifications since 2002. GM first recalled vehicles containing

14   the Takata PSAN-based inflators in 2013 and subsequently issued several more recalls covering

15   nearly three million vehicles. In an ultimately unsuccessful attempt to prove that its passenger-side

16   Takata inflators should be exempt from recall, GM partnered with a research organization to study

17   PSAN's degradation and aging process and the various factors that can contribute to a rupture. Its

18   conclusions were published in the *Federal Register* and are widely known within the automotive

19   industry.[68] Thus, GM has known for years that PSAN propellants are volatile and unstable.

20   Additionally, according to the *New York Times* article discussed above, it was GM that first

21   approached Autoliv, Inc., to inquire about using inflators containing PSAN in the late 1990s, and

22   Autoliv informed GM specifically that the use of PSAN-based propellants in airbag inflators was

23   dangerous.[69]

24        156.    Despite GM's knowledge that the use of PSAN-based propellant in an airbag inflator

25   was dangerous and could result in ruptures, GM continued to purchase and install ARC inflators

26

27   _____
     [68] 85 Fed Reg 76159 (Nov. 27, 2020), General Motors, Denial of Consolidated Petition for Decision
     of Inconsequential Defect.
28   [69] "A Cheaper Airbag, and Takata's Road to a Deadly Crisis," N.Y. Times, Aug. 26, 2016.

containing ammonium nitrate in its vehicles for years, even as it was recalling Takata inflators that contained PSAN-based propellant. As the ARC Defective Inflators began to rupture in GM models, GM recalled only a limited number of vehicles that contained a particular lot of inflators, despite its knowledge that ARC driver- and passenger-side inflators in various GM models and model years from 2002 through at least 2015 also had experienced ruptures, revealing a systemic issue related to PSAN rather than an isolated manufacturing defect.

157.    The Porsche Defendants have been aware of the dangers of PSAN-based ammonium nitrate since 2014, when NHTSA began its investigation into Takata's PSAN-based inflators, multiple OEMs recalled millions of vehicles, and Congress held hearings. However, it was likely aware long before that because, in addition to Volkswagen AG being its parent company, Porsche AG is a member of the Group of Five German automakers that allegedly met with Takata in February 2007 to discuss issues associated with ammonium nitrate-based propellant.

158.    Porsche is aware that the passenger-side inflators it purchased from ARC are the same or substantially similar to the driver-side toroidal stored gas hybrid inflators that have ruptured with fatal results and to the passenger-side inflator that ruptured in a vehicle made by Audi, which is also owned by Volkswagen AG, that caused injuries.

159.    Despite Porsche's knowledge that the use of PSAN-based propellant in an airbag inflator was dangerous and could result in ruptures, it continued to purchase and install inflators containing PSAN for years, even as its parent company was recalling Takata's inflators that contained the propellant. Porsche has not informed consumers that the airbag inflators in their vehicles contain PSAN-based propellant, nor have they recalled vehicles that contain the ARC Defective Inflators.

160.    Volkswagen AG and Audi AG, as well as their U.S. entities, first recalled vehicles containing Takata inflators in January 2016, long after many other OEMs had begun their recalls. Volkswagen claimed in recall documents that it did not believe a recall was necessary because there had not been a rupture of its type of inflators in a Volkswagen vehicle. However, Volkswagen was aware that a rupture in the same type of inflator had killed a pregnant woman in Malaysia in

October 2014 and a man in South Carolina in December 2015, the latter of which is the rupture that prompted Takata to urge a recall.

161.    In fact, Volkswagen AG was aware that in 2009, a similar inflator intended for one of its vehicles ruptured in Brazil and that Takata believed the PSAN wafers had degraded over time, which significantly increased the burn rate. Volkswagen AG executives were alarmed and expressed concern that an inflator containing PSAN-based propellant could rupture during a crash, shooting fragments toward occupants. They considered issuing a recall but decided against it until eight years after Honda issued its first recall for Takata ruptures.

162.    Volkswagen AG also is part of a consortium of German automakers, known as the Group of Five, which allegedly met with Takata in February 2007 to discuss issues with ammonium-nitrate based propellants. At that point, Volkswagen AG was likely made aware of the 2003 rupture in a BMW vehicle in Switzerland, discussed below.

163.    Thus, Volkswagen AG and its wholly owned subsidiary Audi AG, as well as the U.S. entities, have been aware since at least 2009 that using ammonium nitrate in an inflator propellant poses dangers to occupants and has resulted in injuries and deaths.

164.    Volkswagen and Audi are also aware that the passenger-side inflators it purchased from ARC are the same or substantially similar to the driver-side toroidal stored gas hybrid inflators that have ruptured with fatal results. Finally, Volkswagen and Audi are aware that in December 2021, an ARC passenger-side inflator ruptured in a 2016 Audi A3 vehicle, sending pieces of metal toward the occupants.

165.    Despite Volkswagen's and Audi's knowledge that the use of PSAN-based propellant in an airbag inflator was dangerous and could result in ruptures, these OEMs continued to purchase and install ARC inflators containing PSAN for years, even as they were recalling Takata's inflators that contained the propellant. Neither Volkswagen nor Audi have informed consumers that the airbag inflators in their vehicles contain PSAN-based propellant, nor have they recalled any vehicles.

166.    Inflator ruptures, whether in the manufacturing facilities or in the field, are exceedingly rare in designs that do not contain ammonium nitrate in its propellant. As addressed

below, ARC's driver and passenger toroidal stored gas hybrid inflators that contained PSAN-based propellant have ruptured on several known occasions, twice causing fatal injuries to drivers. The use of fast-burning PSAN-based propellant, particularly in the absence of necessary safety features like pressure relief valves and with the use of friction welding which can leave flash inside the inflators, allowing metal pieces to partially block the vents, rendered the ARC inflators dangerous and defective—a fact that has been known to ARC and to the OEM Defendants for years.

167.    Neither ARC nor the OEM Defendants notified the public which vehicles contain ARC inflators, that ARC's toroidal stored gas hybrid inflators contained PSAN-based propellant, and that PSAN-based propellant is dangerously defective as described above. ARC's use of ammonium nitrate in its hybrid inflators escaped public notice as the world became aware of the Takata ruptures. Thus, even consumers who may have heard about the dangers of ammonium nitrate or who followed the news related to Takata had no reason to believe their non-recalled Class Vehicles pose a strikingly similar danger because they contained ARC's Defective Inflators that relied on PSAN-based propellant.

> **E.**    **ARC's Stored Gas Hybrid Inflators Containing Ammonium Nitrate-Based Propellant Have Ruptured, Causing Injuries And Deaths.**

168.    There have been at least seven known ruptures of ARC's Defective Inflators in vehicles, including six driver inflators and one passenger inflator. Two of those ruptures resulted in a driver fatality. Additionally, two passenger inflators ruptured during Lot Acceptance Testing at ARC's factory. Five of the ruptures resulted in significantly limited recalls of other vehicles that contained other inflators only from that lot. Upon information and belief, several other inflators have ruptured, either in the field or in testing, but have not been publicized.

169.    The ruptures have occurred in various states that do not share similar climates, unlike the hot and humid climates in which Takata ruptures often occur. The Defective Inflators themselves were made at various ARC factories and include both dual-stage (which has a two-stage deployment based on the severity of the crash) and single-stage (which deploys at the same rate no matter the crash severity) inflators. These facts strongly suggest a systemic design defect in the inflators—specifically, the use of PSAN-based propellant—rather than a manufacturing defect

---

1   occurring at one location. They also confirm that the ruptures are not confined to scenarios

2   involving moisture intrusion and can instead be triggered by other factors—which in turn confirms

3   that the fundamental defect here is the decision to use ammonium nitrate, the volatile nature of

4   which can lead to ruptures under a variety of foreseeable conditions that the Class Vehicles are

5   intended and expected to encounter after being sold to consumers.

6          170.    Little is known about the seven field ruptures. News reports have largely reported

7   only on the information provided by NHTSA in the few investigation documents it has made public.

8   News reports about the two fatal incidents do not include information about the drivers or their

9   locations. The following is what is known about each rupture thus far:

10         171.    In 2009, the ARC driver inflator in a 2002 Chrysler Town & Country ruptured in

11  Ohio during a crash.[70] The inflator was a dual-stage hybrid inflator manufactured at ARC's

12  Knoxville, Tennessee, facility.[71]

13         172.    On April 8, 2014, the ARC driver inflator in a 2004 Kia Optima ruptured during a

14  frontal impact crash in New Mexico.[72] The driver suffered serious injuries. The inflator was a

15  single-stage inflator made at ARC's Knoxville, Tennessee, facility.[73] The driver sued Kia Corp. and

16  Kia America, Inc., under their previous names, and the lawsuit was settled quickly. Kia did not issue

17  a recall. In its investigation, NHTSA indicated that this inflator was placed in a Delphi Automotive

18  Systems Corp. airbag module assembly. Delphi was acquired by Autoliv, Inc., in 2009.

19         173.    On July 8, 2016, the driver of a 2009 Hyundai Elantra was killed in Canada when an

20  ARC driver inflator exploded during a crash.[74] This inflator was a single-stage inflator made in

---

[70] Nat'l Highway Traffic Safety Admin., Investigation PE15-027, ODI Opening Resume, July 13, 2015.

[71] *Id.*

[72] *Chavez v. Kia Motors Corp.*, D.N.M., No. 1:15-cv-00462, First Amended Complaint, June 25, 2015.

[73] Nat'l Highway Traffic Safety Admin., Investigation PE15-027, ODI Closing Resume, Aug. 25, 2016.

[74] "1st Recorded Canadian Fatality from Airbag Inflator Rupture Under Investigation," CBC News, Aug. 4, 2016.

ARC's China facility.[75] Hyundai later recalled 2,022 MY 2009 Elantra vehicles in Canada, but did not issue a recall in the United States.[76]

174.    According to a BMW recall document, Tier 1 supplier Key Safety Systems notified BMW on February 8, 2017, that an ARC DPH-7 passenger hybrid inflator intended for BMW ruptured during a quality check or lot acceptance testing at an ARC facility on January 29, 2017.[77] BMW did not specify whether the inflator was a dual-stage or single-stage inflator. According to a chart ARC submitted to NHTSA as part of its response to inquiries in NHTSA's investigation, the DPH-7 inflator was manufactured at ARC's Reynosa, Mexico, facility.[78]

175.    Similarly, Ford issued a recall later in 2017, stating that on July 31, 2017, it was notified that an ARC PH7-120 dual-stage passenger inflator had ruptured during lot acceptance testing at ARC's facility.[79] According to ARC's presentation to NHTSA, the PH7 inflator was manufactured in four of its facilities: Knoxville, Macedonia, China, and Mexico.[80] Ford recalled 650 model year 2017 F-150 and Mustang vehicles that contained an inflator from the same lot as the inflator that ruptured.[81] Ford's airbag module was assembled by Takata Corporation, which was subsequently acquired by Key Safety System and later incorporated into Joyson Safety System.

176.    On September 22, 2017, an ARC driver inflator ruptured in a 2011 Chevrolet Malibu during a crash in Pennsylvania.[82] GM recalled 1,145 model year 2010-2011 Chevrolet Malibu vehicles built with inflators from the same lot as the inflator that ruptured (Recall 19V019). GM did not specify the type of inflator but stated that it was manufactured in Mexico.[83] According to ARC's submission to NHTSA, the driver inflator that is manufactured at ARC's Mexico facility is a CADH

---

[75] Nat'l Highway Traffic Safety Admin., Investigation EA16-003, ODI Opening Resume, Aug. 4, 2016.
[76] Transport Canada, Recall No. 2018-173, Apr. 11, 2018.
[77] BMW, Recall No. 17V189, Part 573 Safety Recall Report, Mar. 21, 2017.
[78] Nat'l Highway Traffic Safety Admin., Investigation PE15-027, ARC Response to Information Request, Attachment: ARC Automotive 2015 Presentation, July 17, 2015, at PDF 10.
[79] Ford, Recall No. 17V529, Part 573 Safety Recall Report, Aug. 31, 2017.
[80] Nat'l Highway Traffic Safety Admin., Investigation PE15-027, ARC Response to Information Request, Attachment: ARC Automotive 2015 Presentation, July 17, 2015, at PDF 10.
[81] Ford, Recall No. 17V529, Part 573 Safety Recall Report, Aug. 31, 2017.
[82] *McQuaide v. Gen'l Motors LLC*, Pa., Allegheny Co. Ct. Com. Pleas, No. GD-18-007744, Third Amended Complaint, Jan. 29, 2019.
[83] Gen'l Motors, Recall No. 19V019, Part 573 Safety Recall Report, Jan. 31, 2019.

(aka, ADH-C).[84] The airbag module was manufactured by TRW Automotive Holdings Corp., which has since been acquired by ZF Friedrichshafen AG to form what is commonly referred to as ZF-TRW.

177.    As addressed below, according to NHTSA, an ARC passenger hybrid inflator manufactured on June 1, 2014, ruptured in the field. NHTSA did not specify the make, model, and model year vehicle or the date of rupture.[85]

178.    On August 15, 2021, a driver in Calumet, Michigan, was killed due to a rupture of the ARC driver hybrid inflator in her 2015 Chevrolet Traverse. The victim, who was driving with two of her children as passengers, collided with an oncoming vehicle that crossed into her lane, and her airbag deployed. According to the police investigation, "It appeared that the driver's side airbag malfunctioned causing it to detach from the steering column and sent metal fragments into the driver's compartment of the vehicle. The igniter for the front driver's side airbag was found on the passenger side dashboard. There was also metal shrapnel on the driver's side dash, in the instrument cluster and markings on the driver's side roof which appeared to come from the driver's side airbag."[86] The police investigation report noted that the autopsy of the victim found parts of the metal airbag inflator lodged in her neck. The other passengers in the victim's vehicle, including an unbelted right front passenger and occupants in the second and third row seats, survived the crash.

179.    GM sent a contract field investigator to examine the vehicle on September 8, 2021, and on September 14, 2021, another GM field investigator accompanied by the police investigator performed x-rays on the metal shards that were removed during the autopsy. Further inspection of the vehicle and airbag pieces were examined by counsel representing the victim's family, GM, ARC, and Toyoda Gosei (the Tier 1 supplier to GM) on October 27, 2021. The investigation report includes a photograph of the ruptured inflator, which is unrecognizable as an inflator due to the extent of the damage, as depicted below:

---

[84] Nat'l Highway Traffic Safety Admin., Investigation PE15-027, ARC Response to Information Request, Attachment: ARC Automotive 2015 Presentation, July 17, 2015, at PDF 10.
[85] *See, e.g.,* Nat'l Highway Traffic Safety Admin., Investigation EA16-003, Investigation Response Ltr. to Volkswagen Group of Am., Inc., Sept. 14, 2020.
[86] Houghton Co. Sheriff's Off., Incident Report, Aug. 15, 2021.



180.    GM subsequently issued a recall of 552 model year 2008-2017 Buick Enclave vehicles and 2013-2017 Chevrolet Traverse vehicles (Recall 21V782).[87] As with its previous recall, GM recalled only inflators made from the same lot as the ruptured inflator that were used either as original equipment or replacement inflators. GM did not specify the type, stage, or manufacturing location for the inflator.

181.    On April 14, 2022, GM submitted another safety recall report to NHTSA for defective ARC-made driver inflators it claimed were in more than 2,500 model year 2015 Buick Enclave, Chevrolet Traverse, and GMC Acadia vehicles.[88] According to GM's recall submission to NHTSA, the company received notice of a claim on November 9, 2021, from an attorney regarding injuries to the driver of a 2015 Chevrolet Traverse.[89] On February 18, 2022, the claimant notified GM that the driver airbag had ruptured during a crash on an unspecified date and that it inspected the vehicle on March 23, 2022, and determined that the driver's ARC inflator ruptured in the crash.[90] GM went on to state: "On April 7, 2022, GM's Safety and Field Action Decision Authority decided to conduct a safety recall on all front driver airbag modules containing an inflator from the same manufacturing lot as the inflator under investigation. GM is continuing to investigate this

---

[87] Gen'l Motors, Recall No. 21V782, Part 573 Safety Recall Report, Oct. 7, 2021.
[88] *Id.*
[89] Gen'l Motors, Recall No. 22V246, Part 573 Safety Recall Report, Apr. 14, 2022.
[90] *Id.*

incident. GM's investigation has not identified another rupture allegation involving the vehicles in this recall population."

182.    On December 18, 2021, the ARC passenger hybrid inflator in a 2016 Audi A3 ruptured during a crash in California, causing severe laceration injuries to the front seat passenger. An individual personal injury case was filed and remains pending.[91] In July 2022, VW recalled 1,216 vehicles, noting that although it had not yet determined a root cause, it was only recalling inflators from the same "suspect batch."[92]

183.    According to photos of an exemplar airbag installed in the 2015-2017 Audi A3, the passenger inflators are ARC PH7 hybrid inflators manufactured in Macedonia.[93]

184.    As evidenced above, clearly, the ARC stored gas hybrid inflators that have ruptured thus far vary in type, stage, and location of manufacture. However, it is equally clear that they share an important characteristic: They include phase-stabilized ammonium nitrate—a chemical compound that is widely regarded as unsuitably volatile for use in motor vehicle airbags—as the secondary propellant.

185.    Equally important, despite knowledge of the dangers of PSAN-based propellants and the growing number of ruptures, neither ARC—which has not issued any of its own recalls for the inflators—nor OEM Defendants that fitted them into their vehicles have recalled all of the stored gas hybrid inflators using PSAN-based propellant. In fact, thus far, they have issued only very limited recalls following ruptures, a pattern that follows the devastating Takata airbag inflator recalls that went on for many years and needlessly endangered vehicle occupants.

**F.    NHTSA Has Been Investigating ARC's Toroidal Stored Gas Hybrid Inflators Since 2015.**

186.    In July 2015, NHTSA opened a Preliminary Evaluation (PE15-027) into 490,000 ARC hybrid airbag inflators that "may rupture during frontal air bag deployment resulting in metal

---

[91] *Barbone v. Khijniak*, Cal., Orange County Super. Ct., No. 30-2022-01254070-CU-PA-CJC, Apr. 8, 2022.
[92] VW, Recall No. 22V543 Part 573 Safety Recall Report, July 27, 2022.
[93] eBay, Audi A3 Right Passenger Dash Bag SRS Inflator Stk 21262, accessed Mar. 3, 2022.

fragments being propelled into the passenger compartment."[94] NHTSA noted that it had received notice of the 2009 rupture in the 2002 Chrysler Town & Country in December 2014 and then received news of the rupture in the 2004 Kia Optima in June 2015, prompting the agency to start an investigation when it realized that both inflators were ARC hybrid inflators. NHTSA's opening resume mentioned that ARC's stored gas hybrid inflators contain ammonium nitrate-based propellant and are supposed to be hermetically sealed against environmental elements.[95]

187.    A year later, in August 2016, NHTSA upgraded the Preliminary Evaluation to an Engineering Analysis (EA16-003), which is a more in-depth, detailed investigation. During its Preliminary Evaluation, NHTSA learned that GM and Hyundai also used airbags that contain ARC hybrid driver inflators.[96] The agency originally focused on inflators made between the start of production, which appears to have been 2001, and September 2004, based on the two ruptures it was aware of.[97] About eight million vehicles made by Chrysler, GM, Kia, and Hyundai that contained ARC hybrid driver inflators were made during that limited time frame. NHTSA upgraded and expanded the investigation after learning about the rupture in the 2009 Hyundai Elantra that occurred in Canada in July 2016.

188.    In its "ODI Resume" (a technical form completed as part of the NHTSA recall process, with "ODI" referring to the Office of Defects Investigation) announcing the Engineering Analysis, NHTSA noted the inflators involved in the three known field incidents had ruptured in "substantially the same manner" and were "assembled using substantially the same manufacturing process."[98] NHTSA's stated focus was to determine how many ARC driver inflators were in vehicles in the United States and to collect more ARC inflators from the field to test and evaluate them to determine a root cause.[99]

---

[94] Nat'l Highway Traffic Safety Admin., Investigation PE15-027, ODI Opening Resume, July 13, 2015.
[95] *Id.*
[96] Nat'l Highway Traffic Safety Admin., Investigation EA16-003, ODI Opening Resume, Aug. 4, 2016.
[97] *Id.*
[98] *Id.*
[99] *Id.*

189.    In NHTSA's information request to ARC, the agency stated, "[t]o assist us at this stage of the investigation, we are requesting certain information concerning all toroidal shaped frontal air bag inflators manufactured by ARC that were subsequently supplied to a Tier 1 or other air bag system manufacturer, for incorporation into their completed air bag modules…from the start of production (SOP) up to the date of this letter."[100]

190.    NHTSA has not publicly released most of the documents that have been filed in the EA16-003 investigation. It has posted the letters it sent to various OEMs, Tier 1 Suppliers, and ARC, but not the companies' responses. It did, however, publish an October 2016 letter the agency sent to ARC chastising the company for failing to respond to its requests. The letter additionally stated, in part:

> Furthermore, beyond ARC's lax response to compulsory process, ARC's attitude and approach to the Agency's investigation remains troubling. Since this investigation was opened, ARC has on more than one occasion questioned the necessity of providing certain information, failed to provide documents in a readable format, appeared nonchalant in its approach to developing a testing plan or protocol, and has advocated for the closure of the investigation without possessing or providing a full understanding of the root cause for at least one of the underlying inflator ruptures.

> Additionally, a number of incidents involving ARC's product have been brought to NHTSA's attention by vehicle manufacturers and other suppliers. These incidents range from testing failures to recalls, and raise serious questions regarding the quality and integrity of ARC's air bag inflators. While vehicle manufacturers and other suppliers have voluntarily notified NHTSA of these and other incidents without the need for a formal request, ARC has failed to take any steps to notify the Agency of these incidents, or their potential relationship to the incidents under investigation. After the Agency learned of one of these incidents earlier this year, the Agency contacted ARC and indicated that the company needed to provide this type of information to NHTSA proactively. Instead of noting the serious nature of these incidents and committing to work with NHTSA to determine the appropriate range of issues at hand, ARC's counsel stated that they had no obligation to provide such information and chastised Agency staff for indicating otherwise.

> Compounding ARC's failure to inform the Agency of these matters, ARC has also failed to comply with Standing General Order 2015-02A, issued in the underlying Preliminary Evaluation, which requires ARC to file a report within five days of receiving notification of an inflator field rupture. On July 8, 2016, a fatal rupture occurred in Newfoundland, Canada. NHTSA was notified of this incident on by both Transport Canada and by Hyundai. Although ARC was clearly notified of the incident, as demonstrated by ARC's attendance at an inspection of the vehicle that occurred on July 26, 2016, ARC has failed to provide any report

---

[100] Nat'l Highway Traffic Safety Admin., EA16-003, Ltr to ARC Automotive, Inc., Aug. 9, 2016.

to NHTSA regarding that incident. As noted by the Standing General Order, failure to comply with that obligation calls for the imposition of daily civil penalties.

ARC's response to the Agency's investigation to date does not demonstrate the behavior that NHTSA expects of manufacturers, must less manufacturers of vital safety components utilized in vehicles across the globe. To the contrary, ARC's behavior has demonstrated a lack of cognizance regarding the seriousness of this investigation and the underlying issues. ARC has been given every consideration, yet has failed to respond in kind…[101]

191.    By August 2020, NHTSA had expanded its Engineering Analysis to include "toroidal shaped hybrid air bag inflators, both passenger and driver side" and was requesting additional information specifically regarding the PH7 toroidal shaped hybrid front passenger airbag inflator "to facilitate its investigation of the potential risk of deployment-related field rupture."[102] Regarding the PH7 inflator, NHTSA focused on a time frame "defined by a) a starting point of June 1, 2014, the inflator build date of a confirmed field event, and b) the end point of January 31, 2018, the implementation date of equipment and process improvements by ARC on all toroidal inflator assembly lines."[103]

192.    NHTSA sent similar letters requesting information about the PH7 passenger hybrid inflator to vehicle manufacturers Volkswagen, BMW, Fiat Chrysler, GM, Toyota, Kia, and Hyundai.

193.    In April 2021, NHTSA posted a memorandum to the public file for EA16-003 stating that it was reviewing ARC's responses to redact all personally identifiable information and that these types of responses "are usually complex, contain large volumes of documents, and require additional time for review and redaction."[104] The agency asserted that, "[t]he public version of the response will be posted to this investigation file when available." The response has yet to be publicly posted.

---

[101] Nat'l Highway Traffic Safety Admin., EA16-003, Ltr. to ARC Automotive, Inc., Re: ARC's Response to EA16-003, Oct. 4, 2016, at 3 (emphasis added).
[102] Nat'l Highway Traffic Safety Admin., EA16-003, Ltr. to ARC Automotive, Inc., Aug. 18, 2020.
[103] *Id.*
[104] Nat'l Highway Traffic Safety Admin., EA16-003, Memo. Re: Response to Information Request, Apr. 13, 2021.

1

### G.    Defendants' Misconduct and Economic Injury To Plaintiffs And The Class.

2       194.    Like ordinary consumers, Plaintiffs reasonably believed when purchasing their Class

3   Vehicles that the vehicles were equipped with safe airbags that did not have a dangerous propensity

4   to shoot shrapnel into their faces, necks, torsos, and limbs or those of other vehicle occupants. The

5   safe, reliable, and proper functioning of an airbag inflator is a material component of an automobile

6   purchase or lease because it is required to ensure the vehicle can safely and properly operate.

7   Accordingly, the ordinary reasonable consumer would have considered the Inflator Defect to

8   constitute an important and material part of deciding whether to spend money to purchase or lease a

9   Class Vehicle (as defined below).

10      195.    Defendants were aware that consumers did not expect that their airbags would have

11  a dangerous propensity to shoot metal shrapnel and had readily available means to convey that

12  information to Plaintiffs and the Class—including through on-vehicle labeling, stickers, and

13  placards, through owner manuals, brochures, and pamphlets, through advertising for the Class

14  Vehicles, and through full and complete disclosure by way of recalls. Plaintiffs and the Class were

15  exposed to such materials information prior to purchasing or leasing their Class Vehicles, at the

16  time of purchase or lease (through interactions with OEM Defendants' sales employees and other

17  agents), and/or every day they sat in their Class Vehicles. Indeed, Defendants had one obvious

18  location to convey a warning about an airbag defect: on the steering wheel itself, an item the driver

19  cannot help but see before ever driving the car.

20      196.    Defendants nonetheless chose not to warn about or disclose the defect at any point in

21  time. The Defendants' concealment succeeded because each entity in the chain between ARC and

22  the OEM Defendants remained silent about the defect—resulting in the public, prospective

23  purchasers and lessees, automobile dealerships, automobile retailers, and automotive repair and

24  service facilities remaining unaware of the Inflator Defect, which successfully prevented any

25  warning to Plaintiffs and the Class. The foreseeable and intended effect of the Defendants'

26  concerted silence was that they all continued to profit from the sale, service, and use of the

27  Defective Inflators and Class Vehicles equipped with those inflators—with consumers bearing all

28  the safety risks and suffering economic losses as a result.

197.    Defendants intended to mislead and in fact misled reasonable consumers—including Plaintiffs and the Class—through their concealment of the Inflator Defect. Defendants did so with the intent to generate and increase sales of the Class Vehicles, thereby increasing Defendants' relative share of the automotive components and automobile markets.

198.    The Class Vehicles have a diminished value compared to the price they commanded when purchased or leased by the Class Members because neither the market nor any reasonable consumer would ignore the potential danger involving an airbag shooting metal shrapnel into the driver and passengers when assessing the value of an automobile and whether to purchase or lease it. Consequently, Plaintiffs paid more for their Class Vehicles than they otherwise would have because of the diminished value caused by Defendants' concealment of the Inflator Defect.

199.    Because the existence of the Inflator Defect in the Class Vehicles would have been patently material to any reasonable consumer had it been disclosed, Plaintiffs and the Class would not have purchased or leased the Class Vehicles and/or would not have paid as much for them were it not concealed.

200.    By concealing the Inflator Defect, Defendants implicitly distorted and misrepresented the true value of every Class Vehicle such that every Plaintiff and Class member received a vehicle of different and substantially lesser value—one with a higher effective cost— than they reasonably believed they were receiving. Stated differently, Plaintiffs and the Class surrendered more and acquired less in their transactions than they would have if Defendants had disclosed the Inflator Defect in the Class Vehicles. Accordingly, Plaintiffs and the Class did not realize the benefit of the bargain in purchasing and leasing the Class Vehicles, and their expectations as ordinary reasonable consumers were not met.

201.    Plaintiffs and the Class paid substantially more than the market value represented by the price bargained for. Plaintiffs and the Class bargained on a particular market value for their respective Class Vehicles. But because Defendants' misconduct and concealment resulted in Plaintiffs receiving less than they bargained for, Plaintiffs and the Class effectively paid a price that was higher than that reflected in the market price that they paid.

1    202.    For these reasons, every Class Vehicles is worth less than Plaintiffs and the Class

2    paid.

3    203.    Through the use of misleading representations and concealment of the Inflator

4    Defect, Defendants commanded a price for every Class Vehicle that exceeded what Plaintiffs and

5    the Class would have paid had they been fully informed.

6    204.    Absent the false and misleading representations, Plaintiffs and the Class would only

7    have been willing to pay less for the Class Vehicles, if they were willing to purchase them at all.

8    205.    In short, the cost of every Class Vehicle would have been lower absent Defendants'

9    misconduct and concealment.

10   206.    Defendants' misconduct and concealment also created and sustained increased

11   market demand for the Class Vehicles and increased Defendants' market share relative to what

12   consumer demand and Defendants' market share would have been had they not concealed the

13   Inflator Defect. Plaintiffs and the Class lost money as a result because they did not receive what

14   they reasonably believed they were paying for due to Defendants' misrepresentations and their

15   concealment of the Inflator Defect, while Defendants realized a commensurate unearned gain

16   because they did not deliver to Plaintiffs and the Class what they reasonably expected to receive in

17   exchange for the money they paid.

18   207.    Plaintiffs and the Class detrimentally altered their positions and suffered damages in

19   an amount no less than the difference in value between what they reasonably believed they were

20   paying for and what they actually received.

21   ## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

22   ### A.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and

23   Could Not Discover Their Claims.

24   208.    Plaintiffs and members of the Classes had no knowledge of the misconduct and

25   concealment alleged herein, or of facts sufficient to place them on inquiry notice of the claims set

26   forth herein until August 2020 when the NHTSA expanded its Engineering Analysis to include

27   "toroidal shaped hybrid air bag inflators, both passenger and driver side" and requested additional

28

1  information from ARC specifically regarding the PH7 toroidal shaped hybrid front passenger airbag

2  inflator "to facilitate its investigation of the potential risk of deployment-related field rupture."

3      209.    Plaintiffs and members of the Class are consumers who purchased or leased Class

4  Vehicles. No information in the public domain was available to the Plaintiffs and the members of

5  the Class prior to August 2020 that revealed sufficient information to suggest that Defendants were

6  involved in the misconduct or concealment alleged herein. Therefore, the statute of limitations did

7  not begin to run because Plaintiffs and members of the Class did not and could not discover their

8  claims, or in the alternative, because fraudulent concealment tolled the statute of limitations, until at

9  the earliest, August 2020.

10      210.    Plaintiffs and members of the Class had no means of obtaining any facts or

11  information concerning any aspect of ARC's dealings with the Airbag Module Defendants and

12  OEM Defendants, much less the fact that they had engaged in the misconduct and concealment

13  alleged herein.

14      211.    For these reasons, the statute of limitations as to Plaintiffs' and the Class's claims did

15  not begin to run and has been tolled with respect to the claims that Plaintiffs and members of the

16  Class have alleged in this Complaint.

17      **B.    Fraudulent Concealment Tolled the Statute of Limitations.**

18      212.    In the alternative, application of the doctrine of fraudulent concealment tolled the

19  statute of limitations on the claims asserted herein by Plaintiffs and the Class. Plaintiffs and

20  members of the Class did not discover, and could not discover through the exercise of reasonable

21  diligence, the existence of the misconduct and concealment alleged herein until when the NHTSA

22  expanded its Engineering Analysis to include "toroidal shaped hybrid air bag inflators, both

23  passenger and driver side" and requested additional information from ARC specifically regarding

24  the PH7 toroidal shaped hybrid front passenger airbag inflator "to facilitate its investigation of the

25  potential risk of deployment-related field rupture" at the very earliest.

26      213.    Before that time, Plaintiffs and members of the Class were unaware of Defendants'

27  unlawful conduct and did not know before then that they purchased or leased, or overpaid form

28  Class Vehicles containing Defective Inflators throughout the United States. No or little information,

actual or constructive, was ever made available to Plaintiffs and members of the Class that even hinted to Plaintiffs that they were being injured by Defendants' misconduct and concealment.

214.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the misconduct, were wrongfully concealed and carried out in a manner that precluded detection.

215.    By its very nature, the Defendants' misconduct was inherently self-concealing. Airbags and their components are not exempt from safety regulation and, thus, Plaintiffs and members of the Class reasonably considered that the Class Vehicles, including all the automotive parts and components contained therein, they purchased or leased met or exceeded safety regulations. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' conduct before August 2020 at the very earliest. Plaintiffs and the members of the Class could not have discovered the misconduct or concealment at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants to avoid detection of, and fraudulently conceal, their misconduct.

216.    Because the misconduct was both self-concealing and affirmatively concealed by Defendants, Plaintiffs and members of the Class had no knowledge of the misconduct, or of any facts or information that would have caused a reasonably diligent person to investigate whether misconduct existed, until August 2020 at the very earliest.

217.    For these reasons, the statute of limitations as to Plaintiffs' and the Class's claims did not begin to run and has been tolled with respect to the claims that Plaintiffs and members of the Class have alleged in this Complaint.

## VII.    CLASS ACTION ALLEGATIONS

218.    As stated, *supra*, "Class Vehicles" refers to all vehicles containing the defective toroidal stored gas hybrid inflators manufactured by ARC for which there are representative Plaintiffs. Plaintiffs intend to amend this Complaint to add additional representative Plaintiffs and Class Vehicles after further investigation and discovery.

219.    The Class Vehicles are equipped with driver and/or passenger airbags containing Defective Inflators. The Defective Inflators suffer from a common, uniform defect that renders

them vulnerable to rupturing and ejecting metal shrapnel. Certain OEM Defendants have recalled various Class Vehicles based on the Defective Inflators. Based on the incomplete, pre-discovery information available at this time, and subject to additions and revisions based on information unearthed in discovery, the Class Vehicles include:

| Model Years | Manufacturer | Model | Side | Airbag Module Supplier |
|---|---|---|---|---|
| 2015-2019 | BMW | X5 | Passenger | Joyson |
| 2013-2017 | General Motors | GMC Acadia | Driver | Toyoda Gosei |
| 2013-2017 | General Motors | Chevrolet Traverse | Driver | Toyoda Gosei |
| 2015-2020 | Audi | A3 | Passenger | Joyson |
| 2015-2021 | Volkswagen | Golf | Passenger | Joyson |
| 2015-2021 | Volkswagen | GTI | Passenger | Joyson |
| 2018-2019 | Volkswagen | Jetta | Passenger | Joyson |
| 2015-2017 | Ford | F-150 | Passenger | Joyson |
| 2015-2017 | Ford | Mustang | Passenger | Joyson |
| 2015-2020 | Porsche | Macan | Passenger | Joyson |

220.    The Defective Inflators manufactured by ARC are identifiable, discrete physical products that remain essentially unchanged when incorporated into a Class Vehicle. As a result, the Defective Inflators follow a traceable physical chain of distribution from ARC, to the Airbag Module Defendants, to the OEM Defendants, to automobile dealerships and retailers, and then to Plaintiffs and the Class.

221.    Defective Inflators that are incorporated into the assembly contain markings identifying ARC as the manufacturer on a small label on the component. Defective Inflators can therefore be physically traced through the supply chain.

222.    Pursuant to Federal Rule of Civil Procedure ("Rules") 23(a), 23(b)(2), and 23(b)(3), Plaintiffs bring this action on behalf of a proposed **National Class** defined as follows:

*All persons in the United States who currently own, or lease or leased, a Class Vehicle in the United States.*

223.     Additionally, pursuant to Rules 23(b)(2) and/or 23(b)(3), Plaintiffs will also or alternatively seek certification of the following subclasses:

**California Subclass** brought by Plaintiffs John Britton and Eva Jacinto, comprised of:

*All persons who currently own, or lease or leased, an Audi or Ford Class Vehicle in California.*

224.     **Florida Subclass** brought by Plaintiffs Celeste Felice, Glenda Dillon, Stephen Gearhart, and Patricia Jones, comprised of:

*All persons who currently own, or lease or leased, a BMW, GM, Porsche, or Volkswagen Class Vehicle in Florida.*

225.     **Illinois Subclass** brought by Melissa Warren, Nicole Senkpeil, Eniko Gedo, Jeremy Young, and Rhonda Hunt Muhammed comprised of:

*All persons who currently own, or lease or leased, a BMW, GM, or Volkswagen Class Vehicle in Illinois.*

226.     **Massachusetts Subclass** brought by Kristen Luiz, comprised of:

*All persons who currently own, or lease or leased, a BMW Class Vehicle in Massachusetts.*

227.     **New Jersey Subclass** brought by Anthony Raspantini, comprised of:

*All persons who currently own, or lease or leased, a Ford Class Vehicle in New Jersey.*

228.     **New York Subclass** brought by Plaintiffs Francine Lewis and Matthew Kakol, comprised of:

*All persons who currently own, or lease or leased, a Ford or Volkswagen Class Vehicle in New York.*

229.     Unless otherwise stated, the term "Class" refers jointly and severally to the National Class and to each Subclass.

230.     Excluded from the Class are: (a) each Defendant and its board members, executive-level officers, attorneys, and immediate family members of any such persons; (b) the Court, the Court's immediate family, and the Court staff; (c) any person who asserts a personal injury or wrongful death claim caused by the Inflator Defect; and (d) any person who timely and properly excludes himself or herself from the Class.

231.   **Numerosity—Fed. R. Civ. P. 23(a)(1).** The members the proposed Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.

232.   Although the precise number of Class members is unknown to Plaintiffs, upon information and belief the Class would easily number in the thousands if not tens of thousands. Millions of vehicles spanning nearly 20 model years are potentially affected by the Inflator Defect. The Class is thus comprised of numerous, geographically dispersed members who cannot be practicably joined.

233.   The true size of the Class should be ascertainable through the OEM Defendants' business records and by other means.

234.   **Typicality—Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of other Class members' claims because Plaintiffs and the Class all purchased or leased a Class Vehicle containing Defective Inflators. All received less than the full value Class Vehicles due to the Inflator Defect and OEM Defendants' representations and/or Defendants' omissions. Class members, like Plaintiffs, would not have purchased the Class Vehicles or paid as much had Defendants not misrepresented the safety of the Class Vehicles or concealed and omitted to disclose the Inflator Defect, which was unknown to Plaintiffs and Class members alike.

235.   Plaintiffs and the Class all were exposed to the same or substantially similar misrepresentations and to the same omissions—namely, concealment of the Inflator Defect.

236.   Plaintiffs and each Class member suffered economic damages that are calculable on a class-wide basis. The claims all arise from a single course of conduct and each Class member would individually make similar legal and factual arguments to establish Defendants' liability.

237.   There are no defenses available that are unique to the Plaintiffs.

238.   **Commonality & Predominance—Fed. R. Civ. P. 23(a)(2) & 23(b)(3).** Plaintiffs and the Class are united by a community of interest in obtaining appropriate remedies, including injunctive relief, repair, or replacement of the defective vehicles or vehicle components, restitution, damages, and other available relief designed to redress Defendants' wrongful conduct. This action involves questions of law and fact that are common to the Class that are susceptible to common

answers and that predominate over any individual questions specific to any Class members. These include:

  a.  Whether the subject airbag inflators are defective;

  b.  Whether the Class Vehicles are equipped with Defective Inflators;

  c.  Whether Defective Inflators in the Class Vehicles pose an unreasonable safety risk or are otherwise material to reasonable consumers;

  d.  Whether an ordinary reasonable consumer would have purchased or leased a Class Vehicle had he or she known of the Inflator Defect;

  e.  Whether an ordinary reasonable consumer would have paid less money to purchase or lease a Class Vehicle had they known of the Inflator Defects— and if so, the diminution in Class Vehicle value that the Inflator Defect would have caused;

  f.  Whether the Class Vehicles commanded a market premium based on the fact that the airbag defect had not been disclosed to the public;

  g.  Whether the Class and Subclass members were denied the benefit of their bargain as a result of the undisclosed Inflator Defect;

  h.  Whether Defendants had actual or constructive knowledge of the Inflator Defects;

  i.  When Defendants first had actual or constructive knowledge of the Inflator Defects;

  j.  Whether Defendants had a duty to disclose the Inflator Defects before or at the time Plaintiffs and the Class purchased or leased their respective Class Vehicles;

  k.  Whether Defendants had and have an ongoing duty to disclose the Inflator Defects;

  l.  Whether Defendants breached their express and implied warranties for the Class Vehicles and Defective Inflators;

1             m.     Whether Defendants violated the Magnusson-Moss Warranty Act and/or the

2                    Song-Beverly Consumer Warranty Act;

3             n.     Whether Defendants violated governing laws prohibiting unfair and

4                    deceptive trade practices and other similar consumer protection laws of

5                    Plaintiffs' and the Class members' respective jurisdictions;

6             o.     Whether Defendants breached other duties or violated other applicable laws

7                    by their representations and/or by their omissions, including concealment of

8                    the Inflator Defect;

9             p.     Whether Defendants breached their obligations to provide timely repairs for

10                   the Class Vehicles;

11            q.     Whether Defendants should be declared legally and financially responsible

12                   for notifying the Class and Subclass members of the true and complete nature

13                   and extent of the Inflator Defects;

14            r.     Whether Defendants should be declared legally and financially responsible

15                   for notifying Class and Subclass members of their right to reimbursement

16                   from Defendants for the costs incurred in diagnosing, repairing, and

17                   replacing the Defective Inflators in the Class Vehicles;

18            s.     Whether and to what extent Defendants are obligated to pay actual and

19                   consequential damages to the Class and Subclass members as a result of the

20                   Inflator Defect;

21            t.     Whether Defendants fraudulently concealed the Inflator Defect;

22            u.     Whether Defendants misconduct was knowing and willful;

23            v.     Whether Defendants should be obligated to pay punitive damages in

24                   connection with the claims brought in this action, and if so, the amount of

25                   those damages;

26            w.     Whether Defendants were unjustly enriched by receiving Plaintiffs' and the

27                   Class members' money for the Class Vehicles;

28

1          x.      Whether Defendants should be ordered to disgorge all or part of the monies

2                received from Plaintiffs and the Class in exchange for the Class Vehicles;

3          y.      Whether Plaintiffs and the Class are entitled to damages, injunctive relief,

4                restitution, or other relief sought in this Complaint; and

5          z.      The amounts to which Plaintiffs and the Class are entitled.

239.    These common issues will drive the resolution of the litigation in that their determination will resolve in one stroke issues that are central to the validity of each Class members' claims.

240.    The factual and legal issues identified above (a) remain common to the Class, (b) arise from a common course of conduct and systemic policy decisions made by Defendants, (c) predominate in number and importance over questions that may not be common to the class, and (d) preclude neither class-wide calculation of damages nor the methodological determination of how such damages should be allocated among Class members.

241.    **Adequacy of Representation—Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Class members. Plaintiffs commit to protecting the interests of the Class without exercising personal interest or otherwise acting in a manner inconsistent with the best interests of the Class generally. Plaintiffs have retained attorneys with exceptional experience in complex litigation, including extensive class action experience and experience in handling consumer protection cases and product liability cases, including automobile defect claims. The firms and lead counsel for the firms retained by Plaintiffs also have substantial trial experience, individually and collectively. Plaintiffs and their attorneys will responsibly, ethically, and vigorously advocate on behalf of the Class and Plaintiffs' counsel have ample resources to do so.

242.    **Ascertainability.** The identities of the other Class members are ascertainable from various sources including Defendants' production and distribution records, Polk automotive data, vehicle ownership records, government ownership records, or via simple notice by publication.

243.   **Predominance.** The common questions of law or fact identified above are substantially similar and predominate over those questions affecting only specific members of the Class and Subclass.

244.   **Superiority.** The proposed class action is superior to the other means available to the Class to obtain relief.

245.   The damages suffered by individual Class members are relatively small compared to the burden and expense of individual litigation of the claims described here against Defendants so that making the class whole in the absence of a class action is unlikely and impracticable.

246.   This means Class members have relatively less interest in individually controlling the prosecution of separate actions and it cannot be said that the interests of individuals pursuing individual cases in conducting separate lawsuits is so strong as to call for denial of a class action. Without class certification, the prosecution of separate consumer actions by individual Class members would be impracticable and financially difficult and, therefore, unlikely. Indeed, upon information and belief—based upon searches of PACER and Westlaw dockets—no other legal actions seeking benefit-of-the-bargain economic damages have been brought against Defendant concerning the subject matter of this action. There are two known personal injury suits and nothing more.

247.   Denial of class treatment run the risk of establishing incompatible standards of conduct for Defendants, discouraging the prosecution of meritorious but small claims, and it may result in adjudications which would be dispositive of the interests of other Class members who are not parties to the adjudication, or otherwise substantially impair the ability of Class members (and Defendants) to protect their rights and interests.

248.   Defendants have no facially plausible interest in defending against separate, geographically dispersed claims and, in fact, that would be more burdensome to Defendants than defending against all potential claims in a single forum and proceeding.

249.   Likewise, the judicial system has no interest in burdening a number of courts when the claims of this highly cohesive class can be fairly and efficiently concentrated and managed by this Court.

250.     Individualized actions would run the risk of creating inconsistent or contradictory judgments arising from the same set of facts and would increase the likely delay and expense to all parties involved and to the courts, including this Court. By proceeding as a class action, the claims at issue can be managed efficiently through economies of scale.

251.     Additionally, the claims are manageable, each Subclass claim is governed by one state's law and those laws are consonant with one another. Defendants' misconduct impacts all Class members, whose losses are capable of calculation on a class-wide or Subclass-side basis.

252.     Ultimately, the class action procedure is superior to other methods of adjudicating the Plaintiffs and Class members' claims. This is precisely why class actions exist—class treatment facilitates the fair, uniform and efficient adjudication of claims, as it would here, and it promotes judicial economy while avoiding the undue financial, administrative and procedural burdens that necessarily would result from a multiplicity of individual actions.

253.     **Injunctive and Declaratory Relief—Fed. R. Civ. P. 23(b)(2).** Defendants acted or refused to act on grounds generally applicable to the Class, making the award of equitable relief and/or restitution appropriate to the Class in their entirety.

254.     **Particular Issues—Fed. R. Civ. P. 23(c)(4).** Any or all of the issues identified above are appropriate for certification pursuant to Rule 23(c)(4) because each is particular and common to the Class and the resolution of each or all would materially advance the disposition of this action and the parties' interests.

255.     Certification of particular issues would move the litigation forward efficiently, saving money, time, and judicial resources for all involved, regardless of whether the action as a whole might be certified.

256.     For the reasons set forth above, these issues predominate in number and importance over questions that may not be common to the Class. Further, as to the California Class, a class action should further be certified under California Consumer Legal Remedies Act, Cal. Civ. Code § 1781.

VIII.   **CAUSES OF ACTION: NATIONAL CLASS**

**National Class Count I:**
**Common Law Fraudulent Concealment**
**Against All Defendants**

257.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

258.   Plaintiffs bring this claim for fraudulent concealment on behalf of the National Class against all Defendants on the basis that the state laws involved do not conflict with one another in a case-dispositive manner and they involve the same key elements: duty, reliance, and causation. Alternatively, Plaintiffs bring this claim under the laws of their respective states.

259.   Defendants had a duty to disclose the existence, nature, and extent of the Inflator Defect in the Class Vehicles because:

   a.   Defendants were in a superior position to know the true facts about the Inflator Defect as the designers, manufacturers, assemblers, distributors, marketers, and warrantors of the Defective Inflators and Class Vehicles, and given their experience and knowledge as experts and long-time veterans of the automotive industry;

   b.   Plaintiffs and the Class could not reasonably have been expected to know, learn, or discover the Inflator Defect as they were not part of the process of designing, manufacturing, assembling, marketing, distributing, or warranting the Defective Inflators or Class Vehicles;

   c.   Defendants knew that Plaintiffs and the Class could not reasonably have been expected to know, learn, or discover the existence, nature, or extent of the Inflator Defect; and

   d.   The Inflator Defect pose a severe risk of harm in that the metal shrapnel can puncture and stab the occupants, causing severe and potentially fatal injuries.

260.   ARC concealed the Inflator Defect by:

   a.   Representing that its Defective Inflators were safe and fit for their intended use when ARC knew that they were dangerous and would diminish the value of the Class Vehicles because of the Inflator Defect;

b.      Knowingly selling and profiting from the Defective Inflators intended for use in consumer vehicles while maintaining silence as to the defect with the intent and purpose of ensuring that prospective consumers would remain unaware of about the Inflator Defect and would purchase Class Vehicles containing the Defective Inflators, leading to continuing profits for ARC at the expense of consumer safety;

c.      Choosing not to require that its business partners, including other suppliers and OEMs, disclose the Inflator Defect to prospective consumers so that the companies could enjoy continued profits from the sale of vehicles equipped with the Defective Inflators;

d.      Purposefully concealing the existence of the Inflator Defect from dealerships, retailers, service facilities, and other businesses that sell, inspect, service, and maintain consumer vehicles so that the public would remain ignorant of the danger and would continue purchasing vehicles with ARC's Defective Inflators;

e.      Confidentially settling potential claims involving individuals injured or killed by Defective Inflators and securing confidentiality agreements to ensure those individuals would not disclose the Inflator Defect to the media and public (this allegation is made upon information and belief and refers to the allegations above, applying just to those Defendants);

f.      Publicly representing that its airbag inflators were safe and reliable to perform their intended function so as to create a false public perception that the Defective Inflators were not defective and did not have a dangerous propensity to rupture and eject metal shrapnel;

g.      Refusing to implement recalls of the Defective Inflators when it became clear they were defective and had a dangerous propensity to rupture and eject metal shrapnel;

1     h.     Misrepresenting the nature of the Inflator Defect when coordinating with the
2            OEMs and Tier 1 suppliers in defining the scope of the recalls by stating or
3            implying that ruptures were due to isolated manufacturing concerns when, in
4            fact, the inflators were fundamentally defective and unreasonably dangerous
5            due to the common design utilizing ammonium nitrate; and/or

6     i.     Falsely representing and limiting the scope of affected units when conducting
7            recalls.

8   261.   The Airbag Module Defendants concealed the Inflator Defect by:

9     a.     Representing that their airbag module assemblies were safe and fit for their
10           intended use when they knew that they were dangerous and would diminish
11           the value of the Class Vehicles because of the Inflator Defect;

12    b.     Knowingly selling and profiting from the Defective Inflators intended for use
13           in consumer vehicles while maintaining silence as to the defect with the
14           intent and purpose of ensuring that prospective vehicle consumers would
15           remain unaware of about the Inflator Defect and would purchase Class
16           Vehicles containing the Defective Inflators, leading to continuing profits for
17           the Airbag Module Defendants at the expense of consumer safety;

18    c.     Choosing not to require that their business partners, including ARC and
19           OEMs, disclose the Inflator Defect to prospective consumers so that the
20           companies could enjoy continued profits from the sale of airbag module
21           assemblies equipped with the Defective Inflators;

22    d.     Purposefully concealing the existence of the Inflator Defect from dealerships,
23           retailers, service facilities, and other businesses that sell, inspect, service, and
24           maintain consumer vehicles so that the public would remain ignorant of the
25           danger and would continue purchasing vehicles with ARC's Defective
26           Inflators;

27    e.     Confidentially settling potential claims involving individuals injured or killed
28           by Defective Inflators and securing confidentiality agreements to ensure

1        those individuals would not disclose the Inflator Defect to the media and

2        public (this allegation is made upon information and belief and refers to the

3        allegations above, applying just to those Defendants);

4        f.      Publicly representing that their airbag modules were safe and reliable to

5        perform their intended function so as to create a false public perception that

6        the Defective Inflators were not defective and did not have a dangerous

7        propensity to rupture and eject metal shrapnel;

8        g.     Refusing to implement recalls of airbag modules containing the Defective

9        Inflators when it became clear they were defective and had a dangerous

10       propensity to rupture and eject metal shrapnel;

11       h.     Misrepresenting the nature of the Inflator Defect when coordinating with the

12       ARC and the OEMs in defining the scope of the recalls by stating or

13       implying that ruptures were due to isolated manufacturing concerns when, in

14       fact, the inflators were fundamentally defective and unreasonably dangerous

15       due to the common design utilizing ammonium nitrate; and/or

16       i.      Falsely representing and limiting the scope of affected units when conducting

17       recalls.

18    262.   The OEM Defendants concealed the Inflator Defect by:

19       a.     Representing that the Class Vehicles—including the airbags equipped in

20       those vehicles— were safe and fit for their intended use when those

21       Defendants knew that they were dangerous because of the Inflator Defect;

22       b.     Knowingly selling and profiting from vehicles equipped with the Defective

23       Inflators while maintaining silence as to the Inflator Defect with the intent

24       and purpose of ensuring that prospective consumers would remain unaware

25       of about the Inflator Defect and would purchase the Class Vehicles, leading

26       to continuing profits for those Defendants at the expense of consumer safety;

27       c.     Purposefully withholding the existence of the Inflator Defect from

28       dealerships, retailers, service facilities, and other business which sell, inspect,

service, and maintain consumer vehicles so that the public would remain
ignorant of the danger and would continue purchasing the OEMs' vehicles;

    d.    Confidentially settling potential claims involving individuals injured or killed by Defective Inflators and securing confidentiality agreements to ensure those individuals would not disclose the defect to the media and public (this allegation is made upon information and belief and refers to the allegations above, applying just to those Defendants);

    e.    Publicly representing that their vehicles were safe and reliable so as to create a false public perception that the airbag inflators in those vehicles were not defective and did not have a dangerous propensity to rupture and eject metal shrapnel;

    f.    Misrepresenting the nature of the defect when issuing prior recalls by stating that it was due to isolated manufacturing concerns when, in fact, the inflators were fundamentally defective and unreasonably dangerous due to the common design utilizing ammonium nitrate; and/or

    g.    Falsely representing and limiting the scope of affected units when conducting recalls.

263.    Defendants have engaged in deceptive, misleading, unfair, unconscionable, and fraudulent acts and practices that have caused actual damages to Plaintiffs and the Class, as described herein.

264.    Defendants' intentional concealment of the Inflator Defect and their false, deceptive, misleading, and confusing representations and omissions would be material to any ordinary, average, and reasonable consumer's decision whether to buy a Class Vehicle, given that the defect pertains to the most fundamental and important feature of an airbag system—safety. No reasonable consumer, including Plaintiffs, would have purchased a Class Vehicle but for Defendants' acts, practices and omissions, as described throughout this Complaint.

1    265.   Any ordinary, average, objectively reasonable consumer acting reasonably in the

2    circumstances would have been deceived by Defendants' acts and practices, including the

3    misrepresentations and omissions described herein.

4    266.   As a direct and proximate result of Defendants' deceptive practices, Plaintiffs and

5    the Class have sustained economic injury and loss that first occurred at the time each Class Vehicle

6    was purchased.

7    267.   Accordingly, Plaintiffs and the Class demand the applicable damages and other relief

8    sought in the Prayer for Relief below.

9    268.   Additionally, Defendants deliberately, maliciously, wantonly, and intentionally

10   concealed the Inflator Defect from the Class Members so as to increase their own profits—despite

11   knowing that doing so jeopardized the safety and lives of those driving and riding in the Class

12   Vehicles. This misconduct warrants and requires the imposition of punitive damages to prevent

13   Defendants from engaging in this same misconduct again and to deter other individuals and

14   businesses from engaging in the same or similar course of action.

15
                                    **National Class Count II:**
16                       **Violation of the Magnusson-Moss Warranty Act**
                                    **Against the OEM Defendants**

17   269.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

18   270.   Plaintiffs bring this claim for violation of the Magnusson-Moss Warranty Act (15

19   U.S.C. § 2301, *et seq.*) on behalf of the National Class against the OEM Defendants.

20   271.   Plaintiffs and members of the Class and Subclass are "consumers" under 15 U.S.C. §

21   2301(3).

22   272.   Defendants are "suppliers" and "warrantors" under 15 U.S.C. § 2301(4) and (5).

23   273.   The Class Vehicles are "consumer products" under 15 U.S.C. § 2301(6).

24   274.   Defendants provided an implied warranty of merchantability as part of its business

25   of supplying and profiting from the sale of the Class Vehicles and the Defective Inflators. This

26   warranty of merchantability includes that the Class Vehicles' airbag inflators were fit for their

27   ordinary purpose (*i.e.*, that they would safely deploy rather than shooting metal shrapnel at the

28

drivers and passengers), would pass without objection in the trade as designed, manufactured, and marketed, and were adequately and properly contained, packaged, and labeled.

275. Defendants breached their warranty for the Class Vehicles' inflators because:

    a.    The airbag inflators have latent defects which cause them to have a dangerous propensity to rupture and eject metal shrapnel, thereby subjecting Plaintiffs and the class and subclass to the risk of loss and injury;

    b.    Defendants denied and concealed the existence of the Inflator Defect, in the process refusing to pay for needed repairs and replacements for Plaintiffs and the Class and Subclasses; and

    c.    Defendants failed to provide the needed repair or replacement for the fundamental design defect impacting the Class Vehicles.

276. Plaintiffs and the Class sustained damages and other losses due to Defendants' breach of their warranties. Plaintiffs and the Class will suffer irreparable harm if Defendants are not ordered to properly repair all of the Class Vehicles and Defective Inflators immediately, offer rescission by repurchasing their defective Class Vehicles for their full cost, and reimburse the owners and lessees of the Class Vehicles for the monies they have paid to own and lease the vehicles.

277. Resorting to any informal dispute resolution procedure or affording Defendants a reasonable opportunity to cure its breach of written warranties to Plaintiffs and the Class, is unnecessary and futile. At the time they sold and leased the Class Vehicles, Defendants knew, should have known, or were reckless in not knowing of their misrepresentations or omissions concerning the Inflator Defect, but nevertheless failed to rectify the situation or disclose it to Plaintiffs or the Class.

278. Moreover, the remedies available through any informal dispute resolution procedure would be wholly inadequate under the circumstances. Accordingly, any statutory requirement that Plaintiffs resort to an informal dispute resolution procedure or afford Defendants a reasonable opportunity to cure its breach of written warranties is excused and, thereby, deemed satisfied.

279.    Plaintiffs, individually and on behalf of the Class, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs and any other applicable relief sought in the Prayer for Relief below.

## IX.    CAUSES OF ACTION: CALIFORNIA SUBCLASS

**California Subclass Count I:**
**Violations of California's Consumer Legal Remedies Act**
**Against the ARC, Audi, Ford, and Joyson Safety System Defendants**

280.    Plaintiffs John Britton and Eva Jacinto (referred to collectively as "Plaintiffs" in this count) incorporate by reference the allegations in the preceding paragraphs.

281.    Plaintiffs bring this count individually and on behalf of the California Subclass against the ARC, Audi, Ford, and Joyson Safety System Defendants.

282.    Defendants are "persons" under California Civil Code § 1761(c).

283.    Plaintiffs and the California Subclass members are "consumers" under California Civil Code § 1761(d) because they purchased Class Vehicles primarily for personal, family, or household use.

284.    The purchase of the Class Vehicles by Plaintiffs and the California Subclass constitute "transactions" within the meaning of California Civil Code § 1761(e).

285.    The Class Vehicles are "goods" under California Civil Code § 1761(a).

286.    Defendants' violations of the CLRA occurred repeatedly in their trade or practice— including the design, manufacture, distribution, marketing, sale, and lease of the Defective Inflators and Class Vehicles.

287.    Defendants violated California Civil Code § 1770(a) by concealing, misrepresenting, and failing to disclose the Inflator Defect, including the true nature, extent, and cause of the defect. In particular Defendants violated:

    a.  California Civil Code § 1770(a)(5) by representing that the Class Vehicles and their equipped airbag inflators had a characteristic that they did not actually have—*i.e.*, that the vehicles were safe and suitable for use on the roadway, when, in fact, they were not because their airbag inflators were

defectively designed such that they had an unreasonably dangerous propensity to rupture, causing severe and fatal injuries;

 b. California Civil Code § 1770(a)(7) by representing that the Class Vehicles and their equipped airbag inflators were of a particular quality, grade, or standard when, in fact, they were not of that quality, grade, or standard;

 c. California Civil Code § 1770(a)(9) by concealing and failing to disclose that the Class Vehicles' airbag inflators were inherently defective, defectively designed, and not suitable for their intended use despite advertising them as safe and suitable for their intended function; and

 d. California Civil Code § 1770(a)(16) by failing to market, distribute, sell, and lease the Class Vehicles equipped with Defective Inflators in accordance with Defendants' previous representations—*i.e.*, that the Class Vehicles were safe and suitable for their intended use, when, in fact, they were not because of the Inflator Defect.

288. Defendants had a duty to disclose the existence, nature, and extent of the Inflator Defect (which they breached, as alleged above), because:

 a. Defendants were in a superior position to know the true facts about the Inflator Defect as the designers, manufacturers, assemblers, distributors, marketers, and warrantors of the Defective Inflators and Class Vehicles, and given their experience and knowledge as experts and long-time veterans of the automotive industry;

 b. Plaintiffs and the Class could not reasonably have been expected to know, learn, or discover the Inflator Defect as they were not part of the process of designing, manufacturing, assembling, marketing, distributing, or warranting the inflators or Class Vehicles;

 c. Defendants knew that Plaintiffs and the Class could not reasonably have been expected to know, learn, or discover the existence, nature, or extent of the Inflator Defect; and

d.    The Inflator Defect pose a severe risk of harm in that the metal shrapnel can

puncture and stab the occupants, causing severe and potentially fatal injuries.

289.    ARC concealed the Inflator Defect by:

a.    Representing that its airbag inflators were safe and fit for their intended use

when Defendants knew that they were dangerous and would diminish the

value of the Class Vehicles because of the Inflator Defect;

b.    Knowingly selling and profiting from the Defective Inflators intended for use

in consumer vehicles while maintaining silence as to the defect with the

intent and purpose of ensuring that prospective consumers would remain

unaware of about the Inflator Defect and would purchase vehicles containing

the Defective Inflators, leading to continuing profits for ARC at the expense

of consumer safety;

c.    Choosing not to require that its business partners, including other suppliers

and OEMS, disclose the Inflator Defect to prospective consumers so that the

companies could enjoy continued profits from the sale of vehicles equipped

with the Defective Inflators;

d.    Purposefully concealing the existence of the Inflator Defect from dealerships,

retailers, service facilities, and other businesses that sell, inspect, service, and

maintain consumer vehicles so that the public would remain ignorant of the

danger and would continue purchasing vehicles with ARC's inflators;

e.    Confidentially settling potential claims involving individuals injured or killed

by Defective Inflators and securing confidentiality agreements to ensure

those individuals would not disclose the Inflator Defect to the media and

public (this allegation is made upon information and belief and refers to the

allegations above);

f.    Publicly representing that its airbag inflators were safe and reliable to

perform their intended function so as to create a false public perception that

1    the Defective Inflators were not defective and did not have a dangerous

2    propensity to rupture and eject metal shrapnel;

3    g.    Refusing to implement recalls of the Defective Inflators when it became clear

4          they were defective and had a dangerous propensity to rupture and eject

5          metal shrapnel;

6    h.    Misrepresenting the nature of the Inflator Defect when coordinating with the

7          OEMs and Tier 1 suppliers in defining the scope of the recalls by stating or

8          implying that ruptures were due to isolated manufacturing concerns when, in

9          fact, the inflators were fundamentally defective and unreasonably dangerous

10         due to the common design utilizing ammonium nitrate; and/or

11   i.    Falsely representing and limiting the scope of affected units when conducting

12         recalls.

13   290.  Joyson Safety Systems concealed the Inflator Defect by:

14   a.    Representing that their airbag module assemblies were safe and fit for their

15         intended use when they knew that they were dangerous and would diminish

16         the value of the Class Vehicles because of the Inflator Defect;

17   b.    Knowingly selling and profiting from the Defective Inflators intended for use

18         in consumer vehicles while maintaining silence as to the defect with the

19         intent and purpose of ensuring that prospective vehicle consumers would

20         remain unaware of about the Inflator Defect and would purchase Class

21         Vehicles containing the Defective Inflators, leading to continuing profits for

22         the Airbag Module Defendants at the expense of consumer safety;

23   c.    Choosing not to require that their business partners, including ARC and

24         OEMs, disclose the Inflator Defect to prospective consumers so that the

25         companies could enjoy continued profits from the sale of airbag module

26         assemblies equipped with the Defective Inflators;

27   d.    Purposefully concealing the existence of the Inflator Defect from dealerships,

28         retailers, service facilities, and other businesses that sell, inspect, service, and

1    maintain consumer vehicles so that the public would remain ignorant of the

2    danger and would continue purchasing vehicles with ARC's Defective

3    Inflators;

4    e.    Confidentially settling potential claims involving individuals injured or killed

5         by Defective Inflators and securing confidentiality agreements to ensure

6         those individuals would not disclose the Inflator Defect to the media and

7         public (this allegation is made upon information and belief and refers to the

8         allegations above);

9    f.    Publicly representing that its airbag modules were safe and reliable to

10        perform their intended function so as to create a false public perception that

11        the Defective Inflators were not defective and did not have a dangerous

12        propensity to rupture and eject metal shrapnel;

13   g.    Refusing to implement recalls of airbag modules containing the Defective

14        Inflators when it became clear they were defective and had a dangerous

15        propensity to rupture and eject metal shrapnel;

16   h.    Misrepresenting the nature of the Inflator Defect when coordinating with the

17        ARC and the OEMs in defining the scope of the recalls by stating or

18        implying that ruptures were due to isolated manufacturing concerns when, in

19        fact, the inflators were fundamentally defective and unreasonably dangerous

20        due to the common design utilizing ammonium nitrate; and/or

21   i.    Falsely representing and limiting the scope of affected units when conducting

22        recalls.

23   291.   The Audi and Ford Defendants concealed the defect by:

24   a.    Representing that the Class Vehicles—including the airbags equipped in

25        those vehicles— were safe and fit for their intended use when those

26        Defendants knew that they were dangerous because of the Inflator Defect;

27   b.    Knowingly selling and profiting from vehicles equipped with the Defective

28        Inflators while maintaining silence as to the Inflator Defect with the intent

and purpose of ensuring that prospective consumers would remain unaware
of about the Inflator Defect and would purchase the Class Vehicles, leading
to continuing profits for those Defendants at the expense of consumer safety;

c.     Purposefully withholding the existence of the Inflator Defect from
dealerships, retailers, service facilities, and other business which sell, inspect,
service, and maintain consumer vehicles so that the public would remain
ignorant of the danger and would continue purchasing the OEMs' vehicles;

d.     Publicly representing that their vehicles were safe and reliable so as to create
a false public perception that the airbag inflators in those vehicles were not
defective and did not have a dangerous propensity to rupture and eject metal
shrapnel;

e.     Misrepresenting the nature of the defect when issuing prior recalls by stating
that it was due to isolated manufacturing concerns when, in fact, the inflators
were fundamentally defective and unreasonably dangerous due to the
common design utilizing ammonium nitrate; and/or

f.     Falsely representing and limiting the scope of affected units when conducting
recalls.

292.     Ordinary reasonable consumers have no general appreciation of the components and
subcomponents in airbag systems, but would expect the vehicle generally and the airbag system
specifically to be well-designed and to offer drivers and passengers a reasonable level of safety if
deployed. No ordinary reasonable consumer would expect or anticipate the Inflator Defect. To the
extent ordinary reasonable consumers are or were aware that airbag systems include inflators, they
would hold the same expectations and beliefs regarding the inflators as they hold with respect to the
airbag system as a whole. No ordinary reasonable consumer would expect airbag deployment to
potentially result in a shower of shrapnel comprised of fragmented components. Consequently,
Defendants' unfair and deceptive trade practices—and particularly their concealment of the Inflator
Defect—could, would, and did deceive a substantial portion of the purchasing public and imposed a
serious safety risk on the public.

293.     The Inflator Defect poses a risk of severe harm as shown by known instances of failure in real-world situations that involved injuries and death. The safe, reliable, and proper functioning of an airbag inflator is a material element of an automobile purchase transaction because it is required to ensure the vehicle can safely and properly operate as intended. Accordingly, the ordinary reasonable consumer would have considered the Inflator Defect to constitute an important and material part of deciding whether to purchase or lease a Class Vehicle.

294.     Defendants have engaged in deceptive, misleading, unfair, unconscionable, and fraudulent acts and practices that have caused actual damages to Plaintiffs and the Class, as described herein.

295.     Defendants' intentional concealment of the Inflator Defect and their false, deceptive, misleading, and confusing representations and omissions would be material to any ordinary, average, and reasonable consumer's decision whether to buy a Class Vehicle, given that the defect pertains to the most fundamental and important feature of an airbag system—safety. No reasonable consumer, including Plaintiffs, would have purchased a Class Vehicle but for Defendants' acts, practices and omissions, as described throughout this Complaint.

296.     Any ordinary, average, objectively reasonable consumer acting reasonably in the circumstances would have been deceived by Defendants' acts and practices, including the misrepresentations and omissions described herein.

297.     As a direct and proximate result of Defendants' deceptive practices, Plaintiffs and the Class have sustained economic injury and loss—either by purchasing a vehicle they otherwise would not have purchased or paying more than they otherwise would have as a result of Defendants' actions and omissions alleged above—that first occurred at the time each Class Vehicle was purchased or leased.

298.     Accordingly, Plaintiffs and the California Subclass demand the applicable damages and other relief sought in the Prayer for Relief below.

299.     Defendants deliberately, maliciously, wantonly, and intentionally concealed the Inflator Defect from the Class Members so as to increase their own profits—despite knowing that doing so jeopardized the safety and lives of those driving and riding in the Class Vehicles. This

misconduct warrants and requires the imposition of punitive damages to prevent Defendants from engaging in this same misconduct again, and to deter other individuals and businesses from engaging in the same or similar course of action. Plaintiffs do not yet seek such damages, but will amend to do so at the appropriate time.

300.     Defendants have engaged in deceptive, misleading, unfair, unconscionable, and fraudulent acts and practices that are a direct and proximate cause of actual harm to Plaintiffs and the Class, as described herein.

301.     Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

302.     Defendants' intentional concealment of the Inflator Defect and their false, deceptive, misleading, and confusing representations and omissions would be material to any ordinary, average, and reasonable consumer's decision whether to buy a Class Vehicle, given that the defect pertains to the most fundamental and important feature of an airbag system—safety. No reasonable consumer, including Plaintiffs, would have purchased a Class Vehicle but for Defendants' acts, practices and omissions, as described throughout this Complaint.

303.     Any ordinary, average, objectively reasonable consumer acting reasonably in the circumstances would have been deceived by Defendants' acts and practices, including the misrepresentations and omissions described herein.

304.     As a direct and proximate result of Defendants' deceptive practices, Plaintiffs and the Class have sustained economic injury and loss that first occurred at the time each Class Vehicle was purchased. Plaintiffs do not yet seek monetary damages, but will amend to do so at the appropriate time.

305.     As a result of Defendants' omissions and misrepresentations, Plaintiffs and the Subclass: (1) suffered an ascertainable loss of money, property, and value of the Class Vehicles; and (2) were harmed and suffered actual damages because the Class Vehicles have a latent safety defect. Plaintiffs do not yet seek such damages, but will amend to do so at the appropriate time.

306.   Due to Defendants' original and continuing misconduct alleged above, Plaintiffs and the Subclass are entitled to injunctive, declaratory, and equitable relief, including an order, judgment, and other judicial action, decision, or proclamation:

      a.   Declaring that the Class Vehicles have material safety defects in their airbag inflators;

      b.   Declaring that Defendants' conduct violated the CLRA;

      c.   Declaring that Plaintiffs and the Subclass are entitled to reimbursement or restitution for money spent on the Class Vehicles; and

      d.   Enjoining Defendants from continuing to violate the CLRA.

307.   Plaintiffs sent notice to all Defendants who are subject to this Count pursuant to Cal. Civ. Code § 1782(a), and the 30-day response period has elapsed as to those Defendants. Plaintiffs therefore seek damages pursuant to this Count.

308.   Pursuant to California Civil Code § 1780, Plaintiffs seek injunctive relief—including injunctive relief requiring Defendants to cease and desist from further misrepresenting the Products as described herein—reasonable attorney's fees and costs, and any further injunctive or equitable relief the Court deems proper.

309.   Defendants have failed to rectify the problems associated with the actions detailed above and, accordingly, Plaintiffs are pursuing claims for actual, punitive, and statutory damages, as appropriate against Defendants.

310.   Plaintiffs, individually and on behalf of the Class and California Subclass, currently seek injunctive, restitution and attorneys' fees and costs, and reserve the right to amend to seek damages, including punitive damages, pursuant to Cal Civ. Code § 1780, *et seq*.

**California Subclass Count II:**
**Violation of California's Unfair Competition Law**
**Against the ARC, Audi, Ford, and Joyson Safety Systems Defendants**

311.   Plaintiffs John Britton and Eva Jacinto (referred to collectively as "Plaintiffs" in this count) incorporate by reference the allegations in the preceding paragraphs.

312.   Plaintiffs bring this count individually and on behalf of the California Subclass against the ARC, Audi, Ford, and Joyson Safety Systems Defendants.

313.    The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. *California Business and Professions Code* § 17200.

314.    Defendant's acts, omissions, misrepresentations, practices, and non-disclosures alleged throughout this Complaint constitute business acts and practices.

315.    Defendant's acts, omissions, misrepresentations, practices and non-disclosures alleged throughout this Complaint herein constitute unlawful, unfair, and fraudulent business acts and practices because they have the capacity to deceive reasonable consumers, including Plaintiffs and the California Subclass, as to the benefits and effectiveness of the Class Vehicles and, thereby, the Defective Inflators.

316.    Defendants violated California Business & Professions Code § 17200 (the "Unfair Competition Law" or "UCL") by engaging in "unfair competition," including through "unlawful, unfair or fraudulent business acts or practices" and "unfair, deceptive, untrue or misleading advertising." Defendants' violations include:

        a.    Advertising, marketing, distributing, selling, and leasing the Defective Inflators and Class Vehicles when Defendants knew those vehicles were defective and unable to reliably and safely perform their intended use;

        b.    Failing to disclose the true nature, scope, and extent of the Inflator Defect; and

        c.    Concealing material facts regarding the Class Vehicles—*i.e.*, that those vehicles were equipped with Defective Inflators.

317.    Defendants had a duty to disclose the existence, nature, and extent of the Inflator Defect (which they breached, as alleged above), because:

        a.    Defendants were in a superior position to know the true facts about the Inflator Defect as the designers, manufacturers, assemblers, distributors, marketers, and warrantors of the Defective Inflators and Class Vehicles, and given their experience, and knowledge as experts and long-time veterans of the automotive industry;

b.      Plaintiffs and the California Subclass members could not reasonably have been expected to know, learn, or discover the Inflator Defect as they were not part of the process of designing, manufacturing, assembling, marketing, distributing, or warranting the vehicles;

c.      Defendants knew that Plaintiffs and the California Subclass members could not reasonably have been expected to know, learn, or discover the existence, nature, or extent of the Inflator Defect; and

d.      By virtue of having concealed the nature, extent, and scope of the Inflator Defect.

318.    Defendants' conduct is unlawful in that it violates:

a.      The CLRA, as alleged in California Count I;

b.      The Song-Beverly Act, as alleged in California Counts IV and VI;

c.      The Transportation Recall Enhancement, Accountability and Documentation Act (the "TREAD Act"), 49 USC § 30101, *et seq.* (by failing to timely inform NHTSA of the nature, extent, and scope of the Inflator Defect and allowing vehicles to continue to be sold, leased, and used in a dangerous defective condition);

d.      The implied and express warranty provisions of California Commerce Code § 2313, as alleged in California Counts III and V; and

e.      The Magnusson-Moss Warranty Act, as alleged in National Count II.

319.    Defendants' actions constitute "unfair" business practices because, as alleged above, because:

a.      Defendants engaged in a misleading and deceptive practice of knowingly or intentionally selling the Defective Inflators and Class Vehicles equipped with those inflators;

b.      Defendants' acts and practices offend an established public policy of transparency in the sale or lease of consumer vehicles, and engage in

1     immoral, unethical, oppressive, and unscrupulous activities that are

2     substantially injurious to consumers; and

3          c.     The harm to Plaintiffs and California Subclass members grossly outweighs

4                 the utility of Defendants' practices.

5     320.   Defendants' practices and omissions alleged above constitute fraudulent business

6 acts or practices as they deceived Plaintiffs and are highly likely to deceive members of the

7 consuming public into purchasing a Class Vehicle that unbeknownst to Plaintiffs and the California

8 Subclass members were dangerously defective.

9     321.   Defendants have engaged in deceptive, misleading, unfair, unconscionable, and

10 fraudulent acts and practices that have caused actual damages to Plaintiffs and the California

11 Subclass members, as described herein.

12     322.   Defendants' intentional concealment of the Inflator Defect and their false, deceptive,

13 misleading, and confusing representations and omissions would be material to any ordinary,

14 average, and reasonable consumer's decision whether to buy a Class Vehicle, given that the defect

15 pertains to the most fundamental and important feature of an airbag system—safety. No reasonable

16 consumer, including Plaintiffs, would have purchased a Class Vehicle but for Defendants' acts,

17 practices and omissions, as described throughout this Complaint.

18     323.   Any ordinary, average, objectively reasonable consumer acting reasonably in the

19 circumstances would have been deceived by Defendants' acts and practices, including the

20 misrepresentations and omissions described herein.

21     324.   As a direct and proximate result of Defendants' deceptive practices, Plaintiffs and

22 the California Subclass have sustained economic injury and loss that first occurred at the time each

23 Class Vehicle was purchased.

24     325.   Accordingly, Plaintiffs and the California Subclass lass demand the applicable

25 damages and other relief sought in the Prayer for Relief below.

26     326.   Defendants deliberately, maliciously, wantonly, and intentionally concealed the

27 Inflator Defect from the Class Members so as to increase their own profits—despite knowing that

28 doing so jeopardized the safety and lives of those driving and riding in the Class Vehicles. This

1  misconduct warrants and requires the imposition of punitive damages to prevent Defendants from

2  engaging in this same misconduct again, and to deter other individuals and businesses from

3  engaging in the same or similar course of action.

4       327.   As a result of Defendants' actions, omissions, and misrepresentations, Plaintiffs and

5  the California Subclass members: (1) suffered an ascertainable loss of money, property, and value of

6  the Class Vehicles; and (2) were economically harmed because the Class Vehicles have a latent

7  safety defect which has an unreasonably dangerous defect.

8       328.   In light of Defendants' original and continuing misconduct alleged above, Plaintiffs

9  and the California Subclass members are entitled to injunctive, declaratory, and equitable relief,

10 including an order, judgment, and other judicial action, decision, or proclamation:

11            a.    Declaring that the Class Vehicles have material safety defects in their airbag

12                  inflators;

13            b.    Declaring that Defendants' conduct violated the UCL;

14            c.    Declaring that Plaintiffs and the California Subclass members are entitled to

15                  reimbursement or restitution for money spent on the Class Vehicles; and

16            d.    Enjoining Defendants from continuing to violate the UCL and, in accordance

17                  with Bus. & Prof. Code § 17203, enjoining Defendants to commence a

18                  corrective advertising campaign.

19      329.   Plaintiffs allege, in the alternative to their other causes of action, that they lack an

20 adequate remedy at law because monetary damages alone fail to make those vehicles safe for

21 continued operation. To do so, Plaintiffs require that their airbag inflators be replaced with a safer

22 design—and the cost of replacing the airbag inflators, including parts and labor, potentially exceeds

23 the amount of monetary damages suffered as a result of the diminution in value.

24      330.   Plaintiffs, individually and on behalf of the California Subclass members, seek all

25 available relief including injunctive and equitable relief, restitution, and attorneys' fees and costs.

26 / / /

27

28

**California Subclass Count III:**
**Breach of Implied Warranty**
**Against the Audi and Ford Defendants**

331.   Plaintiffs John Britton and Eva Jacinto (referred to collectively as "Plaintiffs" in this count) incorporate by reference the allegations in the preceding paragraphs.

332.   Plaintiffs bring this count individually and on behalf of the California Subclass against the Audi and Ford Defendants.

333.   The Class Vehicles are "goods" under Cal. Com. Code §§ 2105(1) and 10103(a)(8).

334.   The California Subclass members are "buyers" and "lessees" of the Class Vehicles under Cal. Com. Code §§ 2103(1)(a) and 10103(a)(14).

335.   The Audi and Ford Defendants are "merchants," "sellers," and "lessors" under Cal. Com. Code §§ 2104(1), 10103(c), and 10103(a)(16).

336.   California law conferred an implied warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which they were to be used pursuant to Cal. Com. Code §§ 2314 and 10212.

337.   The Class Vehicles are not merchantable, and as such Defendants breached their implied warranty, because:

    a.   The Class Vehicles do not have the quality that a buyer would reasonably expect due to being equipped with Defective Inflators;

    b.   The Class Vehicles would not pass without objection in the automotive trade given the Inflator Defect;

    c.   The Inflator Defect render the Class Vehicles unsafe to drive and unfit for ordinary purposes;

    d.   The labeling for the Class Vehicles failed to disclose the Inflator Defect; and

    e.   The Class Vehicles do not conform to their labeling, which represents that the vehicles are safe and suitable for their intended use.

338.   Defendants' breach of its implied warranties proximately caused the California Subclass members to suffer damages in excess of $5,000,000.00.

339.    Plaintiffs, individually and on behalf of the California Subclass, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

**California Count IV:**
**Violations of the Song-Berverly Act via Breach of Implied Warranty**
**Against the Audi and Ford Defendants**

340.    Plaintiffs John Britton and Eva Jacinto (referred to collectively as "Plaintiffs" in this count) incorporate by reference the allegations in the preceding paragraphs.

341.    Plaintiffs bring this count individually and on behalf of the California Subclass against the Audi and Ford Defendants.

342.    California Civil Code § 1792 provides that, unless properly disclaimed, every sale of consumer goods is accompanied by an implied warranty of merchantability. Defendants did not at any time properly disclaim the warranty.

343.    The Class Vehicles are "consumer goods" under California Civil Code § 1791(a).

344.    Plaintiffs and the California Subclass members are "buyers" under California Civil Code § 1791(b). Defendants are the "manufacturers" of the airbag inflators and Class Vehicles under California Civil Code § 1791(j).

345.    Defendants knew of the particular purposes for which the Class Vehicles and the Defective Inflators were intended and impliedly warranted to Plaintiffs and the California Subclass members that the Class Vehicles (all of which were equipped with a Defective Inflator) were "merchantable" under California Civil Code §§ 1791.1(a) & 1792.

346.    The Class Vehicles are not merchantable, and as such Defendants breached their implied warranty, because:

    a.    The Class Vehicles do not have the quality that a buyer would reasonably expect due to the airbag inflator defects;

    b.    The Class Vehicles would not pass without objection in the automotive trade because they are equipped with Defective Inflators;

    c.    The Inflator Defect renders the vehicles unsafe to drive and unfit for ordinary purposes;

d.   The labeling for the Class Vehicles failed to disclose the Inflator Defect; and

e.   The Class Vehicles do not conform to their labeling, which represents that the vehicles are safe and suitable for their intended use.

347.   Plaintiffs and the Subclass received the Class Vehicles in a condition which substantially diminishes their value, and which prevents the vehicles from safely and properly functioning. As a result of Defendants' failure to comply with their statutory obligations, Plaintiffs are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their vehicles, or the overpayment or diminution in value of their vehicles.

348.   Plaintiffs, individually and on behalf of the California Subclass, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

**California Subclass Count V:**
**Breach of Express Warranty**
**Against the Audi and Ford Defendants**

349.   Plaintiffs John Britton and Eva Jacinto (referred to collectively as "Plaintiffs" in this count) incorporate by reference the allegations in the preceding paragraphs.

350.   Plaintiffs bring this count individually and on behalf of the California Subclass against the Audi and Ford Defendants.

351.   The Class Vehicles are "goods" under Cal. Com. Code §§ 2105(1) and 10103(a)(8).

352.   The Audi and Ford Defendants are "merchants," "sellers," and "lessors," of the Class Vehicles under Cal. Com. Code §§ 2104(1), 10103(c), and 2103(1)(d), respectively.

353.   The California Subclass members who purchased and leased Class Vehicles in California are "buyers" and "lessees" under Cal. Com. Code §§ 2103(1)(a), 10103(a)(14).

354.   Defendants issued an express written warranty for each defective Class Vehicle they sold, including that:

a.   The airbag inflators would be free of defects in materials and workmanship at the time of sale; and

b.   The vehicle would be free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized service

1            facilities, without charge, to fully correct defects in materials or

2            workmanship.

3       355.   The warranties listed above formed the basis of the bargain with regard to the

4   California Subclass members' purchase and lease of Class Vehicles.

5       356.   Defendants breached their warranty for the Class Vehicles because:

6          a.   The airbag inflators have latent defects which have a dangerous propensity to

7             cause the inflators to rupture and eject metal shrapnel, subjecting Plaintiffs

8             and the class and subclass to the risk of loss and injury; and

9          b.   Defendants denied, concealed, and misrepresented the Inflator Defect, in the

10             process refusing to pay for or provide in a reasonably timely fashion the

11             needed repairs and replacements for Plaintiffs and the class and subclass.

12       357.   Defendants' breach of its express warranties proximately caused the Subclass to

13   suffer damages in excess of $5,000,000.00.

14       358.   Plaintiffs, individually and on behalf of the California Subclass, seek all available

15   relief, including monetary damages (including actual, compensatory, and punitive damages),

16   injunctive and equitable relief, and attorneys' fees and costs.

17   **California Subclass Count VI:**
**Violations of the Song-Beverly Act via Breach of Express Warranty**

18   **Against the Audi and Ford Defendants**

19       359.   Plaintiffs John Britton and Eva Jacinto (referred to collectively as "Plaintiffs" in this

20   count) incorporate by reference the allegations in the preceding paragraphs.

21       360.   Plaintiffs bring this count individually and on behalf of the California Subclass

22   against the Audi and Ford Defendants.

23       361.   The Class Vehicles are "consumer goods" under California Civil Code § 1791(a).

24       362.   Plaintiffs and the Subclass members are "buyers" under California Civil Code §

25   1791(b).

26       363.   The Audi and Ford Defendants are the "manufacturers" of the Class Vehicles under

27   California Civil Code § 1791(j).

28

1    364.   Defendants issued an express written warranty for each defective Class Vehicle they

2    sold, including that:

3         a.   The Inflator Defect would be free of defects in materials and workmanship at

4              the time of sale; and

5         b.   The vehicle would be free of defects in design, materials, and workmanship

6              and that repairs and other adjustments would be made by authorized service

7              facilities, without charge, to fully correct defects in materials or

8              workmanship.

9    365.   The warranties listed above formed the basis of the bargain with regard to the

10   California Subclass members' purchase and lease of Class Vehicles.

11   366.   Defendants breached their warranty for the Class Vehicles because:

12        a.   The airbag inflators have latent defects which have a dangerous propensity to

13             cause the inflators to rupture and eject metal shrapnel, subjecting Plaintiffs

14             and the Subclass to the risk of loss and injury; and

15        b.   Defendants denied, concealed, and misrepresented the Inflator Defect, in the

16             process refusing to pay for or provide in a reasonably timely fashion the

17             needed repairs and replacements for Plaintiffs and the California Subclass

18             members.

19   367.   Plaintiffs and the California Subclass members received the vehicles in a condition

20   which substantially diminishes their value, and which prevents the vehicles from safely and

21   properly functioning. As a result, Plaintiffs are entitled to damages and other legal and equitable

22   relief, including, at their election, the purchase price of their vehicles, or the overpayment or

23   diminution in value of their vehicles.

24   368.   Plaintiffs, individually and on behalf of the Subclass, seek all available monetary

25   damages (including actual, compensatory, and punitive damages), injunctive and equitable relief,

26   and attorneys' fees and costs.

27   / / /

28

X.    **CAUSES OF ACTION: FLORIDA SUBCLASS**

**Florida Subclass Count I:**
**Violations of Florida's Unfair and Deceptive Trade Practices Act**
**Against the ARC, Joyson, Toyoda Gosei North America, BMW, GM, Porsche,**
**and Volkswagen Defendants**

369.    Plaintiffs Celeste Felice, Glenda Dillon, Stephen Gearhart, and Patricia Jones incorporate by reference the allegations in the preceding paragraphs.

370.    Plaintiffs bring this claim individually and on behalf of the Florida Subclass against the ARC, Joyson, Toyoda Gosei North America, BMW, GM, Porsche, and Volkswagen Defendants.

371.    Defendants have engaged in deceptive and unfair trade practices that have caused actual damages to Plaintiffs and the Florida Subclass and violated Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla., Stat. §§ 501.201, *et seq.*

372.    Section 501.204(a), *Florida Statutes*, prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

373.    Plaintiffs and the Florida Subclass members are "consumers" under Fla. Stat. § 501.203(7).

374.    Defendants acts and omissions as alleged throughout this Complaint occurred while Defendants were engaged in "trade or commerce" as defined in Fla. Stat. § 501.203(8).

375.    The Class Vehicles and the Defective Inflators are "goods" as defined in within the meaning and scope of the FDUTPA.

376.    Defendants violated the FDUTPA by engaging in the deceptive acts and unfair practices described above and incorporated into this count, which offend established public policy, are substantially injurious to consumers, and are unscrupulous, oppressive, unethical, or immoral.

377.    Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive trade acts or practices in connection with the design, manufacture, distribution, sale, and lease of the Class Vehicles and the Defective Inflators by concealing the Inflator Defect from the Florida Subclass.

378.    ARC concealed the defect by:

a.      Representing that its airbag inflators were safe and fit for their intended use when ARC knew that they were dangerous and would diminish the value of the Class Vehicles because of the Inflator Defect;

b.      Knowingly selling and profiting from the Defective Inflators intended for use in consumer vehicles while maintaining silence as to the defect with the intent and purpose of ensuring that prospective consumers would remain unaware of about the Inflator Defect and would purchase vehicles containing the Defective Inflators, leading to continuing profits for ARC at the expense of consumer safety;

c.      Choosing not to require that its business partners, including other suppliers and OEMS, disclose the Inflator Defect to prospective consumers so that the companies could enjoy continued profits from the sale of vehicles equipped with the Defective Inflators;

d.      Purposefully concealing the existence of the Inflator Defect from dealerships, retailers, service facilities, and other businesses that sell, inspect, service, and maintain consumer vehicles so that the public would remain ignorant of the danger and would continue purchasing vehicles with ARC's inflators;

e.      Confidentially settling potential claims involving individuals injured or killed by Defective Inflators and securing confidentiality agreements to ensure those individuals would not disclose the Inflator Defect to the media and public (this allegation is made upon information and belief and refers to the allegations above);

f.      Publicly representing that its airbag inflators were safe and reliable to perform their intended function so as to create a false public perception that the Defective Inflators were not defective and did not have a dangerous propensity to rupture and eject metal shrapnel;

g.    Refusing to implement recalls of the Defective Inflators when it became clear they were defective and had a dangerous propensity to rupture and eject metal shrapnel;

h.    Misrepresenting the nature of the Inflator Defect when coordinating with the OEMs and Tier 1 suppliers in defining the scope of the recalls by stating or implying that ruptures were due to isolated manufacturing concerns when, in fact, the inflators were fundamentally defective and unreasonably dangerous due to the common design utilizing ammonium nitrate; and/or

i.    Falsely representing and limiting the scope of affected units when conducting recalls.

379.    Joyson and Toyoda Gosei North America concealed the Inflator Defect by:

a.    Representing that its airbag module assemblies were safe and fit for their intended use when they knew that they were dangerous and would diminish the value of the Class Vehicles because of the Inflator Defect;

b.    Knowingly selling and profiting from the Defective Inflators intended for use in consumer vehicles while maintaining silence as to the defect with the intent and purpose of ensuring that prospective vehicle consumers would remain unaware of about the Inflator Defect and would purchase Class Vehicles containing the Defective Inflators, leading to continuing profits at the expense of consumer safety;

c.    Choosing not to require that its business partners, including ARC and OEMs, disclose the Inflator Defect to prospective consumers so that the company could enjoy continued profits from the sale of airbag module assemblies equipped with the Defective Inflators;

d.    Purposefully concealing the existence of the Inflator Defect from dealerships, retailers, service facilities, and other businesses that sell, inspect, service, and maintain consumer vehicles so that the public would remain ignorant of the danger and would continue purchasing vehicles with the Defective Inflators;

e.      Confidentially settling potential claims involving individuals injured or killed by Defective Inflators and securing confidentiality agreements to ensure those individuals would not disclose the Inflator Defect to the media and public (this allegation is made upon information and belief and refers to the allegations above);

f.      Publicly representing that its airbag modules were safe and reliable to perform their intended function so as to create a false public perception that the Defective Inflators were not defective and did not have a dangerous propensity to rupture and eject metal shrapnel;

g.      Refusing to implement recalls of airbag modules containing the Defective Inflators when it became clear they were defective and had a dangerous propensity to rupture and eject metal shrapnel;

h.      Misrepresenting the nature of the Inflator Defect when coordinating with the ARC and the OEMs in defining the scope of the recalls by stating or implying that ruptures were due to isolated manufacturing concerns when, in fact, the inflators were fundamentally defective and unreasonably dangerous due to the common design utilizing ammonium nitrate; and/or

i.      Falsely representing and limiting the scope of affected units when conducting recalls.

380.    BMW, GM, Porsche, and Volkswagen concealed the defect by:

a.      Representing that the Class Vehicles—including the airbags equipped in those vehicles— were safe and fit for their intended use when those Defendants knew that they were dangerous because of the Inflator Defect;

b.      Knowingly selling and profiting from vehicles equipped with the Defective Inflators while maintaining silence as to the Inflator Defect with the intent and purpose of ensuring that prospective consumers would remain unaware of about the Inflator Defect and would purchase the Class Vehicles, leading to continuing profits for those Defendants at the expense of consumer safety;

1    c. Purposefully withholding the existence of the Inflator Defect from

2      dealerships, retailers, service facilities, and other business which sell, inspect,

3      service, and maintain consumer vehicles so that the public would remain

4      ignorant of the danger and would continue purchasing the OEMs' vehicles;

5    d. Confidentially settling potential claims involving individuals injured or killed

6      by Defective Inflators and securing confidentiality agreements to ensure

7      those individuals would not disclose the defect to the media and public (this

8      allegation is made upon information and belief and refers to the allegations

9      above);

10   e. Publicly representing that their vehicles were safe and reliable so as to create

11      a false public perception that the airbag inflators in those vehicles were not

12      defective and did not have a dangerous propensity to rupture and eject metal

13      shrapnel;

14   f. Misrepresenting the nature of the defect when issuing prior recalls by stating

15      that it was due to isolated manufacturing concerns when, in fact, the inflators

16      were fundamentally defective and unreasonably dangerous due to the

17      common design utilizing ammonium nitrate; and/or

18   g. Falsely representing and limiting the scope of affected units when conducting

19      recalls.

20   381. Ordinary reasonable consumers have no general appreciation of the components and

21 subcomponents in airbag systems, but would expect the vehicle generally and the airbag system

22 specifically to be well-designed and to offer drivers and passengers a reasonable level of safety if

23 deployed. No ordinary reasonable consumer would expect or anticipate the Inflator Defect. To the

24 extent ordinary reasonable consumers are or were aware that airbag systems include inflators, they

25 would hold the same expectations and beliefs regarding the inflators as they hold with respect to the

26 airbag system as a whole. No ordinary reasonable consumer would expect airbag deployment to

27 potentially result in a shower of shrapnel comprised of fragmented components. Consequently,

28 Defendants' unfair and deceptive trade practices—and particularly their concealment of the Inflator

1    Defect—could, would, and did deceive a substantial portion of the purchasing public and imposed a

2    serious safety risk on the public.

3        382.    The Inflator Defect poses a risk of severe harm as shown by known instances of

4    failure in real-world situations that involved injuries and death. The safe, reliable, and proper

5    functioning of an airbag inflator is a material element of an automobile purchase transaction

6    because it is required to ensure the vehicle can safely and properly operate as intended.

7    Accordingly, the ordinary reasonable consumer would have considered the airbag inflator defects to

8    constitute an important and material part of deciding whether to purchase or lease a Class Vehicle.

9        383.    Defendants have engaged in deceptive, misleading, unfair, unconscionable, and

10   fraudulent acts and practices that have caused actual damages to Plaintiffs and the Class, as

11   described herein.

12       384.    Defendants' intentional concealment of the Inflator Defect and their false, deceptive,

13   misleading, and confusing representations and omissions would be material to any ordinary,

14   average, and reasonable consumer's decision whether to buy a Class Vehicle, given that the defect

15   pertains to the most fundamental and important feature of an airbag system—safety. No reasonable

16   consumer, including Plaintiffs, would have purchased a Class Vehicle but for Defendants' acts,

17   practices, and omissions, as described throughout this Complaint.

18       385.    Any ordinary, average, objectively reasonable consumer acting reasonably in the

19   circumstances would have been deceived by Defendants' acts and practices, including the

20   misrepresentations and omissions described herein.

21       386.    As a direct and proximate result of Defendants' deceptive practices, Plaintiffs and

22   the Class have sustained economic injury and loss—either by purchasing a vehicle they otherwise

23   would not have purchased or paying more than they otherwise would have as a result of

24   Defendants' actions and omissions alleged above—that first occurred at the time each Class Vehicle

25   was purchased or leased.

26       387.    Accordingly, Plaintiffs and the Florida Subclass demand the applicable damages and

27   other relief sought in the Prayer for Relief below.

28

388.    Defendants deliberately, maliciously, wantonly, and intentionally concealed the Inflator Defect from the Florida subclass members so as to increase their own profits—despite knowing that doing so jeopardized the safety and lives of those driving and riding in the Class Vehicles. This misconduct warrants and requires the imposition of punitive damages to prevent Defendants from engaging in this same misconduct again, and to deter other individuals and businesses from engaging in the same or similar course of action.

389.    Plaintiffs and the Florida Subclass members suffered ascertainable losses and actual damages as a result of Defendants' unfair and deceptive trade practices as described throughout this Complaint and specifically including by paying more than they would have for the Class Vehicles and receiving less than the value they had bargained for at the time they purchased or leased those vehicles.

390.    Plaintiffs and the Florida Subclass members have been aggrieved by the Defendants' deceptive and unfair trade practices and their rights have been adversely affected and, therefore, they are entitled to injunctive and declaratory relief under FDUTPA.

391.    Plaintiffs seek to obtain all monetary and non-monetary relief available under FDUTPA, including compensatory damages, actual damages, and attorneys' fees and costs.

392.    Plaintiffs further seek injunctive, declaratory, and equitable relief, including an order, judgment, and other judicial action, decision, or proclamation:

a.    Declaring that the Class Vehicles have material safety defects in their airbag inflators;

b.    Declaring that Defendants' conduct violated and continues to violate FDUTPA;

c.    Declaring that Plaintiffs and the Florida Subclass members are entitled to reimbursement or restitution for money spent on the class vehicles; and

d.    Enjoining Defendants from continuing to violate FDUTPA.

/ / /

# XI.    CAUSES OF ACTION: ILLINOIS SUBCLASS

**Illinois Subclass Count I:**
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**Against the ARC, Joyson, Toyoda Gosei North America, BMW, GM,**
**and Volkswagen Defendants**

393.    Plaintiffs Melissa Warren, Nicole Senkpeil, Eniko Gedo, Jeremy Young, and Rhonda Hunt Muhammed (referred to as "Plaintiffs" in this count) incorporate by reference the allegations in the preceding paragraphs.

394.    Plaintiffs bring this count individually and on behalf of the Illinois Subclass against the ARC, Joyson, Toyoda Gosei North America, BMW, GM, and Volkswagen Defendants.

395.    Plaintiffs, the Subclass, and the Defendants are "persons" under 815 ILCS 505/1(c).

396.    Plaintiffs and the Subclass are "consumers" under 815 ILCS 505/1(e).

397.    The Defendants were and are engaged in "trade" and "commerce" under 815 ILCS 505/1(f).

398.    The Class Vehicles and Defective Inflators are "merchandise" under 815 ILCS 505/1(b).

399.    Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("IL CFDBPA"), including 815 ILCS 505/2, by participating in misleading, false, or deceptive acts, including by failing to disclose and concealing the Inflator Defect.

400.    ARC concealed the defect by:

      a.    Representing that its airbag inflators were safe and fit for their intended use when ARC knew that they were dangerous and would diminish the value of the Class Vehicles because of the Inflator Defect;

      b.    Knowingly selling and profiting from the Defective Inflators intended for use in consumer vehicles while maintaining silence as to the defect with the intent and purpose of ensuring that prospective consumers would remain unaware of about the Inflator Defect and would purchase vehicles containing the Defective Inflators, leading to continuing profits for ARC at the expense of consumer safety;

c.  Choosing not to require that its business partners, including other suppliers and OEMS, disclose the Inflator Defect to prospective consumers so that the companies could enjoy continued profits from the sale of vehicles equipped with the Defective Inflators;

d.  Purposefully concealing the existence of the Inflator Defect from dealerships, retailers, service facilities, and other businesses that sell, inspect, service, and maintain consumer vehicles so that the public would remain ignorant of the danger and would continue purchasing vehicles with ARC's inflators;

e.  Confidentially settling potential claims involving individuals injured or killed by Defective Inflators and securing confidentiality agreements to ensure those individuals would not disclose the Inflator Defect to the media and public (this allegation is made upon information and belief and refers to the allegations above);

f.  Publicly representing that its airbag inflators were safe and reliable to perform their intended function so as to create a false public perception that the Defective Inflators were not defective and did not have a dangerous propensity to rupture and eject metal shrapnel;

g.  Refusing to implement recalls of the Defective Inflators when it became clear they were defective and had a dangerous propensity to rupture and eject metal shrapnel;

h.  Misrepresenting the nature of the Inflator Defect when coordinating with the OEMs and Tier 1 suppliers in defining the scope of the recalls by stating or implying that ruptures were due to isolated manufacturing concerns when, in fact, the inflators were fundamentally defective and unreasonably dangerous due to the common design utilizing ammonium nitrate; and/or

i.  Falsely representing and limiting the scope of affected units when conducting recalls.

401.  Joyson and Toyoda Gosei North America concealed the Inflator Defect by:

a.      Representing that its airbag module assemblies were safe and fit for their intended use when they knew that they were dangerous and would diminish the value of the Class Vehicles because of the Inflator Defect;

b.      Knowingly selling and profiting from the Defective Inflators intended for use in consumer vehicles while maintaining silence as to the defect with the intent and purpose of ensuring that prospective vehicle consumers would remain unaware of about the Inflator Defect and would purchase Class Vehicles containing the Defective Inflators, leading to continuing profits at the expense of consumer safety;

c.      Choosing not to require that its business partners, including ARC and OEMs, disclose the Inflator Defect to prospective consumers so that the company could enjoy continued profits from the sale of airbag module assemblies equipped with the Defective Inflators;

d.      Purposefully concealing the existence of the Inflator Defect from dealerships, retailers, service facilities, and other businesses that sell, inspect, service, and maintain consumer vehicles so that the public would remain ignorant of the danger and would continue purchasing vehicles with the Defective Inflators;

e.      Confidentially settling potential claims involving individuals injured or killed by Defective Inflators and securing confidentiality agreements to ensure those individuals would not disclose the Inflator Defect to the media and public (this allegation is made upon information and belief and refers to the allegations above);

f.      Publicly representing that its airbag modules were safe and reliable to perform their intended function so as to create a false public perception that the Defective Inflators were not defective and did not have a dangerous propensity to rupture and eject metal shrapnel;

g.  Refusing to implement recalls of airbag modules containing the Defective Inflators when it became clear they were defective and had a dangerous propensity to rupture and eject metal shrapnel;

h.  Misrepresenting the nature of the Inflator Defect when coordinating with the ARC and the OEMs in defining the scope of the recalls by stating or implying that ruptures were due to isolated manufacturing concerns when, in fact, the inflators were fundamentally defective and unreasonably dangerous due to the common design utilizing ammonium nitrate; and/or

i.  Falsely representing and limiting the scope of affected units when conducting recalls.

402.  BMW, GM and Volkswagen concealed the defect by:

a.  Representing that the Class Vehicles—including the airbags equipped in those vehicles—were safe and fit for their intended use when those Defendants knew that they were dangerous because of the Inflator Defect;

b.  Knowingly selling and profiting from vehicles equipped with the Defective Inflators while maintaining silence as to the Inflator Defect with the intent and purpose of ensuring that prospective consumers would remain unaware of about the Inflator Defect and would purchase the Class Vehicles, leading to continuing profits for those Defendants at the expense of consumer safety;

c.  Purposefully withholding the existence of the Inflator Defect from dealerships, retailers, service facilities, and other business which sell, inspect, service, and maintain consumer vehicles so that the public would remain ignorant of the danger and would continue purchasing the OEMs' vehicles;

d.  Confidentially settling potential claims involving individuals injured or killed by Defective Inflators and securing confidentiality agreements to ensure those individuals would not disclose the defect to the media and public (this allegation is made upon information and belief and refers to the allegations above);

e.       Publicly representing that their vehicles were safe and reliable so as to create a false public perception that the airbag inflators in those vehicles were not defective and did not have a dangerous propensity to rupture and eject metal shrapnel;

f.       Misrepresenting the nature of the defect when issuing prior recalls by stating that it was due to isolated manufacturing concerns when, in fact, the inflators were fundamentally defective and unreasonably dangerous due to the common design utilizing ammonium nitrate; and/or

g.       Falsely representing and limiting the scope of affected units when conducting recalls.

403.     Ordinary reasonable consumers have no general appreciation of the components and subcomponents in airbag systems, but would expect the vehicle generally and the airbag system specifically to be well-designed and to offer drivers and passengers a reasonable level of safety if deployed. No ordinary reasonable consumer would expect or anticipate the Inflator Defect. To the extent ordinary reasonable consumers are or were aware that airbag systems include inflators, they would hold the same expectations and beliefs regarding the inflators as they hold with respect to the airbag system as a whole. No ordinary reasonable consumer would expect airbag deployment to potentially result in a shower of shrapnel comprised of fragmented components. Consequently, Defendants' unfair and deceptive trade practices—and particularly their concealment of the Inflator Defect—could, would, and did deceive a substantial portion of the purchasing public and imposed a serious safety risk on the public.

404.     The Inflator Defect poses a risk of severe harm as shown by known instances of failure in real-world situations that involved injuries and death. The safe, reliable, and proper functioning of an airbag inflator is a material element of an automobile purchase transaction because it is required to ensure the vehicle can safely and properly operate as intended. Accordingly, the ordinary reasonable consumer would have considered the airbag inflator defects to constitute an important and material part of deciding whether to purchase or lease a Class Vehicle.

405.    Defendants have engaged in deceptive, misleading, unfair, unconscionable, and fraudulent acts and practices that have caused actual damages to Plaintiffs and the Class, as described herein.

406.    Defendants' intentional concealment of the Inflator Defect and their false, deceptive, misleading, and confusing representations and omissions would be material to any ordinary, average, and reasonable consumer's decision whether to buy a Class Vehicle, given that the defect pertains to the most fundamental and important feature of an airbag system—safety. No reasonable consumer, including Plaintiffs and the Illinois Subclass members, would have purchased a Class Vehicle but for Defendants' acts, practices and omissions, as described throughout this Complaint.

407.    Any ordinary, average, objectively reasonable consumer acting reasonably in the circumstances would have been deceived by Defendants' acts and practices, including the misrepresentations and omissions described herein.

408.    As a direct and proximate result of Defendants' deceptive practices, Plaintiffs and the Class have sustained economic injury and loss—either by purchasing a vehicle they otherwise would not have purchased or paying more than they otherwise would have as a result of Defendants' actions and omissions alleged above—that first occurred at the time each Class Vehicle was purchased or leased.

409.    Accordingly, Plaintiffs and the Illinois Subclass demand the applicable damages and other relief sought in the Prayer for Relief below.

410.    Defendants deliberately, maliciously, wantonly, and intentionally concealed the Inflator Defect from the Class Members so as to increase their own profits—despite knowing that doing so jeopardized the safety and lives of those driving and riding in the Class Vehicles. This misconduct warrants and requires the imposition of punitive damages to prevent Defendants from engaging in this same misconduct again, and to deter other individuals and businesses from engaging in the same or similar course of action.

411.    As a direct and proximate result of Defendants' unlawful deceptive acts and practices, Plaintiffs and the Illinois Subclass suffered ascertainable losses and actual damages as alleged throughout the Complaint, including by paying more than they would have for the Class

1  Vehicles and receiving less than the value they had bargained for at the time they purchased or

2  leased those vehicles.

3        412.   Given the lethal danger presented by the airbag inflator defect, the Defendants'

4  violations present a continuing risk to Plaintiffs and the Illinois Subclass, as well as to the general

5  public.

6        413.   Pursuant to 815 ILCS 505/10a, Plaintiffs and the Illinois Subclass request an order

7  enjoining Defendants' unfair or deceptive trade acts or practices and awarding damages, attorneys'

8  fees, costs, and any other just and proper relief available under the IL CFDBPA.

9                              **Illinois Subclass Count II:**
                    **Violations of the Illinois Uniform Deceptive Trade Practices Act**
10               **Against the ARC, Joyson, Toyoda Gosei North America, BMW, GM,**
                              **and Volkswagen Defendants**
11

12       414.   Plaintiffs Melissa Warren, Nicole Senkpeil, Eniko Gedo, Jeremy Young, and Rhonda

13 Hunt Muhammed (referred to as "Plaintiffs" in this count) incorporate by reference the allegations

14 in the preceding paragraphs.

15       415.   Plaintiffs bring this count individually and on behalf of the Illinois Subclass against

16 the ARC, Joyson, Toyoda Gosei North America, GM, and Volkswagen Defendants.

17       416.   Plaintiffs, the Subclass, and the Defendants are "persons" under 815 ILCS 510/1/(5).

18       417.   In the course of their business, Defendants knowingly and intentionally omitted,

19 concealed, and failed to disclose material facts regarding the existence, nature, and scope of the

20 Inflator Defect. In doing so, they violated the Illinois Uniform Deceptive Trade Practices Act ("IL

21 UDTPA"), including 815 ILCS 510/2, by:

22             a.     Representing that the Class Vehicles and the Defective Inflators have

23                    characteristics, uses, benefits, and qualities which they do not have;

24             b.     Representing that the Class Vehicles and the Defective Inflators are of a

25                    particular standard and quality when they are not;

26             c.     Advertising the Class Vehicles and Defective Inflators with the intent not to

27                    sell or lease them as advertised; and

28             d.     Otherwise engaging in conduct likely to deceive.

418.     Ordinary reasonable consumers have no general appreciation of the components and subcomponents in airbag systems, but would expect the vehicle generally and the airbag system specifically to be well-designed and to offer drivers and passengers a reasonable level of safety if deployed. No ordinary reasonable consumer would expect or anticipate the Inflator Defect. To the extent ordinary reasonable consumers are or were aware that airbag systems include inflators, they would hold the same expectations and beliefs regarding the inflators as they hold with respect to the airbag system as a whole. No ordinary reasonable consumer would expect airbag deployment to potentially result in a shower of shrapnel comprised of fragmented components. Consequently, Defendants' unfair and deceptive trade practices—and particularly their concealment of the Inflator Defect—could, would, and did deceive a substantial portion of the purchasing public and imposed a serious safety risk on the public.

419.     The Inflator Defect poses a risk of severe harm as shown by known instances of failure in real-world situations that involved injuries and death. The safe, reliable, and proper functioning of an airbag inflator is a material element of an automobile purchase transaction because it is required to ensure the vehicle can safely and properly operate as intended. Accordingly, the ordinary reasonable consumer would have considered the airbag inflator defects to constitute an important and material part of deciding whether to purchase or lease a Class Vehicle.

420.     Defendants have engaged in deceptive, misleading, unfair, unconscionable, and fraudulent acts and practices that have caused actual damages to Plaintiffs and the Class, as described herein.

421.     Defendants' intentional concealment of the Inflator Defect and their false, deceptive, misleading, and confusing representations and omissions would be material to any ordinary, average, and reasonable consumer's decision whether to buy a Class Vehicle, given that the defect pertains to the most fundamental and important feature of an airbag system—safety. No reasonable consumer, including Plaintiffs and the Illinois Subclass members, would have purchased a Class Vehicle but for Defendants' acts, practices and omissions, as described throughout this Complaint.

422.    Any ordinary, average, objectively reasonable consumer acting reasonably in the circumstances would have been deceived by Defendants' acts and practices, including the misrepresentations and omissions described herein.

423.    As a direct and proximate result of Defendants' deceptive practices, Plaintiffs and the Class have sustained economic injury and loss—either by purchasing a vehicle they otherwise would not have purchased or paying more than they otherwise would have as a result of Defendants' actions and omissions alleged above—that first occurred at the time each Class Vehicle was purchased or leased.

424.    Accordingly, Plaintiffs and the Illinois Subclass demand the applicable damages and other relief sought in the Prayer for Relief below.

425.    Defendants deliberately, maliciously, wantonly, and intentionally concealed the Inflator Defect from the Class Members so as to increase their own profits—despite knowing that doing so jeopardized the safety and lives of those driving and riding in the Class Vehicles. This misconduct warrants and requires the imposition of punitive damages to prevent Defendants from engaging in this same misconduct again, and to deter other individuals and businesses from engaging in the same or similar course of action.

426.    As a direct and proximate result of Defendants' unlawful deceptive acts and practices, Plaintiffs and the Illinois Subclass suffered ascertainable losses and actual damages as alleged throughout the Complaint, including by paying more than they would have for the Class Vehicles and receiving less than the value they had bargained for at the time they purchased or leased those vehicles.

427.    Given the lethal danger presented by the airbag inflator defect, the Defendants' violations present a continuing risk to Plaintiffs and the Illinois Subclass, as well as to the general public.

428.    Pursuant to 815 ILCS 510/3, Plaintiffs and the Illinois Subclass request an order enjoining Defendants' unfair or deceptive trade acts or practices and awarding damages, attorneys' fees, costs, and any other just and proper relief available under the IL UDTPA.

**Illinois Subclass Count III:**
**Breach of Express Warranty**
**Against the BMW, GM and Volkswagen Defendants**

429.     Plaintiffs Melissa Warren, Nicole Senkpeil, Eniko Gedo, Jeremy Young, and Rhonda Hunt Muhammed (referred to as "Plaintiffs" in this count) incorporate by reference the allegations in the preceding paragraphs.

430.     Plaintiffs bring this count individually and on behalf of the Illinois Subclass against the BMW, GM and Volkswagen Defendants.

431.     Defendants were and are "merchants" of motor vehicles under 810 ILCS 5/2-104(1) and 5/2A-103(3), "sellers" of motor vehicles under 5/2-103(1)(d), and "lessors" of motor vehicles under 810 ILCS 5/2A-103(1)(p).

432.     Plaintiffs and the Illinois Subclass are "buyers" or "lessees" under 810 ILCS 5/2-103(1)(a) and 810 ILCS 5/2-103(1)(n).

433.     The Class Vehicles are "goods" under 810 ILCS 5/2-105(1) and 5/2A-103(1)(h).

434.     Defendants issued an express written warranty for each Class Vehicle they sold or leased, including that:

     a.     The airbag inflators would be free of defects in materials and workmanship at the time of sale; and

     b.     The vehicles would be free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized service facilities, without charge, to fully correct defects in materials or workmanship.

435.     The warranties listed above formed the basis of the bargain with regard to the Illinois Subclass members' purchase and lease of Class Vehicles.

436.     Defendants breached their warranty for the Class Vehicles because:

     a.     The airbag inflators have latent defects which have a dangerous propensity to cause the inflators to rupture and eject metal shrapnel, subjecting Plaintiffs and the Class and Subclass to the risk of loss and injury; and

b.     Defendants denied, concealed, and misrepresented the defect, in the process refusing to pay for or provide in a reasonably timely fashion the needed repairs and replacements for Plaintiffs and the Illinois Subclass.

437.   Defendants' breach of warranty directly and proximately caused Plaintiffs and the Illinois Subclass to suffer damages as alleged throughout this Complaint. Accordingly, Plaintiffs, individually and on behalf of the subclass, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

**Illinois Subclass Count IV:**
**Breach of Implied Warranty**
**Against the BMW, GM and Volkswagen Defendants**

438.   Plaintiffs Melissa Warren, Nicole Senkpeil, Eniko Gedo, Jeremy Young, Rhonda Hunt Muhammed (referred to as "Plaintiffs" in this count) incorporate by reference the allegations in the preceding paragraphs.

439.   Plaintiffs bring this count individually and on behalf of the Illinois Subclass against the BMW, GM and Volkswagen Defendants.

440.   Defendants were and are "merchants" of motor vehicles under 810 ILCS 5/2-104(1) and 5/2A-103(3), "sellers" of motor vehicles under 5/2-103(1)(d), and "lessors" of motor vehicles under 810 ILCS 5/2A-103(1)(p).

441.   Plaintiffs and the Illinois Subclass are "buyers" or "lessees" under 810 ILCS 5/2-103(1)(a) and 810 ILCS 5/2-103(1)(n).

442.   The Class Vehicles are "goods" under 810 ILCS 5/2-105(1) and 5/2A-103(1)(h).

443.   Illinois law implied a warranty that the Class Vehicles, including their airbag inflators, were in merchantable condition under 810 ILCS 5/2-314 and 5/2A-212.

444.   The Class Vehicles are not merchantable, and as such Defendants breached their implied warranty, because:

a.     The Class Vehicles do not have the quality that a buyer would reasonably expect due to the Inflator Defects;

b.     The vehicles would not pass without objection in the automotive trade given that their Defective Inflators have an unreasonable propensity to rupture and eject metal shrapnel;

c.     The Inflator Defect renders the Class Vehicles unsafe to drive and unfit for ordinary purposes;

d.     The labeling for the Class Vehicles failed to disclose the Inflator Defect; and

e.     The Class Vehicles do not conform to their labeling, which represents that the Class Vehicles are safe and suitable for their intended use.

445.    Defendants' breach of warranty directly and proximately caused Plaintiffs and the Illinois Subclass to suffer damages. Accordingly, Plaintiffs, individually and on behalf of the subclass, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

## XII.    CAUSES OF ACTION: MASSACHUSETTS SUBCLASS

**Massachusetts Subclass Count I:**
**Violations of Mass. Ch. 93A (Regulation of Business Practices for Consumers' Protection)**
**Against the ARC, Joyson, and BMW Defendants**

446.    Plaintiff Kristen Luiz (referred to as "Plaintiff" in this count) incorporates by reference the allegations in the preceding paragraphs.

447.    Plaintiff brings this count individually and on behalf of the Massachusetts Subclass against the ARC, Joyson, and the BMW Defendants.

448.    Plaintiff, the Subclass, and the Defendants are "persons" under Mass. Gen. Laws ch. 93A, § 1(a).

449.    Defendants were and are engaged in "trade" or "commerce" under Mass. Gen. Laws ch. 93A, § 1(b).

450.    Defendants violated Mass. Gen. Laws. Ch. 93A (the Massachusetts consumer protection law), by participating in misleading, false, or deceptive acts, including by failing to disclose and concealing the Inflator Defect.

451.    ARC concealed the defect by:

a.   Representing that its airbag inflators were safe and fit for their intended use when ARC knew that they were dangerous and would diminish the value of the Class Vehicles because of the Inflator Defect;

b.   Knowingly selling and profiting from the Defective Inflators intended for use in consumer vehicles while maintaining silence as to the defect with the intent and purpose of ensuring that prospective consumers would remain unaware of about the Inflator Defect and would purchase vehicles containing the Defective Inflators, leading to continuing profits for ARC at the expense of consumer safety;

c.   Choosing not to require that its business partners, including other suppliers and OEMS, disclose the Inflator Defect to prospective consumers so that the companies could enjoy continued profits from the sale of vehicles equipped with the Defective Inflators;

d.   Purposefully concealing the existence of the Inflator Defect from dealerships, retailers, service facilities, and other businesses that sell, inspect, service, and maintain consumer vehicles so that the public would remain ignorant of the danger and would continue purchasing vehicles with ARC's inflators;

e.   Confidentially settling potential claims involving individuals injured or killed by Defective Inflators and securing confidentiality agreements to ensure those individuals would not disclose the Inflator Defect to the media and public (this allegation is made upon information and belief and refers to the allegations above);

f.   Publicly representing that its airbag inflators were safe and reliable to perform their intended function so as to create a false public perception that the Defective Inflators were not defective and did not have a dangerous propensity to rupture and eject metal shrapnel;

g.   Refusing to implement recalls of the Defective Inflators when it became clear they were defective and had a dangerous propensity to rupture and eject metal shrapnel;

h.   Misrepresenting the nature of the Inflator Defect when coordinating with the OEMs and Tier 1 suppliers in defining the scope of the recalls by stating or implying that ruptures were due to isolated manufacturing concerns when, in fact, the inflators were fundamentally defective and unreasonably dangerous due to the common design utilizing ammonium nitrate; and/or

i.   Falsely representing and limiting the scope of affected units when conducting recalls.

452.   Joyson concealed the Inflator Defect by:

a.   Representing that its airbag module assemblies were safe and fit for their intended use when they knew that they were dangerous and would diminish the value of the Class Vehicles because of the Inflator Defect;

b.   Knowingly selling and profiting from the Defective Inflators intended for use in consumer vehicles while maintaining silence as to the defect with the intent and purpose of ensuring that prospective vehicle consumers would remain unaware of about the Inflator Defect and would purchase Class Vehicles containing the Defective Inflators, leading to continuing profits at the expense of consumer safety;

c.   Choosing not to require that its business partners, including ARC and OEMs, disclose the Inflator Defect to prospective consumers so that the company could enjoy continued profits from the sale of airbag module assemblies equipped with the Defective Inflators;

d.   Purposefully concealing the existence of the Inflator Defect from dealerships, retailers, service facilities, and other businesses that sell, inspect, service, and maintain consumer vehicles so that the public would remain ignorant of the danger and would continue purchasing vehicles with the Defective Inflators;

e.    Confidentially settling potential claims involving individuals injured or killed by Defective Inflators and securing confidentiality agreements to ensure those individuals would not disclose the Inflator Defect to the media and public (this allegation is made upon information and belief and refers to the allegations above);

f.    Publicly representing that its airbag modules were safe and reliable to perform their intended function so as to create a false public perception that the Defective Inflators were not defective and did not have a dangerous propensity to rupture and eject metal shrapnel;

g.    Refusing to implement recalls of airbag modules containing the Defective Inflators when it became clear they were defective and had a dangerous propensity to rupture and eject metal shrapnel;

h.    Misrepresenting the nature of the Inflator Defect when coordinating with the ARC and the OEMs in defining the scope of the recalls by stating or implying that ruptures were due to isolated manufacturing concerns when, in fact, the inflators were fundamentally defective and unreasonably dangerous due to the common design utilizing ammonium nitrate; and/or

i.    Falsely representing and limiting the scope of affected units when conducting recalls.

453.   BMW concealed the defect by:

a.    Representing that the Class Vehicles—including the airbags equipped in those vehicles—were safe and fit for their intended use when those Defendants knew that they were dangerous because of the Inflator Defect;

b.    Knowingly selling and profiting from vehicles equipped with the Defective Inflators while maintaining silence as to the Inflator Defect with the intent and purpose of ensuring that prospective consumers would remain unaware of about the Inflator Defect and would purchase the Class Vehicles, leading to continuing profits for those Defendants at the expense of consumer safety;

c.   Purposefully withholding the existence of the Inflator Defect from dealerships, retailers, service facilities, and other business which sell, inspect, service, and maintain consumer vehicles so that the public would remain ignorant of the danger and would continue purchasing BMW's vehicles;

d.   Confidentially settling potential claims involving individuals injured or killed by Defective Inflators and securing confidentiality agreements to ensure those individuals would not disclose the defect to the media and public (this allegation is made upon information and belief and refers to the allegations above);

e.   Publicly representing that its vehicles were safe and reliable so as to create a false public perception that the airbag inflators in those vehicles were not defective and did not have a dangerous propensity to rupture and eject metal shrapnel;

f.   Misrepresenting the nature of the defect when issuing prior recalls by stating that it was due to isolated manufacturing concerns when, in fact, the inflators were fundamentally defective and unreasonably dangerous due to the common design utilizing ammonium nitrate; and/or

g.   Falsely representing and limiting the scope of affected units when conducting recalls.

454.   Ordinary reasonable consumers have no general appreciation of the components and subcomponents in airbag systems, but would expect the vehicle generally and the airbag system specifically to be well-designed and to offer drivers and passengers a reasonable level of safety if deployed. No ordinary reasonable consumer would expect or anticipate the Inflator Defect. To the extent ordinary reasonable consumers are or were aware that airbag systems include inflators, they would hold the same expectations and beliefs regarding the inflators as they hold with respect to the airbag system as a whole. No ordinary reasonable consumer would expect airbag deployment to potentially result in a shower of shrapnel comprised of fragmented components. Consequently, Defendants' unfair and deceptive trade practices—and particularly their concealment of the Inflator

Defect—could, would, and did deceive a substantial portion of the purchasing public and imposed a serious safety risk on the public.

455.    The Inflator Defect poses a risk of severe harm as shown by known instances of failure in real-world situations that involved injuries and death. The safe, reliable, and proper functioning of an airbag inflator is a material element of an automobile purchase transaction because it is required to ensure the vehicle can safely and properly operate as intended. Accordingly, the ordinary reasonable consumer would have considered the airbag inflator defects to constitute an important and material part of deciding whether to purchase or lease a Class Vehicle.

456.    Defendants have engaged in deceptive, misleading, unfair, unconscionable, and fraudulent acts and practices that have caused actual damages to Plaintiffs and the Class, as described herein.

457.    Defendants' intentional concealment of the Inflator Defect and their false, deceptive, misleading, and confusing representations and omissions would be material to any ordinary, average, and reasonable consumer's decision whether to buy a Class Vehicle, given that the defect pertains to the most fundamental and important feature of an airbag system—safety. No reasonable consumer, including Plaintiffs and the Massachusetts Subclass members, would have purchased a Class Vehicle but for Defendants' acts, practices and omissions, as described throughout this Complaint.

458.    Any ordinary, average, objectively reasonable consumer acting reasonably in the circumstances would have been deceived by Defendants' acts and practices, including the misrepresentations and omissions described herein.

459.    As a direct and proximate result of Defendants' deceptive practices, Plaintiffs and the Class have sustained economic injury and loss—either by purchasing a vehicle they otherwise would not have purchased or paying more than they otherwise would have as a result of Defendants' actions and omissions alleged above—that first occurred at the time each Class Vehicle was purchased or leased.

460.    Accordingly, Plaintiffs and the Massachusetts Subclass demand the applicable damages and other relief sought in the Prayer for Relief below.

461.    Defendants deliberately, maliciously, wantonly, and intentionally concealed the Inflator Defect from the Class Members so as to increase their own profits—despite knowing that doing so jeopardized the safety and lives of those driving and riding in the Class Vehicles. This misconduct warrants and requires the imposition of punitive damages to prevent Defendants from engaging in this same misconduct again, and to deter other individuals and businesses from engaging in the same or similar course of action.

462.    As a direct and proximate result of Defendants' unlawful deceptive acts and practices, Plaintiffs and the Massachusetts Subclass suffered ascertainable losses and actual damages as alleged throughout the Complaint, including by paying more than they would have for the Class Vehicles and receiving less than the value they had bargained for at the time they purchased or leased those vehicles.

463.    Given the lethal danger presented by the airbag inflator defect, the Defendants' violations present a continuing risk to Plaintiffs and the Massachusetts Subclass, as well as to the general public.

464.    Plaintiffs and the Massachusetts Subclass an order enjoining Defendants' unfair or deceptive trade acts or practices and awarding damages, attorneys' fees, costs, and any other just and proper relief available under the law.

**Massachusetts Subclass Count II:**
**Breach of Express Warranty**
**Against the BMW Defendants**

465.    Plaintiff Kristen Luiz (referred to as "Plaintiff" in this count) incorporates by reference the allegations in the preceding paragraphs.

466.    Plaintiff brings this count individually and on behalf of the Massachusetts Subclass against the BMW Defendants.

467.    Defendants were and are "merchants" of motor vehicles under Mass. Gen. Laws ch. 106, §§ 2-104(1) and 2A-103(3), "sellers" of motor vehicles under Mass. Gen. Laws ch. 106, § 2-103(1)(d), and "lessors" of motor vehicles under Mass. Gen. Laws ch. 106, § 2-103(1)(p).

468.    Plaintiff and the Massachusetts Subclass are "buyers" or "lessees" under Mass. Gen. Laws ch. 106, §§ 2-103(1)(a) and 2A-103(1)(n).

469.     The Class Vehicles are "goods" under Mass. Gen. Laws ch. 106, §§ 2-105(1) and 2A-103(1)(h).

470.     Defendants issued an express written warranty for each Class Vehicle they sold or leased, including that:

          a.     The airbag inflators would be free of defects in materials and workmanship at the time of sale; and

          b.     The vehicles would be free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized service facilities, without charge, to fully correct defects in materials or workmanship.

471.     The warranties listed above formed the basis of the bargain with regard to the Massachusetts Subclass members' purchase and lease of Class Vehicles.

472.     Defendants breached their warranty for the Class Vehicles because:

          a.     The airbag inflators have latent defects which have a dangerous propensity to cause the inflators to rupture and eject metal shrapnel, subjecting Plaintiffs and the Class and Subclass to the risk of loss and injury; and

          b.     Defendants denied, concealed, and misrepresented the defect, in the process refusing to pay for or provide in a reasonably timely fashion the needed repairs and replacements for Plaintiffs and the Massachusetts Subclass.

473.     Defendants' breach of warranty directly and proximately caused Plaintiffs and the Massachusetts Subclass to suffer damages as alleged throughout this Complaint. Accordingly, Plaintiffs, individually and on behalf of the subclass, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

**Massachusetts Subclass Count III:**
**Breach of Implied Warranty**
**Against the BMW Defendants**

474.     Plaintiff Kristen Luiz (referred to as "Plaintiff" in this count) incorporates by reference the allegations in the preceding paragraphs.

475.    Plaintiff brings this count individually and on behalf of the Massachusetts Subclass against the BMW Defendants.

476.    Defendants were and are "merchants" of motor vehicles under Mass. Gen. Laws ch. 106, §§ 2-104(1) and 2A-103(3), "sellers" of motor vehicles under Mass. Gen. Laws ch. 106, § 2-103(1)(d), and "lessors" of motor vehicles under Mass. Gen. Laws ch. 106, § 2-103(1)(p).

477.    Plaintiff and the Massachusetts Subclass are "buyers" or "lessees" under Mass. Gen. Laws ch. 106, §§ 2-103(1)(a) and 2A-103(1)(n).

478.    The Class Vehicles are "goods" under Mass. Gen. Laws ch. 106, §§ 2-105(1) and 2A-103(1)(h).

479.    Massachusetts law implied a warranty that the Class Vehicles, including their airbag inflators, were in merchantable condition under Mass. Gen. Laws ch. 106, §§ 2-314 and 2A-212.

480.    The Class Vehicles are not merchantable, and as such Defendants breached their implied warranty, because:

    a.    The Class Vehicles do not have the quality that a buyer would reasonably expect due to the Inflator Defects;

    b.    The vehicles would not pass without objection in the automotive trade given that their Defective Inflators have an unreasonable propensity to rupture and eject metal shrapnel;

    c.    The Inflator Defect renders the Class Vehicles unsafe to drive and unfit for ordinary purposes;

    d.    The labeling for the Class Vehicles failed to disclose the Inflator Defect; and

    e.    The Class Vehicles do not conform to their labeling, which represents that the Class Vehicles are safe and suitable for their intended use.

481.    Defendants' breach of warranty directly and proximately caused Plaintiffs and the Massachusetts Subclass to suffer damages. Accordingly, Plaintiffs, individually and on behalf of the subclass, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

XIII.   **CAUSES OF ACTION: NEW JERSEY SUBCLASS**

**New Jersey Subclass Count I:**
**Violations of the New Jersey Consumer Fraud Act**
**Against the ARC, Joyson, and Ford Defendants**

482.   Plaintiff Anthony Raspantini (referred to as "Plaintiff" in this count) incorporates by reference the allegations in the preceding paragraphs.

483.   Plaintiff brings this count individually and on behalf of the New Jersey Subclass against the ARC, Joyson, and Ford Defendants.

484.   Plaintiff, the Subclass, and Defendants are "persons" under N.J. Stat. Ann. § 56:8-1(d).

485.   The Class Vehicles and Defective Inflators are "merchandise" under N.J. Stat. Ann. § 56:8-1(c).

486.   In the course of their business, Defendants violated the New Jersey Consumer Fraud Act ("NJ CFA"), by participating in misleading, false, or deceptive acts, including by failing to disclose and concealing the Inflator Defect.

487.   ARC concealed the defect by:

   a.   Representing that its airbag inflators were safe and fit for their intended use when ARC knew that they were dangerous and would diminish the value of the Class Vehicles because of the Inflator Defect;

   b.   Knowingly selling and profiting from the Defective Inflators intended for use in consumer vehicles while maintaining silence as to the defect with the intent and purpose of ensuring that prospective consumers would remain unaware of about the Inflator Defect and would purchase vehicles containing the Defective Inflators, leading to continuing profits for ARC at the expense of consumer safety;

   c.   Choosing not to require that its business partners, including other suppliers and OEMS, disclose the Inflator Defect to prospective consumers so that the companies could enjoy continued profits from the sale of vehicles equipped with the Defective Inflators;

d.      Purposefully concealing the existence of the Inflator Defect from dealerships, retailers, service facilities, and other businesses that sell, inspect, service, and maintain consumer vehicles so that the public would remain ignorant of the danger and would continue purchasing vehicles with ARC's inflators;

e.      Confidentially settling potential claims involving individuals injured or killed by Defective Inflators and securing confidentiality agreements to ensure those individuals would not disclose the Inflator Defect to the media and public (this allegation is made upon information and belief and refers to the allegations above);

f.      Publicly representing that its airbag inflators were safe and reliable to perform their intended function so as to create a false public perception that the Defective Inflators were not defective and did not have a dangerous propensity to rupture and eject metal shrapnel;

g.      Refusing to implement recalls of the Defective Inflators when it became clear they were defective and had a dangerous propensity to rupture and eject metal shrapnel;

h.      Misrepresenting the nature of the Inflator Defect when coordinating with the OEMs and Tier 1 suppliers in defining the scope of the recalls by stating or implying that ruptures were due to isolated manufacturing concerns when, in fact, the inflators were fundamentally defective and unreasonably dangerous due to the common design utilizing ammonium nitrate; and/or

i.      Falsely representing and limiting the scope of affected units when conducting recalls.

488.    Joyson concealed the Inflator Defect by:

a.      Representing that its airbag module assemblies were safe and fit for their intended use when they knew that they were dangerous and would diminish the value of the Class Vehicles because of the Inflator Defect;

b.   Knowingly selling and profiting from the Defective Inflators intended for use in consumer vehicles while maintaining silence as to the defect with the intent and purpose of ensuring that prospective vehicle consumers would remain unaware of about the Inflator Defect and would purchase Class Vehicles containing the Defective Inflators, leading to continuing profits at the expense of consumer safety;

c.   Choosing not to require that its business partners, including ARC and OEMs, disclose the Inflator Defect to prospective consumers so that the company could enjoy continued profits from the sale of airbag module assemblies equipped with the Defective Inflators;

d.   Purposefully concealing the existence of the Inflator Defect from dealerships, retailers, service facilities, and other businesses that sell, inspect, service, and maintain consumer vehicles so that the public would remain ignorant of the danger and would continue purchasing vehicles with the Defective Inflators;

e.   Confidentially settling potential claims involving individuals injured or killed by Defective Inflators and securing confidentiality agreements to ensure those individuals would not disclose the Inflator Defect to the media and public (this allegation is made upon information and belief and refers to the allegations above);

f.   Publicly representing that its airbag modules were safe and reliable to perform their intended function so as to create a false public perception that the Defective Inflators were not defective and did not have a dangerous propensity to rupture and eject metal shrapnel;

g.   Refusing to implement recalls of airbag modules containing the Defective Inflators when it became clear they were defective and had a dangerous propensity to rupture and eject metal shrapnel;

h.   Misrepresenting the nature of the Inflator Defect when coordinating with the ARC and the OEMs in defining the scope of the recalls by stating or

implying that ruptures were due to isolated manufacturing concerns when, in fact, the inflators were fundamentally defective and unreasonably dangerous due to the common design utilizing ammonium nitrate; and/or

i.      Falsely representing and limiting the scope of affected units when conducting recalls.

489.   Ford concealed the defect by:

a.      Representing that the Class Vehicles—including the airbags equipped in those vehicles—were safe and fit for their intended use when those Defendants knew that they were dangerous because of the Inflator Defect;

b.      Knowingly selling and profiting from vehicles equipped with the Defective Inflators while maintaining silence as to the Inflator Defect with the intent and purpose of ensuring that prospective consumers would remain unaware of about the Inflator Defect and would purchase the Class Vehicles, leading to continuing profits for those Defendants at the expense of consumer safety;

c.      Purposefully withholding the existence of the Inflator Defect from dealerships, retailers, service facilities, and other business which sell, inspect, service, and maintain consumer vehicles so that the public would remain ignorant of the danger and would continue purchasing Ford's vehicles;

d.      Confidentially settling potential claims involving individuals injured or killed by Defective Inflators and securing confidentiality agreements to ensure those individuals would not disclose the defect to the media and public (this allegation is made upon information and belief and refers to the allegations above);

e.      Publicly representing that their vehicles were safe and reliable so as to create a false public perception that the airbag inflators in those vehicles were not defective and did not have a dangerous propensity to rupture and eject metal shrapnel;

f.    Misrepresenting the nature of the defect when issuing prior recalls by stating that it was due to isolated manufacturing concerns when, in fact, the inflators were fundamentally defective and unreasonably dangerous due to the common design utilizing ammonium nitrate; and/or

g.    Falsely representing and limiting the scope of affected units when conducting recalls.

490.    Ordinary reasonable consumers have no general appreciation of the components and subcomponents in airbag systems, but would expect the vehicle generally and the airbag system specifically to be well-designed and to offer drivers and passengers a reasonable level of safety if deployed. No ordinary reasonable consumer would expect or anticipate the Inflator Defect. To the extent ordinary reasonable consumers are or were aware that airbag systems include inflators, they would hold the same expectations and beliefs regarding the inflators as they hold with respect to the airbag system as a whole. No ordinary reasonable consumer would expect airbag deployment to potentially result in a shower of shrapnel comprised of fragmented components. Consequently, Defendants' unfair and deceptive trade practices—and particularly their concealment of the Inflator Defect—could, would, and did deceive a substantial portion of the purchasing public and imposed a serious safety risk on the public.

491.    The Inflator Defect poses a risk of severe harm as shown by known instances of failure in real-world situations that involved injuries and death. The safe, reliable, and proper functioning of an airbag inflator is a material element of an automobile purchase transaction because it is required to ensure the vehicle can safely and properly operate as intended. Accordingly, the ordinary reasonable consumer would have considered the airbag inflator defects to constitute an important and material part of deciding whether to purchase or lease a Class Vehicle.

492.    Defendants have engaged in deceptive, misleading, unfair, unconscionable, and fraudulent acts and practices that have caused actual damages to Plaintiff and the Class, as described herein.

493.    Defendants' intentional concealment of the Inflator Defect and their false, deceptive, misleading, and confusing representations and omissions would be material to any ordinary,

average, and reasonable consumer's decision whether to buy a Class Vehicle, given that the defect pertains to the most fundamental and important feature of an airbag system—safety. No reasonable consumer, including Plaintiff and the New Jersey Subclass members, would have purchased a Class Vehicle but for Defendants' acts, practices and omissions, as described throughout this Complaint.

494.    Any ordinary, average, objectively reasonable consumer acting reasonably in the circumstances would have been deceived by Defendants' acts and practices, including the misrepresentations and omissions described herein.

495.    As a direct and proximate result of Defendants' deceptive practices, Plaintiff and the Class have sustained economic injury and loss—either by purchasing a vehicle they otherwise would not have purchased or paying more than they otherwise would have as a result of Defendants' actions and omissions alleged above—that first occurred at the time each Class Vehicle was purchased or leased.

496.    Accordingly, Plaintiff and the New Jersey Subclass demand the applicable damages and other relief sought in the Prayer for Relief below.

497.    Defendants deliberately, maliciously, wantonly, and intentionally concealed the Inflator Defect from the Class Members so as to increase their own profits—despite knowing that doing so jeopardized the safety and lives of those driving and riding in the Class Vehicles. This misconduct warrants and requires the imposition of punitive damages to prevent Defendants from engaging in this same misconduct again, and to deter other individuals and businesses from engaging in the same or similar course of action.

498.    As a direct and proximate result of Defendants' unlawful deceptive acts and practices, Plaintiff and the New Jersey Subclass suffered ascertainable losses and actual damages as alleged throughout the Complaint, including by paying more than they would have for the Class Vehicles and receiving less than the value they had bargained for at the time they purchased or leased those vehicles.

499.    Given the lethal danger presented by the airbag inflator defect, the Defendants' violations present a continuing risk to Plaintiff and the New Jersey Subclass, as well as to the general public.

1    500.    Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiffs and the New Jersey Subclass an

2    order enjoining Defendants' unfair or deceptive trade acts or practices and awarding damages,

3    attorneys' fees, costs, and any other just and proper relief available under the NJ CFA.

**New Jersey Subclass Count II:**
**Breach of Express Warranty**
**Against Ford**

6    501.    Plaintiff Anthony Raspantini (referred to as "Plaintiff" in this count) incorporates by

7    reference the allegations in the preceding paragraphs.

8    502.    Plaintiff brings this count individually and on behalf of the New Jersey Subclass

9    against Ford.

10    503.    Ford was and is a "merchant" of motor vehicles under N.J. Stat. Ann. §§ 12A:2-

11    104(1) and 12A:2A-103(3), "seller" of motor vehicles under N.J. Stat. Ann. § 12A:2-103(1)(d), and

12    "lessor" of motor vehicles under N.J. Stat. Ann. § 12A:2-103(1)(d).

13    504.    Plaintiff and the New Jersey Subclass are "buyers" or "lessees" under N.J. Stat. Ann.

14    §§ 12A:2-103(1)(a) and 12A:2A-103(1)(n).

15    505.    The Class Vehicles are "goods" under N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-

16    103(1)(h).

17    506.    Ford issued an express written warranty for each Class Vehicle it sold or leased,

18    including that:

19    a.    The airbag inflators would be free of defects in materials and workmanship at

20          the time of sale; and

21    b.    The vehicles would be free of defects in design, materials, and workmanship

22          and that repairs and other adjustments would be made by authorized service

23          facilities, without charge, to fully correct defects in materials or

24          workmanship.

25    507.    The warranties listed above formed the basis of the bargain with regard to the New

26    Jersey Subclass members' purchase and lease of Class Vehicles.

27    508.    Ford breached its warranty for the Class Vehicles because:

28

a.    The airbag inflators have latent defects which have a dangerous propensity to
cause the inflators to rupture and eject metal shrapnel, subjecting Plaintiff
and the Class and Subclass to the risk of loss and injury; and

b.    Ford denied, concealed, and misrepresented the defect, in the process
refusing to pay for or provide in a reasonably timely fashion the needed
repairs and replacements for Plaintiff and the New Jersey Subclass.

509.    Defendant's breach of warranty directly and proximately caused Plaintiff and the
New Jersey Subclass to suffer damages as alleged throughout this Complaint. Accordingly,
Plaintiff, individually and on behalf of the subclass, seek all available monetary damages (including
actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and
costs.

**New Jersey Subclass Count III:**
**Breach of Implied Warranty**
**Against Ford**

510.    Plaintiff Anthony Raspantini (referred to as "Plaintiff" in this count) incorporates by
reference the allegations in the preceding paragraphs.

511.    Plaintiff brings this count individually and on behalf of the New Jersey Subclass
against Ford.

512.    Ford was and is a "merchant" of motor vehicles under N.J. Stat. Ann. §§ 12A:2-
104(1) and 12A:2A-103(3), "seller" of motor vehicles under N.J. Stat. Ann. § 12A:2-103(1)(d), and
"lessor" of motor vehicles under N.J. Stat. Ann. § 12A:2-103(1)(d).

513.    Plaintiff and the New Jersey Subclass are "buyers" or "lessees" under N.J. Stat. Ann.
§§ 12A:2-103(1)(a) and 12A:2A-103(1)(n).

514.    The Class Vehicles are "goods" under N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-
103(1)(h).

515.    New Jersey law implied a warranty that the Class Vehicles, including their airbag
inflators, were in merchantable condition under N.J. Stat. Ann. §§ 12A:2-314 and 12A:2A-212.

516.    The Class Vehicles are not merchantable, and as such Defendant breached its implied
warranty, because:

a.    The Class Vehicles do not have the quality that a buyer would reasonably expect due to the Inflator Defects;

b.    The vehicles would not pass without objection in the automotive trade given that their Defective Inflators have an unreasonable propensity to rupture and eject metal shrapnel;

c.    The Inflator Defect renders the Class Vehicles unsafe to drive and unfit for ordinary purposes;

d.    The labeling for the Class Vehicles failed to disclose the Inflator Defect; and

e.    The Class Vehicles do not conform to their labeling, which represents that the Class Vehicles are safe and suitable for their intended use.

517.    Defendant's breach of warranty directly and proximately caused Plaintiff and the New Jersey Subclass to suffer damages. Accordingly, Plaintiff, individually and on behalf of the subclass, seeks all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

## XIV.   CAUSES OF ACTION: NEW YORK SUBCLASS

**New York Subclass Count I:**
**Violations of the New York General Business Law**
**Against the ARC, Joyson, Ford, and Volkswagen Defendants**

518.    Plaintiffs Francine Lewis and Matthew Kakol (referred to as "Plaintiffs" in this count) incorporate by reference the allegations in the preceding paragraphs.

519.    Plaintiffs bring this count individually and on behalf of the New York Subclass against the ARC, Ford, Volkswagen, and Joyson Safety Systems Defendants.

520.    Plaintiffs and the New York Subclass members are "persons" under N.Y. Gen. Bus. Law § 349(h).

521.    Defendants have engaged in and continue to engage in deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349. Defendants' acts and omissions, as alleged throughout this Complaint, have been willful, unfair, unconscionable, deceptive, and contrary to the public policy of New York, which aims to protect consumers.

522.   Each Defendant is a "person," "firm," "corporation," or "association" under N.Y. Gen. Bus. Law § 349.

523.   Defendants violated the New York Deceptive Acts and Practices Act ("NY DAPA") by engaging in unfair and deceptive trade practices with regard to the design, manufacture, distribution, marketing, sale, and warrantying of the Class Vehicles and the Defective Inflators— including by failing to disclose and concealing the Inflator Defect.

524.   ARC's unfair and deceptive trade practices include:

a.   Representing that its airbag inflators were safe and fit for their intended use when ARC knew that they were dangerous and would diminish the value of the Class Vehicles because of the Inflator Defect;

b.   Knowingly selling and profiting from the Defective Inflators intended for use in consumer vehicles while maintaining silence as to the defect with the intent and purpose of ensuring that prospective consumers would remain unaware of about the Inflator Defect and would purchase vehicles containing the Defective Inflators, leading to continuing profits for ARC at the expense of consumer safety;

c.   Choosing not to require that its business partners, including other suppliers and OEMs, disclose the Inflator Defect to prospective consumers so that the companies could enjoy continued profits from the sale of vehicles equipped with the Defective Inflators;

d.   Purposefully concealing the existence of the Inflator Defect from dealerships, retailers, service facilities, and other businesses that sell, inspect, service, and maintain consumer vehicles so that the public would remain ignorant of the danger and would continue purchasing vehicles with ARC's inflators;

e.   Confidentially settling potential claims involving individuals injured or killed by Defective Inflators and securing confidentiality agreements to ensure those individuals would not disclose the Inflator Defect to the media and

1    public (this allegation is made upon information and belief and refers to the

2    allegations above);

3    f.    Publicly representing that its airbag inflators were safe and reliable to

4          perform their intended function so as to create a false public perception that

5          the Defective Inflators were not defective and did not have a dangerous

6          propensity to rupture and eject metal shrapnel;

7    g.    Refusing to implement recalls of the Defective Inflators when it became clear

8          they were defective and had a dangerous propensity to rupture and eject

9          metal shrapnel;

10   h.    Misrepresenting the nature of the Inflator Defect when coordinating with the

11         OEMs and Tier 1 suppliers in defining the scope of the recalls by stating or

12         implying that ruptures were due to isolated manufacturing concerns when, in

13         fact, the inflators were fundamentally defective and unreasonably dangerous

14         due to the common design utilizing ammonium nitrate; and/or

15   i.    Falsely representing and limiting the scope of affected units when conducting

16         recalls.

17   525.   Joyson Safety Systems' unfair and deceptive trade practices include:

18   a.    Representing that their airbag module assemblies were safe and fit for their

19         intended use when they knew that they were dangerous and would diminish

20         the value of the Class Vehicles because of the Inflator Defect;

21   b.    Knowingly selling and profiting from the Defective Inflators intended for use

22         in consumer vehicles while maintaining silence as to the defect with the

23         intent and purpose of ensuring that prospective vehicle consumers would

24         remain unaware of about the Inflator Defect and would purchase Class

25         Vehicles containing the Defective Inflators, leading to continuing profits for

26         the Airbag Module Defendants at the expense of consumer safety;

27   c.    Choosing not to require that their business partners, including ARC and

28         OEMs, disclose the Inflator Defect to prospective consumers so that the

1   companies could enjoy continued profits from the sale of airbag module

2   assemblies equipped with the Defective Inflators;

3   d.   Purposefully concealing the existence of the Inflator Defect from dealerships,

4   retailers, service facilities, and other businesses that sell, inspect, service, and

5   maintain consumer vehicles so that the public would remain ignorant of the

6   danger and would continue purchasing vehicles with ARC's Defective

7   Inflators;

8   e.   Confidentially settling potential claims involving individuals injured or killed

9   by Defective Inflators and securing confidentiality agreements to ensure

10   those individuals would not disclose the Inflator Defect to the media and

11   public (this allegation is made upon information and belief and refers to the

12   allegations above);

13   f.   Publicly representing that its airbag modules were safe and reliable to

14   perform their intended function so as to create a false public perception that

15   the Defective Inflators were not defective and did not have a dangerous

16   propensity to rupture and eject metal shrapnel;

17   g.   Refusing to implement recalls of airbag modules containing the Defective

18   Inflators when it became clear they were defective and had a dangerous

19   propensity to rupture and eject metal shrapnel;

20   h.   Misrepresenting the nature of the Inflator Defect when coordinating with the

21   ARC and the OEMs in defining the scope of the recalls by stating or

22   implying that ruptures were due to isolated manufacturing concerns when, in

23   fact, the inflators were fundamentally defective and unreasonably dangerous

24   due to the common design utilizing ammonium nitrate; and/or

25   i.   Falsely representing and limiting the scope of affected units when conducting

26   recalls.

27   526.   The Ford and Volkswagen Defendants' unfair and deceptive trade practices include:

28

a.   Representing that the Class Vehicles—including the airbags equipped in those vehicles— were safe and fit for their intended use when those Defendants knew that they were dangerous because of the Inflator Defect;

b.   Knowingly selling and profiting from vehicles equipped with the Defective Inflators while maintaining silence as to the Inflator Defect with the intent and purpose of ensuring that prospective consumers would remain unaware of about the Inflator Defect and would purchase the Class Vehicles, leading to continuing profits for those Defendants at the expense of consumer safety;

c.   Purposefully withholding the existence of the Inflator Defect from dealerships, retailers, service facilities, and other business which sell, inspect, service, and maintain consumer vehicles so that the public would remain ignorant of the danger and would continue purchasing the OEMs' vehicles;

d.   Publicly representing that their vehicles were safe and reliable so as to create a false public perception that the airbag inflators in those vehicles were not defective and did not have a dangerous propensity to rupture and eject metal shrapnel;

e.   Misrepresenting the nature of the defect when issuing prior recalls by stating that it was due to isolated manufacturing concerns when, in fact, the inflators were fundamentally defective and unreasonably dangerous due to the common design utilizing ammonium nitrate; and/or

f.   Falsely representing and limiting the scope of affected units when conducting recalls.

527.   Ordinary reasonable consumers have no general appreciation of the components and subcomponents in airbag systems, but would expect the vehicle generally and the airbag system specifically to be well-designed and to offer drivers and passengers a reasonable level of safety if deployed. No ordinary reasonable consumer would expect or anticipate the Inflator Defect. To the extent ordinary reasonable consumers are or were aware that airbag systems include inflators, they would hold the same expectations and beliefs regarding the inflators as they hold with respect to the

airbag system as a whole. No ordinary reasonable consumer would expect airbag deployment to potentially result in a shower of shrapnel comprised of fragmented components. Consequently, Defendants' unfair and deceptive trade practices—and particularly their concealment of the Inflator Defect—could, would, and did deceive a substantial portion of the purchasing public and imposed a serious safety risk on the public.

528.    The Inflator Defect poses a risk of severe harm as shown by known instances of failure in real-world situations that involved injuries and death. The safe, reliable, and proper functioning of an airbag inflator is a material element of an automobile purchase transaction because it is required to ensure the vehicle can safely and properly operate as intended. Accordingly, the ordinary reasonable consumer would have considered the airbag inflator defects to constitute an important and material part of deciding whether to purchase or lease a Class Vehicle.

529.    Defendants have engaged in deceptive, misleading, unfair, unconscionable, and fraudulent acts and practices that have caused actual damages to Plaintiffs and the Class, as described herein.

530.    Defendants' intentional concealment of the Inflator Defect and their false, deceptive, misleading, and confusing representations and omissions would be material to any ordinary, average, and reasonable consumer's decision whether to buy a Class Vehicle, given that the defect pertains to the most fundamental and important feature of an airbag system—safety. No reasonable consumer, including Plaintiffs and the New York Subclass members, would have purchased a Class Vehicle but for Defendants' acts, practices and omissions, as described throughout this Complaint.

531.    Any ordinary, average, objectively reasonable consumer acting reasonably in the circumstances would have been deceived by Defendants' acts and practices, including the misrepresentations and omissions described herein.

532.    As a direct and proximate result of Defendants' deceptive practices, Plaintiffs and the Class have sustained economic injury and loss—either by purchasing a vehicle they otherwise would not have purchased or paying more than they otherwise would have as a result of Defendants' actions and omissions alleged above—that first occurred at the time each Class Vehicle was purchased or leased.

533.    Accordingly, Plaintiffs and the New York Subclass demand the applicable damages and other relief sought in the Prayer for Relief below.

534.    Defendants deliberately, maliciously, wantonly, and intentionally concealed the Inflator Defect from the Class Members so as to increase their own profits—despite knowing that doing so jeopardized the safety and lives of those driving and riding in the Class Vehicles. This misconduct warrants and requires the imposition of punitive damages to prevent Defendants from engaging in this same misconduct again, and to deter other individuals and businesses from engaging in the same or similar course of action.

535.    As a direct and proximate result of Defendants' unlawful deceptive acts and practices, Plaintiffs and the New York Subclass suffered ascertainable losses and actual damages as alleged throughout the Complaint, including by paying more than they would have for the Class Vehicles and receiving less than the value they had bargained for at the time they purchased or leased those vehicles.

536.    By reason of the foregoing, Defendants are liable to Plaintiffs and the New York Subclass for trebled compensatory damages, attorneys' fees, and the costs of this action.

537.    Plaintiffs and the New York Subclass further seek equitable relief against Defendants to include, at a minimum, an order declaring Defendants' practices to be unlawful, enjoin Defendants from undertaking any further unlawful conduct, and directing Defendants to refund to Plaintiffs and the New York Subclass all amounts to be obtained through their unlawful practices.

538.    Given the lethal danger presented by the airbag inflator defect, Defendants' violations present a continuing risk to Plaintiffs, the New York Subclass, and the general public.

539.    Plaintiffs and the New York Subclass seek actual damages against Defendants for their violations of the NY DAPA and all other available relief, including treble damages, any other available statutory damages, the equitable relief requested above, punitive damages, and attorneys' fees and costs.

/ / /

/ / /

### New York Subclass Count II:
### Breach of Express Warranty
### Against the Ford and Volkswagen Defendants

540.    Plaintiffs Francine Lewis and Matthew Kakol (referred to as "Plaintiffs" in this count) incorporate by reference the allegations in the preceding paragraphs.

541.    Plaintiffs bring this count individually and on behalf of the New York Subclass against the Ford and Volkswagen Defendants.

542.    The Class Vehicles are "goods" under N.Y. U.C.C. Law §§ 2-105(1) and 2A-103(1)(h).

543.    The Defendants are "merchants," "sellers," and "lessors" of the Class Vehicles under N.Y. U.C.C. Law §§ 2-104(1), 2-A-103(3), 2-103(1)(d), and 2-A-103(1)(p).

544.    Plaintiffs and the New York Subclass are "buyers" and "lessees" under N.Y. U.C.C. Law §§ 2-103(1)(a) and 2-A-103(1)(n).

545.    Defendants issued an express written warranty for each Class Vehicle they sold or leased, including that:

        a.    The airbag inflators would be free of defects in materials and workmanship at the time of sale; and

        b.    The vehicles would be free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized service facilities, without charge, to fully correct defects in materials or workmanship.

546.    The warranties listed above formed the basis of the bargain with regard to the New York Subclass members' purchase and lease of Class Vehicles.

547.    Defendants breached their warranty for the Class Vehicles because:

        a.    The airbag inflators have latent defects which have a dangerous propensity to cause the inflators to rupture and eject metal shrapnel, subjecting Plaintiffs and the Class and Subclass to the risk of loss and injury; and

b.      Defendants denied, concealed, and misrepresented the defect, in the process

refusing to pay for or provide in a reasonably timely fashion the needed

repairs and replacements for Plaintiffs and the New York Subclass.

548.    Defendants' breach of warranty directly and proximately caused Plaintiffs and the New York Subclass to suffer damages as alleged throughout this Complaint. Accordingly, Plaintiffs, individually and on behalf of the subclass, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

**New York Subclass Count III:**
**Breach of Implied Warranty**
**Against the Ford and Volkswagen Defendants**

549.    Plaintiffs Francine Lewis and Matthew Kakol (referred to as "Plaintiffs" in this count) incorporate by reference the allegations in the preceding paragraphs.

550.    Plaintiffs bring this count individually and on behalf of the New York Subclass against the Ford and Volkswagen Defendants.

551.    New York law implied a warranty that the Class Vehicles, including their airbag inflators, were in merchantable condition under N.Y. U.C.C. Law §§ 2-314 and 2-A-212.

552.    The Class Vehicles are not merchantable, and as such Defendants breached their implied warranty, because:

a.      The Class Vehicles do not have the quality that a buyer would reasonably

expect due to the Inflator Defects;

b.      The vehicles would not pass without objection in the automotive trade given

that their Defective Inflators have an unreasonable propensity to rupture and

eject metal shrapnel;

c.      The Inflator Defect renders the Class Vehicles unsafe to drive and unfit for

ordinary purposes;

d.      The labeling for the Class Vehicles failed to disclose the Inflator Defect; and

e.      The Class Vehicles do not conform to their labeling, which represents that the

Class Vehicles are safe and suitable for their intended use.

553.    Defendants' breach of warranty directly and proximately caused Plaintiffs and the New York Subclass to suffer damages. Accordingly, Plaintiffs, individually and on behalf of the subclass, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

## XV.    **PRAYER FOR RELIEF**

Plaintiffs pray that judgment be entered against Defendants as follows:

1.    That this action be certified as a class action;

2.    That Plaintiffs be appointed as the representatives of the Class;

3.    That Plaintiffs' attorneys be appointed Class Counsel;

4.    For an order declaring Defendants' conduct to be unlawful;

5.    For an order compelling Defendants to make restitution to Plaintiffs, the Class and Subclass members in an amount to be proven at trial;

6.    For actual damages;

7.    For statutory or other liquidated damages, as applicable;

8.    For punitive damages;

9.    For pre and post-judgment interest at the legal rate to the extent available;

10.    For injunctive and other equitable relief described above and as necessary to protect the interests of Plaintiffs, and members of the Class and Subclass, and an order prohibiting Defendants from engaging in the unlawful, unfair, deceptive and fraudulent acts described above;

11.    For an order that Defendants engage in a corrective advertising campaign;

12.    For an order of restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiffs and the members of the Class and Subclass as a result of their unlawful, unfair, and fraudulent business practices;

13.    For attorney's fees, costs of this action, and out-of-pocket expenses; and

14.    For such other and further relief that the Court deems proper.

/ / /

/ / /

## XVI.   <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, on behalf of themselves, the Class, and the respective Subclasses, hereby demand a trial jury of all issues triable by right.

Date: August 10, 2022

/s/ *Niall P. McCarthy*
Niall P. McCarthy (SBN 160175)
nmccarthy@cpmlegal.com
Elizabeth T. Castillo (SBN 280502)
ecastillo@cpmlegal.com
Melissa Montenegro (SBN 329099)
mmontenegro@cpmlegal.com
Kevin J. Boutin (SBN 334965)
kboutin@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel: (650) 697-6000

Matthew D. Schultz (*pro hac vice*)
mschultz@levinlaw.com
William F. Cash (*pro hac vice*)
bcash@levinlaw.com
Scott Warrick (*pro hac vice*)
swarrick@levinlaw.com
**LEVIN, PAPANTONIO, RAFFERTY, PROCTOR, BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.**
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Tel: (850) 435-7140

R. Frank Melton, II (*pro hac vice*)
melton@newsomelaw.com
C. Richard Newsome *(pro hac vice)*
Newsome@newsomelaw.com
William C. Ourand, Jr. (*pro hac vice*)
ourand@newsomelaw.com
**NEWSOME MELTON, PA**
201 S. Orange St., #1500
Orlando, FL 32801
Tel: (407) 280-1433

Courtney L. Davenport (*pro hac vice*)
courtney@thedavenportlawfirm.com
**THE DAVENPORT LAW FIRM, LLC**

18805 Porterfield Way
Germantown, MD 20874
Tel: (703) 901-1660

*Counsel for Plaintiffs & the Proposed Classes*